No. 22-16742

In the
# United States Court of Appeals
## for the Ninth Circuit

VICENTE TOPASNA BORJA, ET AL.,

*Plaintiffs-Appellants*,

v.

SCOTT T. NAGO, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Hawaii, Case No. 1:20-cv-00433-JAO-RT,
Hon. Jill A. Otake, *United States District Judge*

## VICENTE TOPASNA BORJA, ET AL.'S OPENING BRIEF

Jeremy Patashnik
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

Zachary Martin
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
500 Boylston St.
Boston, MA 02116

Neil C. Weare
RIGHT TO DEMOCRACY PROJECT
1300 Pennsylvania Ave., NW
Washington, DC 20004

Shay Dvoretzky
Geoffrey M. Wyatt
Parker Rider-Longmaid
  *Counsel of Record*
Steven Marcus
Andrew Hanson
Hanaa Khan
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
parker.rider-longmaid@skadden.com

*Counsel for Plaintiffs-Appellants Vicente Topasna Borja, et al.*
*(additional counsel information on inside cover)*

*Additional counsel information continued from front cover*

Vanessa L. Williams
LAW OFFICE OF
  VANESSA L. WILLIAMS
414 W. Soledad Ave., Ste. 500
Hagatna, GU 96910

Pamela Lynn Colon
LAW OFFICES OF PAMELA
  LYNN COLON, LLC
2155 King Cross St., Ste. 3
Christiansted, St. Croix 00820
U.S. Virgin Islands

Anthony "T.J." Quan, Jr.
THE QK GROUP
707 Richards St., PH-7
Honolulu, HI 96813

*Counsel for Plaintiffs-Appellants Vicente Topasna Borja, et al.*

## DISCLOSURE STATEMENT

On April 17, 2023, Appellant Equally American Legal Defense and Education Fund changed its name to Right to Democracy Project. Right to Democracy Project is a 26 U.S.C. § 501(c)(3) nonprofit organization. Right to Democracy Project thus has no parent corporation, and there is no publicly held corporation that holds 10% or more of its stock.

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT.................................................................i

TABLE OF AUTHORITIES......................................................... vi

GLOSSARY ................................................................... xiii

REQUEST FOR ORAL ARGUMENT............................................... xiv

INTRODUCTION .................................................................1

JURISDICTIONAL STATEMENT ...............................................4

STATEMENT OF ISSUES .........................................................5

PERTINENT CONSTITUTIONAL, STATUTORY, AND
    REGULATORY PROVISIONS..............................................5

STATEMENT OF THE CASE.....................................................5

    A.    Legal background.........................................................5

    B.    Factual background........................................................9

    C.    Procedural background ................................................10

STANDARD OF REVIEW ...................................................11

STANDING...................................................................11

SUMMARY OF ARGUMENT ................................................12

ARGUMENT....................................................................18

I.    UOCAVA and UMOVA violate the Constitution's equal-
    protection guarantee. ......................................................18

    A.    Strict scrutiny applies to laws that selectively withhold
        the right to vote.................................................19

# TABLE OF CONTENTS
## (continued)

Page

1. The right to vote is fundamental, so laws that selectively deny the vote are subject to strict scrutiny. ....................................................20

2. Laws that selectively deny the right to vote are subject to strict scrutiny even if the right to vote is statutory rather than constitutional. ...................................23

3. To survive strict scrutiny, selective denials of the right to vote must be necessary and narrowly tailored to serve a compelling interest. ...............................26

B. UOCAVA and UMOVA are subject to, and do not pass muster under, strict scrutiny. .........................................................28

1. UOCAVA and UMOVA are subject to strict scrutiny because they selectively withhold the vote from former state residents living in U.S. territories. ................29

2. UOCAVA and UMOVA fail strict scrutiny because their discriminatory treatment of voters in disfavored territories does not serve any compelling interest. ......................................................................35

C. The district court's reasoning and Appellees' arguments fail. ..................................................................37

1. Strict scrutiny applies even though there is no freestanding constitutional right to vote in the territories. ..................................................................38

2. Contrary to its holding, the district court's reasoning about UOCAVA's and UMOVA's geographical distinctions *supports* the application of strict scrutiny. .........................................................45

# TABLE OF CONTENTS
## (continued)

Page

3. *Katzenbach* doesn't allow the government to avoid strict scrutiny. ..........................................................46

4. UOCAVA and UMOVA are unconstitutional even if a lower level of scrutiny applies. ........................................50

II. The remedy for UOCAVA's and UMOVA's equal-protection violations is to sever the laws' discriminatory exclusion of former state residents living in the territories so that UOCAVA and UMOVA evenhandedly allow all former state residents to vote.................................................................................................54

A. The ordinary remedy for a statute that violates the equal-protection guarantee is to sever the discriminatory treatment so that the statute extends benefits on equal terms. ..................................................................................55

B. The proper remedy here is to sever UOCAVA's and UMOVA's discriminatory exclusion of former state residents who live in U.S. territories so that they can vote on equal terms with former state residents living in foreign countries.................................................................58

C. The district court's reasoning and Appellees' counterarguments are unpersuasive. ...........................................61

1. Withdrawing the vote from former Hawaii residents living in the Northern Mariana Islands does not remedy the equal-protection violation. ..............61

2. There is no "super citizens" problem with severing UOCAVA so that it extends the right to vote with an even hand.........................................................63

CONCLUSION ...............................................................................67

**TABLE OF CONTENTS**
(continued)

**Page**

CERTIFICATE OF COMPLIANCE ......................................................69

CERTIFICATE OF SERVICE ...............................................................70

INDEX OF ADDENDUM .....................................................................72

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Celebrezze*,
460 U.S. 780 (1983).................................................................... 22, 47, 49, 53

*Arizona Dream Act Coalition v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ..........................................................20

*Arizona Green Party v. Reagan*,
838 F.3d 983 (9th Cir. 2016) ...................................................... 22, 48

*Attorney General of Territory of Guam v. United States*,
738 F.2d 1017 (9th Cir. 1984) ..................................................... 41, 42

*Barr v. American Ass'n of Political Consultants, Inc.*,
140 S. Ct. 2335 (2020)............................................................. 12, 55, 56

*Boumediene v. Bush*,
553 U.S. 723 (2008)............................................................................43

*Bullock v. Carter*,
405 U.S. 134 (1972)............................................................................47

*Burdick v. Takushi*,
504 U.S. 428 (1992)............................................ 13, 22, 47, 48, 49, 53

*Bush v. Gore*,
531 U.S. 98 (2000)......................................................... 2, 13, 19, 24, 40

*Califano v. Goldfarb*,
430 U.S. 199 (1977)............................................................................56

*Charfauros v. Board of Elections*,
249 F.3d 941 (9th Cir. 2001) ..................................... 14, 19, 20, 21, 23,
.................................................................... 26, 27, 35, 36, 37, 40

*Cipriano v. City of Houma*,
395 U.S. 701 (1969) (per curiam)........................... 25, 33, 38, 40, 46

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1985)............................................................................20

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Davis v. Guam*,
  932 F.3d 822 (9th Cir. 2019) ............................................................... 20, 21, 60

*Downes v. Bidwell*,
  182 U.S. 244 (1901) ............................................................................................ 51

*Drueding v. Devlin*,
  380 U.S. 125 (1965) ............................................................................................ 47

*Dunn v. Blumstein*,
  405 U.S. 330 (1972) ............................................................. 2, 13, 15, 18, 19, 21,
  ....................................................................... 22, 30, 40, 43, 45, 47, 49

*Evans v. Cornman*,
  398 U.S. 419 (1970) ...................................................... 14, 15, 27, 28, 34, 36, 45

*Financial Oversight & Management Board for*
  *Puerto Rico v. Aurelius Investment, LLC*,
  140 S. Ct. 1649 (2020) ........................................................................................ 34

*Gray v. Sanders*,
  372 U.S. 368 (1963) ..................................................................................... 31, 40

*Green v. City of Tucson*,
  340 F.3d 891 (9th Cir. 2003) ............................................... 19, 30, 32, 33, 46, 47

*Harper v. Virginia State Board of Elections*,
  383 U.S. 663 (1966) ..................................................................... 13, 23, 31, 39, 40

*Harrison v. Kernan*,
  971 F.3d 1069 (9th Cir. 2020) ........................................................................... 12

*Heckler v. Mathews*,
  465 U.S. 728 (1984) ................................................................ 4, 12, 16, 55, 56, 62

*Holt Civic Club v. City of Tuscaloosa*,
  439 U.S. 60 (1978) ............................................................................ 2, 31, 39, 45

*Hussey v. City of Portland*,
  64 F.3d 1260 (9th Cir. 1995) ........................................................... 2, 13, 19, 23,
  ....................................................................... 26, 38, 39, 40, 47

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Idaho Coalition United for Bears v. Cenarrussa*,
   342 F.3d 1073 (9th Cir. 2003) .................................................. 14, 25, 30, 38, 40

*Igartúa de la Rosa v. United States*,
   32 F.3d 8 (1st Cir. 1994) ............................................................................ 41, 43

*Jimenez v. Weinberger*,
   417 U.S. 628 (1974) ........................................................................................56

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) .................................................................. 50, 51

*Katzenbach v. Morgan*,
   384 U.S. 641 (1966) .......................................................... 15, 46, 47, 48, 49

*Kramer v. Union Free School District No. 15*,
   395 U.S. 621 (1969) .............................................................. 2, 13, 15, 19, 21, 22,
   ..................................................................... 24, 25, 26, 27, 30, 33,
   ..................................................................... 35, 38, 39, 40, 46, 47, 60

*Lemons v. Bradbury*,
   538 F.3d 1098 (9th Cir. 2008) .................................................................. 22, 48

*Levin v. Commerce Energy, Inc.*,
   560 U.S. 413 (2010) .......................................................................... 3, 4, 55, 56

*Lopez Lopez v. Aran*,
   844 F.2d 898 (1st Cir. 1988) ........................................................................52

*Lubin v. Panish*,
   415 U.S. 709 (1974) ........................................................................................23

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................11

*Mathews v. Lucas*,
   427 U.S. 495 (1976) ........................................................................................53

*Mendia v. Garcia*,
   768 F.3d 1009 (9th Cir. 2014) ......................................................................12

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Microsoft Corp. v. AT&T Corp.,*
    550 U.S. 437 (2007)................................................................35

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,*
    458 U.S. 50 (1982)................................................................67

*Paeste v. Government of Guam,*
    798 F.3d 1228 (9th Cir. 2015) ................................... 34, 35

*Plyler v. Doe,*
    457 U.S. 202 (1982)................................................................50

*Public Integrity Alliance, Inc. v. City of Tucson,*
    836 F.3d 1019 (9th Cir. 2016) (en banc)................................. 13, 22

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ............................................... 21, 31, 41

*RJR Nabisco, Inc. v. European Community,*
    579 U.S. 325 (2016)................................................................35

*Rodriguez v. Newsom,*
    974 F.3d 998 (9th Cir. 2020) ..................................................41

*Rodriguez v. Popular Democratic Party,*
    457 U.S. 1 (1982)................................................... 43, 44

*Romer v. Evans,*
    517 U.S. 620 (1996)................................................................53

*Romeu v. Cohen,*
    265 F.3d 118 (2d Cir. 2001) ................................... 41, 43, 65

*Sandoval v. County of Sonoma,*
    912 F.3d 509 (9th Cir. 2018) ................................................11

*Segovia v. United States,*
    880 F.3d 384 (7th Cir. 2018) ........................... 41, 42, 63, 65

*Sessions v. Morales-Santana,*
    582 U.S. 47 (2017)................................... 3, 4, 16, 20, 52, 55,
    ........................................................ 56, 57, 58, 59, 60, 62, 65

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Soltysik v. Padilla*,
910 F.3d 438 (9th Cir. 2018) ............................................................22

*Tedards v. Ducey*,
951 F.3d 1041 (9th Cir. 2020) ................................................... 52, 53

*Tineo v. Attorney General*,
937 F.3d 200 (3d Cir. 2019) ...........................................................62

*United States v. Carolene Products Co.*,
304 U.S. 144 (1938) ......................................................................52

*United States v. Vaello Madero*,
142 S. Ct. 1539 (2022) ............................................................ 44, 51

*Wesberry v. Sanders*,
376 U.S. 1 (1964) .................................................................... 21, 41

*Wittman v. Personhuballah*,
578 U.S. 539 (2016) .......................................................................11

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) ............................................... 1, 2, 13, 18, 21

*Zablocki v. Redhail*,
434 U.S. 374 (1978) ................................................................ 18, 20

**CONSTITUTION AND STATUTES**

U.S. Const. art. IV, § 3 ................................................... 29, 34, 43

U.S. Const. amend. V ................................................................4, 20

U.S. Const. amend. XIV, § 1 ....................................................4, 20

U.S. Const. amend. XVII ........................................... 3, 31, 32, 63

28 U.S.C. § 1291 .............................................................................4

28 U.S.C. § 1331 .............................................................................4

42 U.S.C. § 1973dd-I ......................................................................6

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Uniformed and Overseas Citizens Absentee Voting Act
(UOCAVA), 52 U.S.C. §§ 20301-20311,
Pub. L. No. 99-410 (1986) ........................................................ 1, 3, 4, 5,
.................................................................................. 6, 7, 8, 9, 10, 11, 12,
.................................................................................. 13, 14, 15, 16, 17, 18, 19,
.................................................................................. 28, 29, 30, 32, 33, 34, 35, 36, 37,
.................................................................................. 40, 41, 43, 44, 45, 46, 48, 49, 50, 52,
.................................................................................. 53, 54, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67

52 U.S.C. § 20302(a)(1) ......................................................................7

52 U.S.C. § 20310(5)(C) .....................................................................7

52 U.S.C. § 20310(8) ............................................................. 7, 8, 9, 12, 61

Uniform Military and Overseas Voters Act (UMOVA),
Haw. Rev. Stat. §§ 15D-1 to -18 .......................................... 1, 3, 5, 8, 9,
.................................................................................. 10, 11, 12, 13, 14,
.................................................................................. 15, 16, 18, 19, 28, 29,
.................................................................................. 30, 32, 33, 35, 36, 37,
.................................................................................. 40, 41, 45, 46, 48, 49, 50,
.................................................................................. 52, 53, 54, 58, 61, 62, 63, 66, 57

Haw. Rev. Stat. § 15D-2 ....................................................... 8, 12, 61

**RULE AND REGULATION**

Fed. R. App. P. 4(a)(1)(B) ...................................................................4

Haw. Code R. § 3-177-600(d) ...................................................... 1, 8, 12

**OTHER AUTHORITIES**

H.R. Rep. No. 94-649, pt. 1 (1975) ..................................... 6, 44, 45, 59

H.R. Rep. No. 99-765 (1986) ..............................................................7

S. Rep. No. 94-121 (1975) ...............................................................6, 7

Tom C.W. Lin, *Americans, Almost and Forgotten*,
107 Cal. L. Rev. 1249 (2019) ...........................................................51

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

U.S. Census Bureau, *Recent Population Trends for the
U.S. Island Areas: 2000 to 2010* (Apr. 2015),
https://tinyurl.com/ywwbyeaa ........................................................... 51, 52

U.S. Census Bureau, *QuickFacts: Puerto Rico*,
https://tinyurl.com/5a27z59j
(last visited May 1, 2023) ...................................................................... 52

## GLOSSARY

| | |
|---|---|
| OCVRA | Overseas Citizens Voting Rights Act of 1975 |
| UMOVA | Uniform Military and Overseas Voters Act, Haw. Rev. Stat. §§ 15D-1 to -18, and an implementing regulation, Haw. Code R. § 3-177-600(d). |
| UOCAVA | Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. §§ 20301-20311 |

## REQUEST FOR ORAL ARGUMENT

This appeal presents important constitutional issues that Appellants believe the district court incorrectly resolved. Appellants believe that oral argument would help the Court decide this case.

# INTRODUCTION

This case is about whether the federal government and State of Hawaii may extend the right to vote for presidential and congressional representation to former state residents who live in foreign countries, while withholding it from former state residents who live in certain U.S. territories. The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. §§ 20301–20311, and Hawaii law implementing it—the Uniform Military and Overseas Voters Act, Haw. Rev. Stat. §§ 15D-1 to -18, and an accompanying regulation, Haw. Code R. § 3-177-600(d) (together, UMOVA)—draw a discriminatory line: They grant the right to vote in Hawaii federal elections to former Hawaii residents who live in a foreign country or the Northern Mariana Islands. But they deny that same right to former Hawaii residents who live in Guam, the U.S. Virgin Islands, Puerto Rico, or American Samoa. Thus, a former Hawaii resident may vote in federal elections if she lives anywhere in the world—including any foreign country—except one of those four U.S. territories.

That discrimination deprives former Hawaii residents of a fundamental right and violates the Constitution's equal-protection guarantee. The right to vote is uniquely fundamental because it is "preservative of all

- 1 -

rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). That's why a law that "grants the right to vote to some citizens and denies the franchise to others" is subject to strict scrutiny and must be necessary and narrowly tailored to serve a compelling government interest. *Dunn v. Blumstein*, 405 U.S. 330, 337 (1972). That's the rule even when the government is not constitutionally required to extend the right to vote in the first place. Indeed, most officials in this country—even the president and vice-president of the United States—need not be selected by popular vote. *See Bush v. Gore*, 531 U.S. 98, 104 (2000). But when the government *chooses* to extend the vote, it must do so with an even hand or else satisfy "exacting judicial scrutiny." *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 628 (1969); *see Hussey v. City of Portland*, 64 F.3d 1260, 1263 (9th Cir. 1995).

Congress and Hawaii have legislated that former Hawaii residents are part of Hawaii's electorate even though they live elsewhere. The Constitution did not require that choice; lawmakers could have restricted the vote to current Hawaii residents. *See Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68-69 (1978). But once Congress granted the vote to former Hawaii residents, it could not pick and choose among them without showing that the discrimination is necessary and narrowly tailored to serve a compelling interest.

- 2 -

Appellees cannot—and do not even try to—show that UOCAVA and UMOVA satisfy that exacting standard.

Despite clear Supreme Court and Circuit precedent, the district court upheld UOCAVA and UMOVA under rational-basis review. It reasoned that there is no freestanding constitutional right to vote in the territories. That reasoning is plainly wrong. There isn't any freestanding constitutional right to vote for U.S. president or school-board officials, either, and yet the right to cast those votes, once extended by statute, is fundamental, and its selective abridgment must meet strict scrutiny under the Constitution's equal-protection guarantee. Congress and Hawaii extended the vote to former Hawaii residents, an undisputedly legitimate way to define "the people" of the state. *Cf.* U.S. Const. amend. XVII. Having made that decision, neither Congress nor Hawaii could then *selectively* disenfranchise only those former Hawaii residents living in certain U.S. territories.

The remedy for the equal-protection violation is straightforward: The Court should sever the laws' discriminatory exclusion of former state residents who live in U.S. territories so that those citizens can vote on equal terms with former state residents who live in foreign countries. Had Congress "been apprised of the constitutional infirmity," *Sessions v. Morales-*

*Santana*, 582 U.S. 47, 77 (2017) (quoting *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 427 (2010)), UOCAVA would have done just that. The entire purpose of the law was to extend the vote evenly to American citizens abroad who would otherwise be disenfranchised. The only other way to meet the Constitution's "mandate of equal treatment," *id.* at 73 (quoting *Heckler v. Mathews*, 465 U.S. 728, 740 (1984)), would be to nullify UOCAVA altogether—something Congress could not have intended.

## JURISDICTIONAL STATEMENT

a.    The district court had jurisdiction under 28 U.S.C. § 1331. This case arises under the equal-protection guarantee of the Fifth and Fourteenth Amendments to the U.S. Constitution.

b.    This Court has jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final judgment disposing of all parties' claims.

c.    This appeal is timely. On September 6, 2022, the district court granted summary judgment for Appellees. ER-5. On November 4, 2022, within sixty days, Appellants filed their notice of appeal. ER-173-74; *see* Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF ISSUES

**1.** Whether UOCAVA and UMOVA violate the Constitution's equal-protection guarantee because, as laws granting the right to vote to some U.S. citizens who are former Hawaii residents but denying it to others, UOCAVA and UMOVA are subject to and fail strict scrutiny.

**2.** Whether, given Congress' intent to grant voting rights to former state residents who would otherwise lose the right to vote, the remedy for the constitutional violations is to sever UOCAVA's and UMOVA's discriminatory exclusion of former state residents living in U.S. territories so that the laws evenhandedly allow all former Hawaii residents to vote, no matter whether they live in foreign countries or U.S. territories.

## PERTINENT CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS

Relevant authorities are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Legal background

UOCAVA requires each state to allow former state residents who live in a foreign country or the Northern Mariana Islands to vote in the state's federal elections if they are otherwise qualified to vote. Hawaii has implemented that mandate in UMOVA. UOCAVA and UMOVA thus selectively

deny the right to vote in Hawaii federal elections to former state residents who live in Puerto Rico, Guam, the Virgin Islands, or American Samoa.

1.    a.    Congress enacted UOCAVA's predecessor, the Overseas Citizens Voting Rights Act of 1975 (OCVRA), to extend voting rights to citizens who moved from a state and would have otherwise lost the right to vote. Before 1975, a citizen who moved abroad could generally vote in federal elections in his former state only if he intended to move back, and some states didn't allow voting in federal elections even for those citizens. H.R. Rep. No. 94-649, pt. 1, at 2 (1975). But almost all states had laws allowing military and federal government employees living overseas to vote absentee. Congress passed OCVRA, in part, to remedy this "discrimination in favor of Government personnel and against private citizens"—discrimination "suspect under the equal protection clause of the 14th amendment." *Id.* at 3.

OCVRA provided that a citizen "residing outside the United States shall have the right" to vote in the state "in which he was last domiciled immediately prior to his departure from the United States." 42 U.S.C. § 1973dd-I. The Senate Committee Report explained that Congress was "concerned with the common legislative welfare of the entire nation" and that "Americans outside the United States possess both the necessary

interest and the requisite information to participate in the selection of Senators and Congressmen back home." S. Rep. No. 94-121, at 2 (1975). "American citizens outside the United States do have their own Federal stake—their own U.S. legislative and administrative interests—which may be protected only through representation in Congress." *Id.* at 6-7.

**b.** Congress enacted UOCAVA in 1986, Pub. L. No. 99-410, 52 U.S.C. §§ 20301–20311, to "consolidate[] and update[] relevant provisions" of OCVRA with "only minor substantive changes," H.R. Rep. No. 99-765, at 6-7 (1986). UOCAVA's key provision requires each state to permit "overseas voters to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office." 52 U.S.C. § 20302(a)(1). UOCAVA defines an overseas voter as a "person who resides outside the United States and (but for such residence) would be qualified to vote in the last place in which the person was domiciled before leaving the United States." *Id.* § 20310(5)(C).

Important here, UOCAVA defines the "United States" as "the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa." *Id.* § 20310(8). The definition excludes the Northern Mariana Islands and all other territories not

enumerated. Thus, a former state resident who lives in a foreign country, the Northern Mariana Islands, or another unenumerated territory lives outside the "United States" and thus can vote in federal elections.

2.     Hawaii enacted UMOVA to implement UOCAVA's requirements. Haw. Rev. Stat. §§ 15D-1 to -18. UMOVA gives U.S. citizens "living outside the United States" the right to vote in Hawaii federal elections if they "otherwise satisf[y Hawaii's] voter eligibility requirements." *Id.* § 15D-2. Eligibility under UMOVA tracks eligibility under UOCAVA. UMOVA defines "United States" to mean "the several states, the District of Columbia, Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States," *id.*, with an implementing regulation permitting former residents now living in the Northern Mariana Islands to vote in Hawaii federal elections, *see* Haw. Code R. § 3-177-600.

3.     The result of UOCAVA and UMOVA is that a U.S.-citizen former resident of Hawaii living in any foreign country, the Northern Mariana Islands, or another territory not listed in 52 U.S.C. § 20310(8) can vote in Hawaii federal elections. A U.S.-citizen former resident of Hawaii who lives in Puerto Rico, Guam, the Virgin Islands, or American Samoa cannot.

- 8 -

### B.    Factual background

**1.**    Appellant Right to Democracy Project (formerly, Equally American Legal Defense and Education Fund) is a nonprofit advocacy organization with members who are U.S. citizens who resided in Hawaii but now live in Guam, the U.S. Virgin Islands, Puerto Rico, and American Samoa. ER-149. Individual Appellants, who are also members of Right to Democracy Project, are all U.S. citizens and former Hawaii residents who now live in Guam or the Virgin Islands. ER-93, ER-139-51. For example, Vicente Borja is a U.S. citizen who was born in Guam. ER-139. In 1990, after twenty-eight years of Navy service, Mr. Borja moved to Hawaii on a humanitarian reassignment so that his wife could receive cancer treatment. ER-140. Mr. Borja and his wife later moved back to Guam on another humanitarian reassignment. ER-140-41. In 1997, after a decorated career, Mr. Borja was honorably discharged from the Navy. ER-141. He still lives in Guam. ER-93.

**2.**    Because Mr. Borja and the other Individual Appellants live in Guam and the Virgin Islands—the U.S. territories listed in 52 U.S.C. § 20310(8)—UOCAVA and UMOVA do not permit them to vote as former Hawaii residents in Hawaii's presidential and congressional elections, despite their desire to do so. ER-94. If Appellants lived in any foreign country

or the Northern Mariana Islands (about fifty miles from Guam), UOCAVA and UMOVA would grant them that vote. But because they live in certain U.S. territories, they have lost the opportunity to participate in federal elections, unlike former Hawaii residents living anywhere else in the world.

## C.    Procedural background

Appellants sued the United States and the federal, state, and local officials responsible for enforcing UOCAVA's and UMOVA's discriminatory provisions against them. ER-151-53. The operative Third Amended Complaint explains that UOCAVA and UMOVA violate the Constitution's equal-protection guarantee by denying the right to vote in Hawaii federal elections to former Hawaii residents, like Individual Appellants, who live in certain U.S. territories while granting that right to former Hawaii residents who live in any foreign country or the Northern Mariana Islands. ER-166-67. The complaint seeks an order declaring UOCAVA and UMOVA unconstitutional, severing the statutes, and enjoining Appellees to enforce them evenhandedly to permit former Hawaii residents living in all U.S. territories to vote. ER-168-69.

The district court first held that the Third Amended Complaint established standing because Appellants had satisfied "the injury in fact and

traceability requirements" and "the Court could effectuate the requested re-
lief." ER-124. But the court granted Appellees' motions for summary
judgment on the merits. ER-44. The court declined to apply heightened scru-
tiny to UOCAVA's and UMOVA's differential treatment of former Hawaii
residents in the disfavored territories and instead upheld UOCAVA and
UMOVA under rational-basis review. ER-20-44. The court justified that ap-
proach on the grounds that "[t]erritorial residents have no right to vote in
federal elections" and "U.S. citizens who move to certain territories likewise
have no right to vote absentee in their former states of residence." ER-20.

## STANDARD OF REVIEW

This Court reviews the district court's summary judgment ruling de
novo. *Sandoval v. County of Sonoma*, 912 F.3d 509, 515 (9th Cir. 2018).

## STANDING

As the district court correctly held, ER-124, Appellants have standing
to challenge UOCAVA and UMOVA because they have "suffered an 'injury
in fact'" that "is 'fairly traceable' to the conduct being challenged," and "the
injury will likely be 'redressed' by a favorable decision." *Wittman v. Per-
sonhuballah*, 578 U.S. 539, 543 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504
U.S. 555, 560-61 (1992)). UOCAVA and UMOVA harm Appellants by

unequally denying them the right to vote in Hawaii federal elections. Those injuries are traceable to Appellees' enforcement of both UOCAVA and UMOVA. Because UMOVA yields to UOCAVA's command of discriminatory treatment, both laws deny Appellants the right to vote, *see* 52 U.S.C. § 20310(8); Haw. Rev. Stat. § 15D-2; Haw. Code R. § 3-177-600, "even if there are multiple links in the chain" causing that injury, *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014). In short, but for either law's discriminatory treatment, Individual Appellants would be able to vote in Hawaii federal elections. And that injury is redressable because the Court can order an "appropriate remedy"—a "mandate of *equal* treatment." *Heckler*, 465 U.S. at 740; *see Harrison v. Kernan*, 971 F.3d 1069, 1074 (9th Cir. 2020) (citation omitted). As the Supreme Court recently reiterated, "a plaintiff who suffers unequal treatment has standing to challenge a discriminatory exception that favors others." *Barr v. American Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2355 (2020) (*AAPC*) (plurality).

## SUMMARY OF ARGUMENT

**I.** UOCAVA and UMOVA violate the Constitution's equal-protection guarantee because they extend the vote to some citizens within the electorate while selectively withholding the franchise from others.

UOCAVA and UMOVA define the electorate to include former state residents, but they deny the vote to former states residents who live in certain U.S. territories while extending it to former state residents—the same electorate—who live in foreign countries. The Constitution and basic democratic principles require that discrimination to satisfy strict scrutiny, but Appellees do not even contend that it can.

A.     Supreme Court precedent requires strict scrutiny of laws that selectively withhold the right to vote. *Dunn*, 405 U.S. at 337; *see Kramer*, 395 U.S. at 627-28. Decades of voting-rights caselaw reaffirms that principle. *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Hussey*, 64 F.3d at 1263; *Public Integrity Alliance, Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016) (en banc). That makes sense: The right to vote is uniquely fundamental because it is "preservative of all rights," *Yick Wo*, 118 U.S. at 370, no matter what source of law conveys the right to vote in the first place, *see Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 665 (1966). For example, the right to vote for president is granted by state statute, not the Constitution, but it is fundamental all the same. *Bush*, 531 U.S. at 104. Strict scrutiny thus applies when the government selectively extends a statutory right to vote to some citizens in the electorate but denies it to others. *Hussey*, 64 F.3d at 1263. Laws that

distinguish among citizens based on geography are no exception. *Idaho Coalition United for Bears v. Cenarrussa*, 342 F.3d 1073, 1077 (9th Cir. 2003). And strict scrutiny is particularly important where the individuals selectively denied the right to vote for government officials are, because of where they live, subject to those officials' power. *Evans v. Cornman*, 398 U.S. 419, 424 (1970). To survive strict scrutiny, a discriminatory law must be both necessary and narrowly tailored to serve a compelling government interest. *Charfauros v. Board of Elections*, 249 F.3d 941, 952 (9th Cir. 2001).

      **B.**    UOCAVA and UMOVA are subject to, and fail, strict scrutiny. UOCAVA and UMOVA extend the fundamental right to vote only to *some* former state residents—those who live in foreign countries, but not those who live in certain U.S. territories. To be sure, the federal government and the State of Hawaii weren't constitutionally required to open Hawaii federal elections to *any* former residents; Congress and Hawaii could have restricted the vote to current residents alone. But once the government defined the electorate to include former state residents, it needed to extend the right to vote with an even hand or satisfy strict scrutiny. Basic democratic principles reinforce that conclusion, because former Hawaii residents living in the territories—unlike former Hawaii residents living in foreign countries—are

subject to the plenary power of the very federal officials they have no voice in electing. *See Evans*, 398 U.S. at 424. And once strict scrutiny applies, the analysis is complete, because Appellees do not even try to articulate how the statutes' discriminatory treatment is necessary and narrowly tailored to serve a compelling interest. It's not.

**C.** The district court wrongly concluded that strict scrutiny does not apply. None of the decisions the district court cited can support that holding. The sole Ninth Circuit decision cited stands only for the irrelevant proposition, undisputed here, that territorial citizens have no freestanding constitutional right to vote for president. And *Katzenbach v. Morgan*, 384 U.S. 641 (1966), doesn't allow the government to escape strict scrutiny either — it doesn't supply the test for outright denials of the right to vote, especially given the Supreme Court's intervening express statement that further "development in the law [that] culminated in *Kramer*" requires exacting scrutiny. *Dunn*, 405 U.S. at 337. But even if a lower level of scrutiny *did* apply, UOCAVA and UMOVA would fail it all the same. UOCAVA and UMOVA trigger and fail heightened scrutiny because they discriminate against a politically powerless, suspect class. And they fail rational-basis review, too,

because their discriminatory treatment of former state residents living in U.S. territories serves no legitimate purpose.

**II.** The remedy for UOCAVA's and UMOVA's equal-protection violations is to sever the statutes' discriminatory exclusion of former state residents living in the territories so that the laws evenhandedly allow all former state residents living in foreign countries or the territories to vote in their states of former residence.

**A.** The remedy for a statute that violates the equal-protection guarantee is a "mandate of equal treatment." *Morales-Santana*, 582 U.S. at 73 (quoting *Heckler*, 465 U.S. at 740). The options are "extension of benefits to the excluded class" and "withdrawal of benefits from the favored class," determined by what the legislature would have done if apprised of the constitutional infirmity. *Id.* at 73 (citation omitted). "[I]n the typical case," that means "extend[ing] favorable treatment" precisely because Congress' statutory design was to confer benefits in the first place. *Id.* at 77.

**B.** The proper remedy here is to sever UOCAVA and UMOVA so that former state residents who live in U.S. territories can vote on equal terms with former state residents living in foreign countries. That's what Congress and the Hawaii legislature would have done if aware of the equal-protection

- 16 -

violation. UOCAVA's entire purpose is to extend the vote worldwide to former state residents who would otherwise lose it. So Congress would hardly have chosen the only alternative—nullifying UOCAVA entirely. It is certainly not this Court's role to take that drastic step.

C.     The district court's reasoning and Appellees' counterarguments lack merit. Appellees suggest that the remedy for any equal-protection violation is to withdraw the vote from former state residents who live in the Northern Mariana Islands. But that approach does not mandate equal treatment between former Hawaii residents in the disfavored territories and those living abroad—the reason the statutes are unconstitutional—so it's no remedy at all. And Appellees' and the district court's notion that extending the vote to former Hawaii residents living in the territories would itself pose equal-protection concerns based on former residency is unfounded. UOCAVA rests on the undisputed idea that a state's people may include its former residents, but not necessarily people who have never lived there. Neither the district court nor Appellees have suggested that former residency is actually an irrational criterion. In sum, there is no reason that the remedy should withhold the vote for elected officials from the very people most affected by the decisions made by those officials.

## ARGUMENT

## I. UOCAVA and UMOVA violate the Constitution's equal-protection guarantee.

UOCAVA and UMOVA are unconstitutional. Under longstanding equal-protection precedent, "a statutory classification [that] significantly interferes with the exercise of a fundamental right" is subject to strict scrutiny. *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978). And voting is one of the most fundamental rights—it is the very foundation of our democracy. *E.g.*, *Yick Wo*, 118 U.S. at 370. Thus, a law that extends the right to vote to some citizens but withholds it from others is unconstitutional unless it is narrowly tailored to serve a compelling government interest. *Dunn*, 405 U.S. at 337.

UOCAVA and UMOVA fail that test. They selectively grant the right to vote in federal elections to former Hawaii residents living in foreign countries or the Northern Mariana Islands while denying that same right to former Hawaii residents, like Appellants, living in other U.S. territories. And Appellees have not even tried to articulate a compelling interest supposedly served by that discriminatory treatment.

The district court erred in failing to apply strict scrutiny. Strict scrutiny applies to discriminatory exclusions from the right to vote even when there

- 18 -

is no freestanding constitutional right to vote in the first place. *See, e.g.*, *Kramer*, 395 U.S. at 628-29; *Hussey*, 64 F.3d at 1263. In fact, for most elections in this country—including selecting the president—the Constitution does not require a popular vote at all. *See Bush*, 531 U.S. at 104. But what the government may *not* do is hold elections in which only *some* citizens in the electorate may participate. Thus, as most relevant here, classifications that discriminate between voters in the same "geographically defined governmental unit" must satisfy strict scrutiny. *Green v. City of Tucson*, 340 F.3d 891, 899 (9th Cir. 2003). UOCAVA and UMOVA cannot meet that exacting standard. And beyond all that, even assuming a lower level of scrutiny were appropriate, UOCAVA and UMOVA are still unconstitutional.

## A. Strict scrutiny applies to laws that selectively withhold the right to vote.

The Supreme Court and this Court have repeatedly reaffirmed that strict scrutiny applies to classifications that extend the fundamental right to vote to some citizens but withhold it from others. *See, e.g.*, *Dunn*, 405 U.S. at 378; *Hussey*, 64 F.3d at 1263. Unless the government can show that unequal treatment is necessary and narrowly tailored to serve a compelling interest, it fails strict scrutiny. *Charfauros*, 249 F.3d at 952.

> **1.** **The right to vote is fundamental, so laws that selectively deny the vote are subject to strict scrutiny.**

**a.** The Fourteenth Amendment's Equal Protection Clause requires states to ensure "the equal protection of the laws." U.S. Const. amend. XIV, § 1. That requirement "is essentially a direction that all persons similarly situated should be treated alike." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1063 (9th Cir. 2014) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). And it applies to both the federal government and the states, because the equal-protection guarantee "implicit in the Fifth Amendment's Due Process Clause" is "precisely the same as" the mandate in "the Fourteenth Amendment's explicit Equal Protection Clause." *Morales-Santana*, 582 U.S. at 52 & n.1 (citation omitted). Under basic equal-protection principles, laws that treat people differently by "significantly interfer[ing]" with some individuals' exercise of a fundamental right are subject to strict scrutiny. *Zablocki*, 434 U.S. at 388.

"Over a century ago, the United States Supreme Court held that the right to vote [is] a 'fundamental political right.'" *Charfauros*, 249 F.3d at 950 (quoting *Yick Wo*, 118 U.S. at 370). Indeed, the right to vote is *uniquely* fundamental because it is "preservative of all rights." *Davis v. Guam*, 932 F.3d

822, 830 (9th Cir. 2019) (quoting *Yick Wo*, 118 U.S. at 370); *see Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964). That's because other fundamental rights may be "illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The right to vote also allows citizens "to participate in the formation of government policies" — participation that "defines and enforces all other entitlements." *Davis*, 932 F.3d at 830. For these basic reasons, "every United States 'citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.'" *Charfauros*, 249 F.3d at 951 (quoting *Dunn*, 405 U.S. at 336).

    **b.**    When "a challenged statute grants the right to vote to some citizens and denies the franchise to others," the Constitution's equal-protection guarantee demands strict scrutiny, and "'the Court must determine whether the exclusions are *necessary* to promote a *compelling* state interest.'" *Dunn*, 405 U.S. at 337 (quoting *Kramer*, 395 U.S. at 627). That "careful examination is necessary because … [a]ny unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government." *Kramer*, 395 U.S. at 626. Thus, when a court is "reviewing statutes which deny some residents the right to vote, the general presumption of constitutionality afforded state

statutes and the traditional approval given state classifications if the Court can conceive of a 'rational basis' for the distinctions made are not applicable." *Id.* at 627-28. Instead, "it is certainly clear … that a more exacting test is required for any statute that 'place[s] a condition on the exercise of the right to vote.'" *Dunn*, 405 U.S. at 337 (citation omitted).

The Supreme Court and this Court have repeatedly reaffirmed that strict scrutiny applies to classifications that selectively disenfranchise some members of the electorate. Under the Supreme Court's "sliding scale" *Anderson/Burdick* framework, a law "'imposing a lesser burden'" on the right to vote is subject to a lower level of judicial scrutiny, while a law "imposing 'severe' restrictions, at the far end of the scale, is subject to strict scrutiny." *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018) (quoting *Arizona Green Party v. Reagan*, 838 F.3d 983, 988 (9th Cir. 2016), and *Burdick*, 504 U.S. at 434); *see Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Public Integrity Alliance*, 836 F.3d at 1024. Strict scrutiny thus necessarily applies to laws that altogether deny some individuals the right to "vot[e] in a unit wide election." *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008) (citation omitted).

### 2. Laws that selectively deny the right to vote are subject to strict scrutiny even if the right to vote is statutory rather than constitutional.

Strict scrutiny applies whenever the government selectively extends the right to vote to some citizens while denying it to others. *E.g.*, *Hussey*, 64 F.3d at 1263. The reason is that the right to vote is fundamental no matter whether it comes from the Constitution or state, territorial, or other federal law. *E.g.*, *Harper*, 383 U.S. at 665.

Start with the nature of the right to vote. This Court and the Supreme Court have both made clear that the fundamental nature of the right to vote doesn't depend on whether the right comes from the Constitution, a federal statute, a state statute, or any other source of law. The reason is simple: the Constitution's equal-protection guarantee doesn't just safeguard "the exercise of federal constitutional rights." *Charfauros*, 249 F.3d at 951. It also "prevents violations of rights guaranteed to the people by state governments." *Id.* The equal-protection guarantee thus "confers the substantive right to participate on an equal basis with other qualified voters *whenever* the State has adopted an electoral process"—even when the Constitution does not *require* the state to adopt an electoral process. *Lubin v. Panish*, 415 U.S. 709, 713 (1974) (emphasis added; citation omitted).

Voting for president is a good example. "The individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college." *Bush*, 531 U.S. at 104. A state legislature "may, if it so chooses, select the electors itself" without putting them to a vote. *Id.* But "[w]hen the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is *fundamental*." *Id.* (emphasis added). "Having once granted the right to vote" for president, a state assumes an "obligation to avoid arbitrary and disparate treatment of the members of its electorate." *Id.* at 104-05.

Other examples abound. Indeed, the Supreme Court and this Court have repeatedly held that a state-created right to vote was a fundamental right. In *Kramer*, for instance, the Supreme Court struck down a state law that permitted only property owners or lessees (and their spouses) and parents of public schoolchildren to vote in school-board elections. 395 U.S. at 628, 633. The Court held that the right to vote in school-board elections was fundamental even though citizens have no freestanding constitutional right to vote for school boards. *See id.* at 628-29. Even in the school-board context,

the Court explained, "statutes distributing the franchise constitute the foundation of our representative society." *Id.* at 626. The Court stressed that "no less a showing of a compelling justification for disenfranchising residents is required merely because the questions scheduled for the election need not have been submitted to the voters." *Id.* at 629 & n.11. The Court applied the same reasoning in *Cipriano v. City of Houma*, 395 U.S. 701, 705-06 (1969) (per curiam), holding unconstitutional a state law restricting to "property taxpayers" the right to vote in elections regarding utility revenue bonds.

Similarly, this Court held in *Idaho Coalition* that petitions for ballot initiatives "implicate the fundamental right to vote" even though the Constitution doesn't require initiatives to be put to a vote in the first place. 342 F.3d at 1077. The Court thus struck down a state law that treated voters in rural counties more favorably than voters in urban counties for the purpose of gathering signatures for ballot initiatives. *Id.* at 1078. The Court explained that a state "subjects itself to the requirements of the Equal Protection Clause" "when [it] chooses to grant the right to vote," even though there is "no right to participate in direct legislation … explicitly or implicitly guaranteed by the Constitution." *Id.* at 1077 n.7 (citation omitted). And in

*Hussey*, this Court applied strict scrutiny to a law disfavoring certain citizens in decisions regarding municipal annexation. 64 F.3d at 1263.

The bottom line is that, "once citizens are granted the right to vote on a matter, the exercise of that vote becomes protected by the Constitution even though the state was not obliged to allow any vote at all." *Id.* And the test for a law that selectively disenfranchises certain members of the electorate is strict scrutiny, even though, "under a different statutory scheme," the government might have chosen not to extend the right to vote to *anyone*. *Id.* (quoting *Kramer*, 395 U.S. at 628-29). The Constitution's equal-protection guarantee demands "a close and exacting examination" of the law all the same. *Kramer*, 395 U.S. at 626.

> **3.    To survive strict scrutiny, selective denials of the right to vote must be necessary and narrowly tailored to serve a compelling interest.**

"[T]o pass the strict constitutional scrutiny applied in voting rights cases," the government must show that the voting restrictions at issue are "both necessary and narrowly tailored to serve [a] compelling interest." *Charfauros*, 249 F.3d at 952. When a state cannot "advance[] even one credible justification" for electoral procedures that treat certain voters differently

from others, it follows that it also "cannot demonstrate that its procedures were necessary or narrowly tailored." *Id.*

*Kramer* is a good example of how the Supreme Court has applied strict scrutiny in a case involving the right to vote. As noted, the statute in *Kramer* extended the right to vote in school-board elections to owners or lessees of taxable real property in the district (and their spouses) and parents of public schoolchildren. 395 U.S. at 623; *supra* pp. 24-25. The district contended that extending the franchise only to those citizens served the government interest of ensuring that only people with "a 'direct' stake in school affairs" could vote. *Kramer*, 395 U.S. at 631. The Court rejected that argument. Even assuming that objective qualified as a compelling interest, the Court nonetheless found that statute failed strict scrutiny's narrow tailoring requirement because the government could not show that "*all* those excluded [were] in fact substantially less interested or affected than those the statute include[d]." *Id.* at 632 (emphasis added).

The Court reached a similar conclusion in *Evans*, where it applied "close constitutional scrutiny" to a Maryland law that disenfranchised citizens living in a federal enclave inside Maryland. 398 U.S. at 422. Striking down the law, the Court reasoned that "residents of the [enclave] are just as

interested in and connected with electoral decisions … as are their neighbors who live off the enclave." *Id.* at 426. Whatever differences might exist between those living in the enclave and those living in Maryland "do not come close to establishing that degree of disinterest in electoral decisions that might justify a total exclusion from the franchise." *Id.*

### B. UOCAVA and UMOVA are subject to, and do not pass muster under, strict scrutiny.

UOCAVA and UMOVA violate the Constitution's equal-protection guarantee. Because they extend the right to vote in federal elections to former Hawaii residents living in foreign countries and the Northern Mariana Islands but not to former Hawaii residents living in other U.S. territories, UOCAVA and UMOVA are subject to strict scrutiny. Having decided to extend the right to vote to the former-state-resident electorate, the federal government and Hawaii cannot disenfranchise voters within that electorate, based on where those voters live, without showing that the discrimination is necessary and narrowly tailored to serve a compelling interest. The statutes cannot satisfy that exacting standard. Neither the federal government nor Hawaii has even tried to articulate any compelling interest the laws could possibly serve.

1. **UOCAVA and UMOVA are subject to strict scrutiny because they selectively withhold the vote from former state residents living in U.S. territories.**

Because UOCAVA and UMOVA extend the right to vote to some former Hawaii residents but not others, they violate the equal-protection guarantee unless they can satisfy strict scrutiny. And strict scrutiny is especially important here because the former Hawaii residents disenfranchised under UOCAVA and UMOVA are, as citizens living in the territories, uniquely subject to the plenary power of the federal government, *see* U.S. Const. art. IV, § 3, cl. 2, unlike those former Hawaii residents living abroad. It doesn't matter that former Hawaii residents living outside the state have no freestanding constitutional right to vote. Once Congress and Hawaii chose to include former Hawaii residents in the Hawaii electorate, the Constitution's equal-protection guarantee required them to extend the vote to former residents with an even hand or else satisfy strict scrutiny.

a. **UOCAVA and UMOVA must satisfy strict scrutiny because they extend the fundamental right to vote in a discriminatory manner.** The laws grant the right to vote in Hawaii federal elections to former Hawaii residents living abroad or in certain territories, while denying that same right to former Hawaii residents living in other territories. *Supra* pp. 7-8. Because

the "challenged statute[s] grant[] the right to vote to some citizens and den[y] the franchise to others," the Court must apply strict scrutiny to "'determine whether the exclusions are *necessary* to promote a *compelling* state interest.'" *Dunn*, 405 U.S. at 337 (quoting *Kramer*, 395 U.S. at 627).

**b.      Strict scrutiny applies no matter where former Hawaii residents live.** Under the correct constitutional analysis, it makes no difference whether the former Hawaii residents live in France or American Samoa. As this Court has made clear, "strict scrutiny applies to state laws treating [voters] unequally on the basis of geography." *Idaho Coalition*, 342 F.3d at 1077. There is no dispute that that UOCAVA and UMOVA make "the relevant electoral unit," *Green*, 340 F.3d at 900, current and former Hawaii residents. The government can no more withhold the vote from former state residents based on whether they live in a foreign country or a U.S. territory than it can discriminate against current residents based on whether they live in Maui County or Honolulu County. Thus, the government must satisfy strict scrutiny if it wishes to "deprive some residents" of that "unit from voting in a unit wide election." *Id.* at 899. Because that is exactly what UOCAVA and UMOVA do, they must satisfy strict scrutiny.

To be sure, "a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." *Holt Civic Club*, 439 U.S. at 68-69. But once the government has chosen to include former residents in the electorate, "lines may not be drawn" between those former residents that "are inconsistent with" the equal-protection guarantee. *Harper*, 383 U.S. at 665. Thus, although the government may constitutionally restrict the vote to current and former residents (or even to only current residents), it may not discriminate *among* those residents unless it can satisfy strict scrutiny. That rule aligns with the Supreme Court's focus on *the people* in the electorate, not the land those people inhabit. *See Reynolds*, 377 U.S. at 562 ("Legislators represent people, not trees or acres."). In short, "[w]ithin a given constituency, there can be room for but a single constitutional rule." *Gray v. Sanders*, 372 U.S. 368, 382 (1963) (Stewart, J., concurring).

The "governmental unit" holding the elections, in this case, is the State of Hawaii, and the electorate, as noted, comprises current and former Hawaii residents. When a former Hawaii resident living in Japan votes for a Senator, she is participating in a Hawaii election, as a former Hawaii resident, to choose someone to represent Hawaii in the Senate. That makes sense. Indeed, the Seventeenth Amendment provides that "[t]he Senate of

the United States shall be composed of two Senators from each State, *elected by the people thereof*." U.S. Const. amend. XVII (emphasis added). UOCAVA and UMOVA extend voting rights to former Hawaii residents as part of "the people []of" Hawaii. Having defined former Hawaii residents as the electorate, the government cannot draw discriminatory lines among those former residents. Former Hawaii residents remain former Hawaii residents no matter *where* they live—whether a foreign country, the Northern Mariana Islands, or another U.S. territory.

This Court's reasoning in *Green* makes clear why strict scrutiny must apply to UOCAVA and UMOVA. *Green* concerned the procedures by which unincorporated communities could vote on incorporation. 340 F.3d at 893-94. Even though voters in different unincorporated communities might have been treated differently, this Court held that there was no constitutional violation because "the relevant electoral unit" was each individual unincorporated community—and all voters in such a community "are treated equally." *Id.* at 900. That's not the case here. The elections that former Hawaii residents living in certain U.S. territories are excluded from are *the same elections* that their fellow former Hawaii residents who live in foreign countries or the Northern Mariana Island get to vote in. The *only* reason why

former Hawaii residents living in foreign countries and the Northern Mariana Islands have a right to vote, while former Hawaii residents living in other territories do not, is because UOCAVA and UMOVA expressly preclude former residents living in those territories from participating in the elections of this "electoral unit." *Id.*; *see supra* pp. 7-8.

   c.   **Basic democratic principles confirm that strict scrutiny must apply where, as here, a challenged law disenfranchises citizens who are subject to the elected officials' authority.** It makes sense that laws that disenfranchise voters on the basis of geography are subject to strict scrutiny. The Supreme Court has emphasized that strict scrutiny is especially important in protecting the fundamental right to vote when the individuals selectively denied the right to vote for government officials are, because of where those voters live, subject to those officials' power. And here, former Hawaii residents living in the territories—unlike former Hawaii residents living in foreign countries—are subject to Congress' plenary powers.

   In *Cipriano* and *Kramer*, the Supreme Court made clear that strict scrutiny applies to classifications that exclude voters "who are as substantially affected and directly interested in the matter voted upon as are those who are permitted to vote." *Cipriano*, 395 U.S. at 706; *see Kramer*, 395 U.S. at 631.

*Evans* applied that principle specifically to geography. *See* 398 U.S. at 423-24. There, the Court struck down a state law that excluded those living in a federal enclave in Maryland from voting in Maryland elections. The state law was an impermissible geographical classification that disenfranchised voters who, in "numerous and vital ways" were "affected by [Maryland] electoral decisions," because of where they lived. *Id.* at 424. Citizens living in the enclave were subject to Maryland's criminal laws, Maryland's taxes, and Maryland's unemployment laws. *Id.* And Maryland failed to advance a "sufficiently compelling" interest that "justif[ied] limitations on the suffrage" of those citizens. *Id.* at 422.

The same logic applies here. There are "numerous and vital ways in which [territorial] residents are affected by electoral decisions" in which they cannot participate. *Id.* at 424. Indeed, federal elected officials have broad authority over the territories and exert direct control over those jurisdictions. *See* U.S. Const. art. IV, § 3, cl. 2. For instance, "[i]n 2016, in response to Puerto Rico's fiscal crisis," Congress imposed a Financial Oversight and Management Board on Puerto Rico with power to "supervise and modify Puerto Rico's laws." *Financial Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC,* 140 S. Ct. 1649, 1655 (2020). Or take Guam's tax laws, which are in "a

- 34 -

federal statute passed by Congress and signed by the President." *Paeste v. Government of Guam*, 798 F.3d 1228, 1238 (9th Cir. 2015). At the same time, federal law generally does not reach foreign countries because "[i]t is a basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'" *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 335 (2016) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). So a classification that denies the right to vote for federal officials to former Hawaii residents living in U.S. territories (where elected officials' power is at its zenith), but grants that right to former Hawaii residents living in foreign countries (where elected officials' power is at its nadir), makes no sense. That discriminatory classification disenfranchises voters subject to the federal government's plenary power while extending the vote to citizens who, all else equal, are less affected by the decisions those elected officials make.

### 2. UOCAVA and UMOVA fail strict scrutiny because their discriminatory treatment of voters in disfavored territories does not serve any compelling interest.

UOCAVA and UMOVA fail strict scrutiny. For the laws to survive that "careful examination," *Kramer*, 395 U.S. at 626, the governments must show that UOCAVA and UMOVA are "both necessary and narrowly tailored to

serve [a] compelling interest," *Charfauros*, 249 F.3d at 952. *Supra* pp. 26-28.
Neither the federal government nor Hawaii has even tried to identify any
compelling interest that UOCAVA or UMOVA could serve by excluding for-
mer Hawaii residents who live in U.S. territories from voting in federal
elections, much less explain why the exclusion would be necessary or nar-
rowly tailored to achieve any interest. Appellees have never claimed in this
litigation that they can satisfy strict scrutiny.

Rather, Appellees have attempted to justify UOCAVA's and
UMOVA's discriminatory treatment by noting that there are differences be-
tween the territories and the rest of the world, *see* Dist. Ct. Doc. 140-1, at 31-
35, and among the territories, *id.* at 26-31, that might justify different policy
choices under lower levels of scrutiny. But whether it is *rational* to treat U.S.
citizens in Puerto Rico differently from U.S. citizens in France for some pur-
poses—and it is *not* for purposes of UOCAVA and UMOVA, *infra* pp. 52-
54—there is certainly no *compelling reason* making the discrimination *neces-
sary*. Those geographical differences "do not come close to establishing that
degree of disinterest in electoral decisions that might justify a total exclusion
from the franchise." *Evans*, 398 U.S. at 426. In fact, just the opposite is true.
As discussed, former Hawaii residents living in U.S. territories are likely to

- 36 -

have *more* of a stake in the outcome of Hawaii federal elections because they live in jurisdictions under the plenary power of federal lawmakers. *Supra* pp. 34-35.

Because Appellees have not advanced "even one credible justification" for UOCAVA's and UOMOVA's discriminatory treatment of voters in the disfavored territories compared to voters in foreign countries and the Northern Mariana Islands, that discrimination cannot meet strict scrutiny's narrow tailoring requirement. *Charfauros*, 249 F.3d at 952. The laws are thus unconstitutional, and the Court must ask how to remedy the unequal treatment. *Infra* pp. 54-66.

### C. The district court's reasoning and Appellees' arguments fail.

Appellees argue, and the district court held, that UOCAVA and UMOVA are constitutional because they are subject to, and satisfy, rational-basis review. That reasoning is wrong. The notion that UOCAVA and UMOVA need not satisfy strict scrutiny disregards the Supreme Court's and this Court's clear precedent and shortchanges basic democratic principles. But even if a lower level of scrutiny did apply, UOCAVA and UMOVA would still be unconstitutional, because there is no rational reason to withhold the vote from former Hawaii residents subject to the federal

government's plenary power while extending the vote to former Hawaii residents living abroad.

>    **1.    Strict scrutiny applies even though there is no freestanding constitutional right to vote in the territories.**

The district court reasoned that strict scrutiny does not apply because neither citizens living in the territories nor those living abroad have a freestanding constitutional right to vote in federal elections. ER-20-23. That reasoning is plainly wrong under the Supreme Court's and this Court's precedent, and the authorities the district court cited provide no reason to think otherwise.

**a.** The whole point of the Supreme Court's equal protection decisions in cases like *Kramer* and *Cipriano* is that exacting scrutiny applies whenever the government extends the vote to one part of the electorate but not another. *Kramer* was about the right to vote in school-board elections (obviously not a freestanding constitutional right), 395 U.S. at 626; *Cipriano* was about the right to vote on certain bonds (same deal), 395 U.S. at 706. *Supra* pp. 24-25. This Court's decisions stand for the very same proposition. *E.g.*, *Idaho Coalition*, 342 F.3d at 1077; *Hussey*, 64 F.3d at 1263. As the Court explained, "no less a showing of a compelling justification" for denying

- 38 -

certain citizens the right to vote "is required merely because the questions scheduled for the election need not have been submitted to the voters." *Kramer*, 395 U.S. at 629 & n.11; *accord Hussey*, 64 F.3d at 1263. And that makes perfect sense. If strict scrutiny applied only when would-be voters were denied a *freestanding constitutional* right to vote, then those wouldn't be equal-protection decisions. They'd be decisions under the freestanding constitutional provision the government violated.

That's why the district court's reasoning doesn't add up. Nobody disputes here that there's no freestanding constitutional right for former residents of Hawaii to vote in Hawaii's federal elections. Put another way, everyone agrees that the Constitution doesn't require Congress and Hawaii to open its federal elections to *anyone* who resides outside the state. *See Holt Civic Club*, 439 U.S. at 68-69; *supra* p. 31. But that doesn't matter, just as it doesn't matter that there's no freestanding constitutional right for *anyone* in Hawaii to vote for presidential electors. *Supra* p. 24. What matters is that once the government puts the vote to the electorate, it cannot discriminate among the electorate. *See, e.g.*, *Harper*, 383 U.S. at 665; *Charfauros*, 249 F.3d at 951. Geography is no exception. As the Supreme Court explained, "[o]nce the geographical unit for which a representative is to be chosen is

designated, all who participate in the election are to have an equal vote …
*wherever their home may be*." *Gray*, 372 U.S. at 379 (emphasis added).

Just as citizens living in Hawaii exercise a fundamental right when
they vote for president, *see Bush*, 531 U.S. at 104, former Hawaii residents
exercise a fundamental right when they vote in Hawaii federal elections un-
der UOCAVA and UMOVA. Those laws can no more deny former Hawaii
residents living in the disfavored territories the vote than Hawaii could deny
any other members of the electorate the fundamental right to vote for presi-
dent. When the government "grants the right to vote to some citizens and
denies the franchise to others," strict scrutiny applies. *Dunn*, 405 U.S. at 337.

If the district court's reasoning were correct—that strict scrutiny
doesn't apply unless there is a freestanding constitutional right to vote in a
given election—that would mean the Supreme Court's and this Court's vot-
ing precedents were wrongly decided. As noted, there was no freestanding
constitutional right to vote in the elections in *Kramer*, *Cipriano*, *Idaho Coalition*,
or *Hussey*. Yet strict scrutiny applied. In fact, that's the main point of those
decisions. *See supra* pp. 24-26.

To be clear, applying strict scrutiny doesn't mean that UOCAVA or
UMOVA must permit former Hawaii residents who move to *other states* to

vote. Those citizens gain the right to vote in *other states'* elections, so do not entirely lose the right to vote for president and for voting members of Congress. Thus, there's certainly a compelling interest in excluding those citizens from Hawaii federal elections, or else they would get two votes, contrary to basic democratic principles and likely in violation of the equal-protection guarantee's one-person, one-vote principle. *See, e.g.*, *Reynolds*, 377 U.S. at 566. After all, "[e]qual protection requires, 'as nearly as is practicable,' that one person's vote 'be worth as much as another's.'" *Rodriguez v. Newsom*, 974 F.3d 998, 1003 (9th Cir. 2020) (quoting *Wesberry*, 376 U.S. at 7-8). But it's the flipside of that very same one-person, one-vote principle that confirms that, having defined the electorate to include former state residents, UOCAVA and UMOVA may not selectively exclude voters based on where they live.

**b.** The district court found support for its contrary reasoning in *Attorney General of Territory of Guam v. United States*, 738 F.2d 1017, 1019 (9th Cir. 1984), as well as several out-of-circuit cases, *Igartúa de la Rosa v. United States*, 32 F.3d 8 (1st Cir. 1994), *Romeu v. Cohen*, 265 F.3d 118 (2d Cir. 2001), and *Segovia v. United States*, 880 F.3d 384 (7th Cir. 2018). ER-21-22; *see also* Dist. Ct. Doc. 140-1, at 14-15. But those decisions provide no reason to

deviate from the clear commands in the Supreme Court's and this Court's precedents to apply strict scrutiny.

   *i.*      *Attorney General of Guam*—the only Ninth Circuit case the district court relied on in this portion of its analysis—is irrelevant. *Attorney General of Guam* held that the inability of citizens living in Guam to vote for president didn't violate the Constitution because "Guam concededly is not a state" and so "can have no electors, and plaintiffs cannot exercise individual votes in a presidential election." 738 F.2d at 1019. But that point isn't disputed here. Rather, this case is about the discrimination between former Hawaii residents living abroad or in the Northern Mariana Islands (who get to vote) and those living in disfavored U.S. territories (who do not). The concern is inequality within the same electorate, not the voting rights of citizens living in the territories in general. While Appellants would like full voting representation for all citizens living in U.S. territories, their claim here is more limited.

   *ii.*     The out-of-circuit cases the district court cited don't move the needle, either, because they cannot be squared with the Supreme Court's and this Court's precedents. For example, the Seventh Circuit in *Segovia* declined to apply strict scrutiny because "the residents of the territories have no fundamental right to vote in federal elections." 880 F.3d at 390. The First Circuit

- 42 -

similarly concluded in *Igartúa* that UOCAVA did not "infringe[] a funda-
mental right." 32 F.3d at 10. But again, that reasoning disregards the
Supreme Court's consistent application of strict scrutiny to statutes that
"grant[] the right to vote to some citizens and den[y] the franchise to others"
even when there is no freestanding constitutional right to vote in those elec-
tions. *Dunn*, 405 U.S. at 337; *see supra* pp. 23-26, 38-40.

The Second Circuit, for its part, declined to apply strict scrutiny to
UOCAVA "[g]iven the deference owed to Congress in making 'all needful
Rules and Regulations respecting the Territory' of the United States" under
Article IV of the Constitution. *Romeu*, 265 F.3d at 124 (quoting U.S. Const.
art. IV, § 3). Federal Appellees advanced a similar argument below. *See* Dist.
Ct. Doc. 140-1, at 14. But that argument flouts Supreme Court precedent and
departs from what the United States itself has told the Supreme Court.

Precedent makes clear that Congress' authority over the territories
does not allow it to "switch the Constitution on or off at will." *Boumediene v.
Bush*, 553 U.S. 723, 765 (2008). Similarly, Article IV doesn't supersede the
equal-protection mandate that "the voting rights of [territorial] citizens are
constitutionally protected to the same extent as those of all other citizens of
the United States." *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 8 (1982).

The territories, after all, are "subject to the constitutional guarantees of due process and equal protection of the laws," just like the states. *Id.* at 7. The federal government has made that very "concession" before the Supreme Court. *United States v. Vaello Madero*, 142 S. Ct. 1539, 1556 (2022) (Gorsuch, J., concurring). Thus, the fact that former Hawaii residents like Appellants reside in the territories cannot turn off strict scrutiny of a law that grants the right to vote only to former Hawaii residents living elsewhere. If the right to vote in federal elections is fundamental *anywhere* (and it is, *supra* pp. 20-21), it makes no sense to apply a different level of scrutiny in the territories as compared to the rest of the world. Indeed, that the federal government exercises such significant power over the territories only makes the constitutional violation here more serious. *Supra* pp. 33-35.

UOCAVA's legislative history shows that Congress *itself* thought that strict scrutiny must apply to unequal extensions of voting rights to former state residents. Congress enacted OCVRA to remedy "highly discriminatory" state laws extending the vote to former state residents living in foreign countries who were military and federal-government employees, but not to private citizens, because it viewed that differential treatment as constitutionally "suspect under the equal protection clause." H.R. Rep. No. 94-649, pt. 1,

at 3; *supra* pp. 6-7. Stated otherwise, the lawmakers themselves necessarily viewed strict scrutiny as the standard for selectively denying the right to vote, because it is at least rational to extend the right to vote only to military or federal employees whose jobs require them to live out-of-state. Congress thus understood the basic point, which the district court and Appellees have rejected, that the government cannot switch off the equal-protection guarantee based simply on geography. Indeed, Congress understood that the equal-protection guarantee, along with strict scrutiny, reaches citizens living in foreign countries. It makes no sense to think that citizens living in U.S. territories somehow get less constitutional protection.

2.   **Contrary to its holding, the district court's reasoning about UOCAVA's and UMOVA's geographical distinctions *supports* the application of strict scrutiny.**

The district court read *Dunn*, *Evans*, and *Holt City Club* to require strict scrutiny only when citizens "within a single geographical jurisdiction" are treated differently. ER-25 (emphasis removed); *see also* Dist. Ct. Doc. 140-1, at 16-17. But that is exactly what UOCAVA and UMOVA do. *Supra* pp. 7-8. Under those laws, former Hawaii residents who live in a foreign country or the Northern Mariana Islands may vote in Hawaii federal elections because of their prior Hawaii residency. But former Hawaii residents who live in

other U.S. territories may not. UOCAVA and UMOVA have thus defined the electoral unit as current and former U.S.-citizen residents of Hawaii — and so the statutes may not constitutionally discriminate among former residents without satisfying exacting scrutiny. The statutes' differential treatment of former Hawaii residents discriminates among the electorate within a single "geographically defined governmental unit," and so it is subject to strict scrutiny. *Green*, 340 F.3d at 899; *supra* pp. 30-33.

### 3. *Katzenbach* doesn't allow the government to avoid strict scrutiny.

The district court also held, and Appellees contend, that denials of the right to vote incident to expansions don't trigger strict scrutiny under *Katzenbach*. ER-26-29; *see* Dist. Ct. Doc. 140-1, at 18-19; Dist. Ct. Doc. 142-1, at 17. It's understandable that Appellees want to defend UOCAVA and UMOVA based on a 1966 decision that does little to indicate what level of scrutiny the Court was applying. But that defense fails. *Katzenbach* is a *burden* case decided before *Kramer* and *Cipriano*, not an *outright denial* case. Appellees' interpretation of *Katzenbach* would eviscerate decades of post-*Katzenbach* precedent.

*First*, the district court's and Appellees' reliance on *Katzenbach* ignores decision after decision from the Supreme Court and this Court alike—*Kramer*, *Dunn*, *Anderson*, *Burdick*, *Hussey*, and *Green*, just to name a few—that make clear that strict scrutiny applies to laws that selectively withhold the right to vote. The Supreme Court has expressly stated that *Katzenbach* doesn't supply the test for assessing the constitutionality of selective vote denials (even assuming it ever did). As the Court explained in *Dunn*, although it had applied rational-basis review the year before *Katzenbach* to uphold a state's durational residency requirement in *Drueding v. Devlin*, 380 U.S. 125 (1965), "it is certainly clear now that a more exacting test is required for any statute that 'place[s] a condition on the exercise of the right to vote,'" *Dunn*, 405 U.S. at 337 (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)). The Court underscored that, even if the law wasn't "clear" earlier, the "development in the law [that] culminated in *Kramer*"—a case decided three years *after Katzenbach*—set the standard. *Id.* "[I]f a challenged statute grants the right to vote to some citizens and denies the franchise to others," the Court instructed, then "'the Court must determine whether the exclusions are *necessary* to promote a *compelling* state interest.'" *Id.* (quoting *Kramer*, 395 U.S. at 627). That's still the law today, no matter how much Appellees like the 1966

*Katzenbach* decision. *See, e.g.*, *Lemons*, 538 F.3d at 1103 (citing *Burdick*, 504 U.S. at 434). The district court was wrong to rely on *Katzenbach*.

*Second*, *Katzenbach* isn't on point anyway. As Appellees themselves observe, *see* Dist. Ct. Doc. 140-1, at 17-18; Dist. Ct. Doc. 142-1, at 15-16, the caselaw distinguishes between laws that severely restrict the right to vote (and thus must satisfy strict scrutiny), *see Lemons*, 538 F.3d at 1103, and laws that "impos[e] a lesser burden" on the right to vote (and thus need only satisfy a lower level of scrutiny), *Arizona Green Party*, 838 F.3d at 988 (citation omitted); *see supra* p. 22. And while UOCAVA and UMOVA are vote-denial statutes—former Hawaii residents living abroad get to vote in Hawaii's federal elections, but former Hawaii residents living in certain U.S. territories are completely disenfranchised—*Katzenbach* was a vote-burden case.

To explain, *Katzenbach* involved a challenge to a provision of the federal Voting Rights Act intended to stamp out "invidious discrimination" against certain non-English-speaking citizens. 384 U.S. at 654. The statute did not directly grant or deny the right to vote to anyone. Instead, it barred states from denying the right to vote, based on inability to read or write English, to individuals who "successfully completed the sixth primary grade in a public school in, or a private school accredited by, the Commonwealth of

Puerto Rico in which the language of instruction was other than English." *Id.* at 643. In other words, the Voting Rights Act merely made unlawful state and local laws that themselves would have imposed a burden on certain otherwise-eligible voters by requiring them to learn English to vote. At most, *Katzenbach* stands for the proposition that certain laws that fail to remove all burdens posed by *other* laws are not subject to strict scrutiny—consistent with the Supreme Court's *Anderson*/*Burdick* precedents that also reaffirm the vitality of the strict-scrutiny rule that applies here, *see supra* p. 22.

In short, *Katzenbach* doesn't speak to the situation where a statute "grants the right to vote to some citizens and denies the franchise to others." *Dunn*, 405 U.S. at 337. But later decisions do, and they make clear that such laws trigger strict scrutiny. *Id.*; *see Burdick*, 504 U.S. at 434; *supra* pp. 21-26. And because UOCAVA and UMOVA do not merely burden the right to vote, but rather completely disenfranchise former Hawaii residents living in certain territories, they are subject to strict scrutiny. The district court was wrong to conclude otherwise.

### 4. UOCAVA and UMOVA are unconstitutional even if a lower level of scrutiny applies.

Even if strict scrutiny doesn't apply, UOCAVA and UMOVA are still unconstitutional because they also fail the heightened scrutiny that attends laws discriminating against a politically powerless, suspect class. What's more, the laws cannot even pass rational-basis review.

**a. UOCAVA and UMOVA fail heightened scrutiny.** Even putting aside the extensive precedent requiring strict scrutiny, UOCAVA and UMOVA trigger—and fail—heightened scrutiny because they discriminate against a suspect class that is politically powerless.

Courts must closely scrutinize laws that discriminate against groups that have historically been "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Plyler v. Doe*, 457 U.S. 202, 217 n.14 (1982) (citation omitted). This Court uses four factors to help determine whether a law discriminates against "a suspect or quasi-suspect class" and is thus subject to heightened scrutiny: (1) "whether the class has been historically subjected to discrimination"; (2) "whether the class has a defining characteristic that frequently bears a relation to ability to perform or contribute to society";

(3) "whether the class exhibits obvious, immutable or distinguishing characteristics that define them as a discrete group"; and (4) "whether the class is a minority or politically powerless." *Karnoski v. Trump*, 926 F.3d 1180, 1200 & n.17 (9th Cir. 2019). Territorial residents meet each factor.

*First*, territorial residents have endured a long history of discrimination. In the *Insular Cases*, the Court reasoned, for example, that so-called "unincorporated" territories were populated by an "alien race" differing in "religion, customs, laws, methods of taxation and modes of thought," *Downes v. Bidwell*, 182 U.S. 244, 287 (1901), and used that racially grounded reasoning to justify a different mode of constitutional analysis than the rules that apply in so-called "incorporated" territories. *Vaello Madero*, 142 S. Ct. at 1554-56 (Gorsuch, J., concurring).

*Second*, territorial residents obviously have no characteristics preventing them from contributing to society. To the contrary, many territorial residents (including some Appellants, ER-140-42) have served in the U.S. military. *See, e.g.*, T.C.W. Lin, *Americans, Almost and Forgotten*, 107 Cal. L. Rev. 1249, 1275 (2019).

*Third*, the inhabited territories are all racially or ethnically majority-minority, *see* U.S. Census Bureau, *Recent Population Trends for the U.S. Island*

*Areas: 2000 to 2010*, at 15-19 (Apr. 2015), https://tinyurl.com/ywwbyeaa, and Puerto Rico is nearly 99% Hispanic, U.S. Census Bureau, *QuickFacts: Puerto Rico*, https://tinyurl.com/5a27z59j (last visited May 1, 2023).

*Finally*, territorial residents are a politically powerless group. As Judge Torruella observed, "[i]t would be difficult to imagine a more 'discrete and insular' minority, both geographically and constitutionally.'" *Lopez Lopez v. Aran*, 844 F.2d 898, 913 (1st Cir. 1988) (Torruella, J., concurring in part and dissenting in part) (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152-53 n.4 (1938)).

UOCAVA and UMOVA fail heightened scrutiny. Under that standard, a "classification must substantially serve an important governmental interest *today*," and the government must provide an "exceedingly persuasive justification." *Morales-Santana*, 582 U.S. at 58-59 (citation omitted). Appellees can no more satisfy that exacting standard than they can satisfy strict scrutiny. *See supra* pp. 35-37.

**b.    UOCAVA and UMOVA fail rational-basis review.** The district court erred twice over in holding that UOCAVA and UMOVA satisfy rational-basis review. *First*, as this Court has held, "the burdening of the right to vote always triggers a higher level of scrutiny than rational basis review"

under the *Anderson/Burdick* sliding-scale framework. *Tedards v. Ducey*, 951 F.3d 1041, 1066 (9th Cir. 2020); *see supra* p. 22. *Second*, UOCAVA and UMOVA are unconstitutional even assuming rational-basis review applies. The statutes draw distinctions between former Hawaii residents that are un-related to *any* legitimate government interest.

A statute satisfies that test only if it "bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631-32 (1996). Rational-basis review isn't "toothless." *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). To the contrary, courts must "insist on knowing the relation between the classification adopted and the object to be attained." *Romer*, 517 U.S. at 632. And whatever might be said of its objectives, a law that "raise[s] the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected" fails rational-basis review. *Id.* at 634.

UOCAVA and UMOVA fail rational-basis review because there is no legitimate reason to withhold the right to vote in Hawaii federal elections from former residents living in certain U.S. territories while extending that right to former residents living in foreign countries and the Northern Mariana Islands. In fact, as discussed, former Hawaii residents living in U.S. territories have a *greater* interest in federal elections than former Hawaii

residents living in foreign countries because former state residents living in the territories are subject to the federal government's direct control. *Supra* pp. 34-35. At best, citizens who moved to the disfavored territories were excluded under UOCAVA and UMOVA through irrational oversight. At worst, it was animus. *Cf. supra* pp. 50-52. Either way, there is no rational basis for the discriminatory treatment.

## II. The remedy for UOCAVA's and UMOVA's equal-protection violations is to sever the laws' discriminatory exclusion of former state residents living in the territories so that UOCAVA and UMOVA evenhandedly allow all former state residents to vote.

Because UOCAVA and UMOVA unconstitutionally exclude from the vote former Hawaii residents who live in disfavored U.S. territories, the Court must remedy the discriminatory treatment. Longstanding Supreme Court precedent makes clear that the proper way to do that is to sever the discriminatory exclusion so that former state residents may vote no matter where they live. The only alternative is to strike down UOCAVA and UMOVA altogether—but such judicial activism can hardly be what the legislatures would have wanted had they known of the constitutional infirmity.

**A.     The ordinary remedy for a statute that violates the equal-protection guarantee is to sever the discriminatory treatment so that the statute extends benefits on equal terms.**

**1.**     When confronted with an unconstitutional statute, courts generally sever the unlawful portions and enforce the rest of the law. *AAPC*, 140 S. Ct. at 2350 (plurality); *see Morales-Santana*, 582 U.S. at 72-76. Even when the law does not contain a severability clause, the ordinary approach is "to salvage rather than destroy the rest of the law passed by Congress." *AAPC*, 140 S. Ct. at 2350 (plurality). That approach is designed to best effect "the legislature's intent" by retaining the statute's "residual policy" and avoiding "disruption of the statutory scheme." *Morales-Santana*, 582 U.S. at 73, 75 (citations omitted).

In the equal-protection context, a simple constitutional command guides the inquiry: "when the 'right invoked is that to equal treatment,' the appropriate remedy is a mandate of equal treatment." *Id.* at 73 (quoting *Heckler*, 465 U.S. at 740; brackets omitted). And equal treatment can be accomplished in two ways—by extending the benefit to the excluded class or withdrawing it from the favored class. *Id.*; *Heckler*, 465 U.S. at 740. The court's role is to identify the approach the legislature "likely would have chosen 'had it been apprised of the constitutional infirmity.'" *Morales-*

*Santana*, 582 U.S. at 77 (quoting *Levin*, 560 U.S. at 427). To conduct that inquiry, "a court should 'measure the intensity of commitment to the residual policy'—the main rule, not the exception—'and consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation.'" *Id.* at 75 (quoting *Heckler*, 465 U.S. at 739 n.5).

The ordinary result of that inquiry—"the preferred rule in the typical case"—"is to extend favorable treatment," rather than to withdraw it. *Id.* at 77; *accord AAPC*, 140 S. Ct. at 2354 (plurality). That makes sense, because generally the court concludes that the legislature was committed to the extension of benefits in the first place. For example, in a long line of decisions remedying the discriminatory provision of public benefits, the Supreme Court has severed unconstitutional portions of laws so that benefits were extended to the disfavored group, rather than withdrawn from the favored group. *E.g.*, *Califano v. Goldfarb*, 430 U.S. 199, 213-17 (1977); *Jimenez v. Weinberger*, 417 U.S. 628, 630-31 (1974); *see also Morales-Santana*, 582 U.S. at 74 (collecting cases).

**2.** To be sure, *Morales-Santana* presents a rare case in which the Court, having found an equal-protection violation, severed the statute to withdraw favorable treatment. 582 U.S. at 77. But the Court reached that

result because it found that Congress' decision to extend favorable treatment to a limited class was "special treatment" and not "the general rule," and that, had Congress known of the equal-protection problem, it would have eliminated the special treatment rather than the general rule. *Id.* at 72-77.

The statutory scheme in *Morales-Santana* required U.S. citizen parents to have been physically present in the United States for at least ten years before their children's births to pass their citizenship to children born abroad. *Id.* at 51. But "Congress ordered an exception" for unwed U.S.-citizen mothers alone; they needed only one year of continuous presence in the United States to pass to their citizenship to children born abroad. *Id.* After holding that the statute's differential treatment of unwed citizen fathers was unconstitutional, the Court severed the statute so that the ten-year (now five-year) rule would apply to everyone. *Id.* at 76-77. The Court reasoned that the ten-year rule was the "main rule" to which Congress was committed, and that extending "the special treatment Congress prescribed … for U.S.-citizen mothers" would turn what was clearly intended to be a statutory exception into the general rule. *Id.* at 52, 75, 77. That approach thus would lead to significant "disruption of the statutory scheme" and would obviate "Congress'

recognition of 'the importance of residence in this country as the talisman of dedicated attachment.'" *Id.* at 75 (citation omitted).

In underscoring that *Morales-Santana* was "hardly the typical case," the Court emphasized that "the preferred rule in the typical case is to extend favorable treatment." *Id.* at 77. The Court made clear that the judicial task is to identify "the general rule" that Congress would have preferred to preserve so that the remedy can "abrogate[] [the] exception" rather than the statute's "main rule." *Id.* at 75-76. The inquiry is designed to avoid a remedy with "the potential for disruption of the statutory scheme." *Id.* at 75 (citation and quotation marks omitted).

**B.** **The proper remedy here is to sever UOCAVA's and UMOVA's discriminatory exclusion of former state residents who live in U.S. territories so that they can vote on equal terms with former state residents living in foreign countries.**

**1.** The correct remedy here is to sever UOCAVA and UMOVA so that they extend voting rights to former Hawaii residents living in the territories. UOCAVA's structure, purpose, and history all make clear that had Congress been aware of the equal-protection violation, it would have extended the right to vote to former Hawaii residents living in the territories rather than withdrawn the vote from former Hawaii residents who move to

foreign countries. Indeed, Congress would have been presented with just two choices: extend the right to vote to former Hawaii residents living in the U.S. territories, or *decline to enact — or repeal — UOCAVA entirely*.

Congress surely would have chosen the former course. UOCAVA's "residual policy" or "main rule," *Morales-Santana*, 582 U.S. at 75, is to allow former residents of a state who would otherwise lose the right to vote to participate in federal elections. That's the whole point of the statute. *Supra* pp. 6-8. Indeed, UOCAVA's legislative history demonstrates the "intensity of [Congress'] commitment," *Morales-Santana*, 582 U.S. at 75 (citation omitted), to that main rule of extending voting rights to former state residents. Congress enacted UOCAVA's predecessor *to expand voting rights* given concerns that the inconsistent treatment of out-of-state voters under state and federal law was itself "highly discriminatory" and "suspect under the equal protection clause." H.R. Rep. No. 94-649, pt. 1, at 3. UOCAVA and its predecessor remedied that problem by adopting a rule that (except for U.S. citizens who moved from a state to a disfavored territory), citizens who left a state and otherwise would have lost the right to vote would maintain their ability to vote in federal elections in that state. In other words, when apprised of possible equal-protection concerns about overseas voters, Congress chose to

expand the right to vote rather than restrict it. There's no reason to think Congress would choose a different path if apprised of the unconstitutionality of excluding former state residents who live in U.S. territories. In fact, there's every reason not to: given the constitutional violation, Congress would need to choose not to pass UOCAVA at all to keep the vote from former state residents living in U.S. territories. That is "scarcely a purpose one can sensibly attribute to Congress." *Morales-Santana*, 582 U.S. at 76.

**2.** Extending the vote makes sense as a more general matter, too, because the argument for extension in voting-rights cases is even stronger than in public-benefits cases. Public benefits, after all, require lawmakers to balance policy tradeoffs in allocating finite resources. But voting rights do not involve such tradeoffs or scarcity. Broadening the vote promotes bedrock principles of our democracy—that the right to vote is "preservative of all rights," *Yick Wo*, 118 U.S. at 370, because it affords citizens the "opportunity to participate in the formation of government policies," *Davis*, 932 F.3d at 830. Once the government puts a position to a vote, the only sensible policy a court can attribute to the government is that it means to extend democracy, not restrict it. If Appellees were right, *Kramer* would have nullified

the school-board vote rather than required it to be open on equal terms to the full electorate. *See supra* pp. 24-25, 27.

**3.**     The mechanics of severability here are straightforward. Consistent with Congress' and Hawaii's clear intent of expanding voting rights to those who move outside a state to a jurisdiction where they cannot otherwise vote in federal elections, the Court should strike and order unenforceable the inclusion of "the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa" in UOCAVA's definition of "United States," 52 U.S.C. § 20310(8), and "Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States" in the definition of "United States" in UMOVA, Haw. Rev. Stat. § 15D-2.

### C.     The district court's reasoning and Appellees' counterarguments are unpersuasive.

#### 1.     Withdrawing the vote from former Hawaii residents living in the Northern Mariana Islands does not remedy the equal-protection violation.

Appellees argue that the proper remedy for any unconstitutionality is to deny voting rights to former Hawaii residents living in the Northern Mariana Islands rather than severing UOCAVA and UMOVA to permit former

Hawaii residents living in other U.S. territories to vote. Dist. Ct. Doc. 140-1, at 36-40; Dist. Ct. Doc. 142-1, at 21-23. Appellees are wrong for two reasons.

*First*, Appellees' supposed remedy isn't a remedy at all, because it doesn't address the unequal treatment between former Hawaii residents living in other U.S. territories (who cannot vote) and those living in foreign countries (who can). Again, the remedy for an equal-protection violation "is a mandate of equal treatment," *Morales-Santana*, 582 U.S. at 73 (quoting *Heckler*, 465 U.S. at 740), and Appellees' supposed remedy doesn't accomplish equal treatment. Just the opposite—it would *increase* the number of former Hawaii residents subject to discriminatory exclusion from the franchise. That supposed remedy would thus "ascrib[e] a discriminatory intent to Congress," contrary to the equal-protection guarantee and the correct remedial course. *Tineo v. Attorney General*, 937 F.3d 200, 218 (3d Cir. 2019) (explaining that "[t]he Court's reluctance to grant extension in *Morales-Santana*" turned on the attribution of discriminatory intent and statutory disruption extension would entail).

*Second*, Appellees' supposed remedy also fails because, as discussed, it conflicts with the main rule and animating purpose of both UOCAVA and UMOVA: to extend voting rights to former state residents, particularly when

equal-protection considerations are at stake. *Supra* pp. 58-60. Thus, withdrawing the right to vote from *any* former Hawaii residents would not advance the statutes' rule or purpose.

> ## 2. There is no "super citizens" problem with severing UOCAVA so that it extends the right to vote with an even hand.

Although it didn't reach the remedial question, the district court thought that one of the reasons UOCAVA and UMOVA must be constitutional is that allowing former state residents living in the territories to vote would itself raise equal-protection concerns by creating a class of territorial "super citizens" who can vote for president and voting members of Congress, while most other citizens living in the territories cannot. ER-34-36; *see also Segovia*, 880 F.3d at 391. Appellees have advanced the same argument. Dist. Ct. Doc. 140-1, at 24-25. Despite the district court's and Appellees' framing, the concern goes not to the merits—since Appellees do not contend that avoiding "super citizens" is a compelling interest—but to the remedial question. In any event, there is no equal-protection problem with extending the right to vote with an even hand to former state residents.

*First*, the "super citizens" argument misunderstands the relevant electorate—current *and former* state residents. The basis for UOCAVA, consistent

with the Seventeenth Amendment, is that Congress and the states can extend the vote to former residents as people of those states. *See supra* pp. 31-32. A former Hawaii resident living in Guam is part of the Hawaii electorate (although UOCAVA impermissibly withholds his right to vote), but a citizen who was born in Guam and has never left is not. Strict scrutiny therefore doesn't necessarily apply to differential treatment—with respect to a Hawaii election—between a former Hawaii resident living in Guam and a citizen of Guam who has never lived in Hawaii because there is no discrimination within the relevant electorate. *See supra* pp. 21-26, 30-33.

*Second*, because nobody is claiming that strict scrutiny applies to the "super citizen" issue, the only super-citizen question is whether the government can meet a lower form of scrutiny by extending the vote to former state residents but not to other U.S. citizens. Put differently, is it reasonable to extend the vote to former residents of a state living in the territories but not to U.S. citizens in the territories who have never lived in that state? The answer to that question *must* be yes, because, to use the district court's phrase, the right to vote under UOCAVA *does* "turn on prior residence in a state." ER-34. Consider how UOCAVA thus allows a former state resident living in France to vote, but *not* a U.S. citizen living in France who was never a state

resident. She could be a citizen because, say, she was born to U.S.-citizen parents in France or she was born in Puerto Rico. *See generally Morales-Santana*, 582 U.S. at 51-55. If Appellees and the district court think it's reasonable to draw the line at former state residency as to U.S. citizens living in foreign countries, then what's different about the territories? They don't say.

What Appellees *did* argue (and the district court thought) is that making the right to vote under UOCAVA depend on prior state residence could make voting rights "turn on wealth." Dist. Ct. Doc. 140-1, at 25 (quoting *Romeu*, 265 F.3d at 124-25); *see* ER-35. But even accepting that voting rights in a former state of residence might correlate with wealth, Appellees have not explained how that poses an equal-protection issue. They do not argue that strict scrutiny applies to differential treatment of territorial "super citizens" (who are former residents of a state) and other citizens of the territory (who never lived in a state). And they offer no reason that the goal of limiting the vote to former state residents does not satisfy a lower level of scrutiny. Again, that's exactly what UOCAVA does as to citizens who move anywhere *but* the U.S. territories. *Supra* pp. 7-8; *see also* Br. of Amicus Curiae U.S. Virgin Islands 4, *Segovia v. United States*, No. 17-1463 (U.S.), https://tinyurl.com/mr3absee.

The bottom line is simple. It makes no sense to refuse to remedy the discriminatory denial to some former state residents of the fundamental right to vote on the notion that providing equal treatment by extending the vote evenhandedly to former state residents would discriminate against *non*–former state residents. UOCAVA and UMOVA, by their very design, legitimately define the electorate to include current and former state residents, but not people who never lived in the state. If Congress can define a state's electorate to include former state residents (and all here agree that it can constitutionally do just that), then it *must* do so with an even hand. It is no defense that treating the electorate equally would treat individuals *outside* the electorate differently.

*   *   *

When Congress and Hawaii defined the Hawaii electorate to include former state residents, they undertook a fundamental constitutional obligation to extend the vote equally among those former state residents. UOCAVA and UMOVA breach that obligation and thus violate the Constitution's equal-protection guarantee. The laws selectively extend the right to vote in federal elections to former Hawaii residents who live in foreign countries but withhold it from Hawaii residents who live in U.S. territories, and

Appellees do not even argue that the laws' exclusionary treatment can satisfy strict scrutiny. The Court thus should sever UOCAVA's and UMOVA's exclusionary provisions so that the laws extend federal voting rights to all former Hawaii residents living in foreign countries or U.S. territories. Out of deference to Congress and Hawaii, and to allow the legislatures time to remedy the laws themselves, the Court could also consider temporarily staying its order severing UOCAVA and UMOVA. *Cf. Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 88 (1982). But any stay should be short, given the compelling signs that Congress would have preferred extension of the vote and the unequal treatment that a stay would prolong.

## CONCLUSION

This Court should reverse the district court's grant of summary judgment and sever UOCAVA's and UMOVA's unconstitutional provisions so that the laws equally extend federal voting rights to former state residents living in foreign countries or U.S. territories.

Dated: May 1, 2023

Respectfully submitted,

*/s/ Parker Rider-Longmaid*

Jeremy Patashnik
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

Zachary Martin
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
500 Boylston St.
Boston, MA 02116

Neil C. Weare
RIGHT TO DEMOCRACY PROJECT
1300 Pennsylvania Ave., NW
Washington, DC 20004

Vanessa L. Williams
LAW OFFICE OF
  VANESSA L. WILLIAMS
414 W. Soledad Ave., Ste. 500
Hagatna, GU 96910

Shay Dvoretzky
Geoffrey M. Wyatt
Parker Rider-Longmaid
  *Counsel of Record*
Steven Marcus
Andrew Hanson
Hanaa Khan
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
parker.rider-longmaid@skadden.com

Pamela Lynn Colon
LAW OFFICES OF PAMELA
  LYNN COLON, LLC
2155 King Cross St., Ste. 3
Christiansted, St. Croix 00820
U.S. Virgin Islands

Anthony "T.J." Quan, Jr.
THE QK GROUP
707 Richards St., PH-7
Honolulu, HI 96813

*Counsel for Plaintiffs-Appellants Vicente Topasna Borja, et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-16742

I am the attorney or self-represented party.

**This brief contains** | 13,994 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Parker Rider-Longmaid | **Date** | 05/01/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

- 69 -

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2023, I electronically filed this brief and addendum with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: May 1, 2023        Respectfully submitted,

                      */s/ Parker Rider-Longmaid*
                      Parker Rider-Longmaid
                      SKADDEN, ARPS, SLATE,
                        MEAGHER & FLOM LLP
                      1440 New York Ave., NW
                      Washington, DC 20005
                      202-371-7000
                      parker.rider-longmaid@skadden.com

                      *Counsel for Plaintiff-Appellants*
                      *Vicente Topasna Borja, et al.*

[This page intentionally left blank.]

# INDEX OF ADDENDUM

**Page**

U.S. Const. art. IV, § 3..................................................................Add. 1

U.S. Const. amend. V....................................................................Add. 1

U.S. Const. amend. XIV, § 1........................................................Add. 2

U.S. Const. amend. XVII..............................................................Add. 2

52 U.S.C. § 20302. State responsibilities.....................................Add. 3

52 U.S.C. § 20310. Definitions.....................................................Add. 7

Haw. Rev. Stat. § 15D-2. Definitions ..........................................Add. 9

Haw. Rev. Stat. § 15D-3. Elections covered...............................Add. 12

Haw. Rev. Stat. § 15D-4. Role of chief election officer..........Add. 13

Haw. Code R. § 3-177-600-(d). Ballot packages;
        contents; eligibility..........................................................Add. 14

# ADDENDUM

## U.S. Const. art. IV, § 3.

New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress.

The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

## U.S. Const. amend. V.

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life,

liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**U.S. Const. amend. XIV, § 1.**

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**U.S. Const. amend. XVII.**

The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures.

When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill

such vacancies: Provided, That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.

This amendment shall not be so construed as to affect the election or term of any Senator chosen before it becomes valid as part of the Constitution.

## 52 U.S.C. § 20302. State responsibilities

### (a) In general

Each state shall—

(1) permit absent uniformed services voters and overseas voters to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office;

(2) accept and process, with respect to any election for Federal office, any otherwise valid voter registration application and absentee ballot application from an absent uniformed services voter or overseas voter, if the application is received by the appropriate State election official not less than 30 days before the election;

(3) permit absent uniformed services voters and overseas voters to use Federal write-in absentee ballots (in accordance with section 20303 of this title) in general elections for Federal office;

(4) use the official post card form (prescribed under section 20301 of this title) for simultaneous voter registration application and absentee ballot application;

(5) if the State requires an oath or affirmation to accompany any document under this chapter, use the standard oath prescribed by the Presidential designee under section 20301(b)(7) of this title;

(6) in addition to any other method of registering to vote or applying for an absentee ballot in the State, establish procedures—

(A) for absent uniformed services voters and overseas voters to request by mail and electronically voter registration applications and absentee ballot applications with respect to general, special, primary, and runoff elections for Federal office in accordance with subsection (e);

(B) for States to send by mail and electronically (in accordance with the preferred method of transmission designated by the absent uniformed services voter or overseas voter under

subparagraph (C)) voter registration applications and absentee ballot applications requested under subparagraph (A) in accordance with subsection (e); and

(C) by which the absent uniformed services voter or overseas voter can designate whether the voter prefers that such voter registration application or absentee ballot application be transmitted by mail or electronically;

(7) in addition to any other method of transmitting blank absentee ballots in the State, establish procedures for transmitting by mail and electronically blank absentee ballots to absent uniformed services voters and overseas voters with respect to general, special, primary, and runoff elections for Federal office in accordance with subsection (f);

(8) transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter—

(A) except as provided in subsection (g), in the case in which the request is received at least 45 days before an election for Federal office, not later than 45 days before the election; and

- Add. 5 -

(B) in the case in which the request is received less than 45 days before an election for Federal office —

    (i) in accordance with State law; and

    (ii) if practicable and as determined appropriate by the State, in a manner that expedites the transmission of such absentee ballot;

(9) if the State declares or otherwise holds a runoff election for Federal office, establish a written plan that provides absentee ballots are made available to absent uniformed services voters and overseas voters in manner that gives them sufficient time to vote in the runoff election;

(10) carry out section 20304(b)(1) of this title with respect to the processing and acceptance of marked absentee ballots of absent overseas uniformed services voters; and

(11) report data on the number of absentee ballots transmitted and received under subsection (c) and such other data as the Presidential designee determines appropriate in accordance with the standards developed by the Presidential designee under section 20301(b)(11) of this title.

…

## 52 U.S.C. § 20310. Definitions

As used in this chapter, the term—

(1) "absent uniformed services voter" means—

(A) a member of a uniformed service on active duty who, by reason of such active duty, is absent from the place of residence where the member is otherwise qualified to vote;

(B) a member of the merchant marine who, by reason of service in the merchant marine, is absent from the place of residence where the member is otherwise qualified to vote; and

(C) a spouse or dependent of a member referred to in subparagraph (A) or (B) who, by reason of the active duty or service of the member, is absent from the place of residence where the spouse or dependent is otherwise qualified to vote;

…

(3) "Federal office" means the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress;

…

(5) "overseas voter" means—

(A) an absent uniformed services voter who, by reason of active duty or service is absent from the United States on the date of the election involved;

(B) a person who resides outside the United States and is qualified to vote in the last place in which the person was domiciled before leaving the United States; or

(C) a person who resides outside the United States and (but for such residence) would be qualified to vote in the last place in which the person was domiciled before leaving the United States.

(6) "State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa;

…

(8) "United States", where used in the territorial sense, means the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa.

**Haw. Rev. Stat. § 15D-2. Definitions**

In this chapter:

"Covered voter" means:

(1) A uniformed-service voter or an overseas voter who is registered to vote in this State;

(2) An overseas voter who, before leaving the United States, was last eligible to vote in this State and, except for a state residency requirement, otherwise satisfies this State's voter eligibility requirements;

(3) An overseas voter who, before leaving the United States, would have been last eligible to vote in this State had the voter then been of voting age and, except for a state residency requirement, otherwise satisfies this State's voter eligibility requirements; or

(4) An overseas voter who was born outside the United States, is not described in paragraph (2) or (3), and except for a state residency requirement, otherwise satisfies this State's voter eligibility requirements, if:

(A) The last place where a parent or legal guardian of the voter was, or under this chapter would have been, eligible to vote before leaving the United States is within this State; and

(B) The voter has not previously registered to vote in any other state.

"Dependent" means an individual recognized as a dependent by a uniformed service.

"Federal postcard application" means the application prescribed under section 101(b)(2) of the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. section 1973ff(b)(2).

"Federal write-in absentee ballot" means the ballot described in section 103 of the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. section 1973ff-2.

"Military-overseas ballot" means:

(1) A federal write-in absentee ballot;

(2) A ballot specifically prepared or distributed for use by a covered voter in accordance with this chapter; or

(3) A ballot cast by a covered voter in accordance with this chapter.

"Overseas voter" means a United States citizen who is living outside the United States.

"State" means a state of the United States, the District of Columbia, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States.

"Uniformed service" means:

(1) Active and reserve components of the Army, Navy, Air Force, Marine Corps, or Coast Guard of the United States;

(2) The Merchant Marine, the commissioned corps of the Public Health Service, or the commissioned corps of the National Oceanic and Atmospheric Administration of the United States; or

(3) The National Guard and state militia.

"Uniformed-service voter" means an individual who is qualified to vote and is:

(1) A member of the active or reserve components of the Army, Navy, Air Force, Marine Corps, or Coast Guard of the United States who is on active duty;

(2) A member of the Merchant Marine, the commissioned corps of the Public Health Service, or the commissioned corps of the

National Oceanic and Atmospheric Administration of the United States;

(3) A member on activated status of the National Guard or state militia; or

(4) A spouse or dependent of a member referred to in this definition.

"United States", used in the territorial sense, means the several states, the District of Columbia, Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States.

## Haw. Rev. Stat. § 15D-3. Elections covered

The voting procedures in this chapter apply to:

(1) A general, special, or primary election for federal office;

(2) A general, special, or primary election for statewide or state legislative office or state ballot measure; and

(3) A general, special, recall, primary, or runoff election for local government office or local ballot measure conducted under section 11-

91.5 for which absentee voting or voting by mail is available for other voters.

**Haw. Rev. Stat. § 15D-4. Role of chief election officer**

(a) The chief election officer shall be the state official responsible for implementing this chapter and the State's responsibilities under the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. section 1973ff et seq.

(b) The chief election officer shall establish an electronic transmission system through which a covered voter may apply for and receive voter registration materials, military-overseas ballots, and other information under this chapter. The chief election officer may satisfy the requirements of this chapter by utilizing an electronic transmission system established by the Federal Voting Assistance Program in lieu of creating a separate electronic transmission system.

(c) The chief election officer shall develop standardized absentee-voting materials, including privacy and transmission envelopes and their electronic equivalents, authentication materials, and voting instructions, to

be used with the military-overseas ballot of a voter authorized to vote in any jurisdiction in this State.

(d) The chief election officer shall accept forms prescribed by the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. section 1973ff et seq., for use by a covered voter [that] contains the prescribed standard declaration to swear or affirm specific representations pertaining to the voter's identity, eligibility to vote, status as a covered voter, and timely and proper completion of an overseas-military ballot.

**Haw. Code R. § 3-177-600-(d). Ballot packages; contents; eligibility**

(a) Unless the context indicates otherwise, a ballot package is used by any voter in an election by mail, unless the voter votes in-person at a voter service center by using a voting device (e.g. a voter directly using a voting system such as a direct recording electronic device or a marksense ballot counter).

(b) A ballot package, unless it is transmitted electronically, consists of the following:

(1) An official ballot;

(2) A return identification envelope with postage prepaid;

(3) A secrecy envelope or secrecy sleeve;

(4) The instructions provided for in HRS § 11-104; and

(5) A statement to be subscribed to by the voter that affirms the fact that the voter is the person, voting and that the voter's employer or agent of the employer, agent of the voter's labor union, or any candidate listed on the ballot did not assist the voter, as described in HRS § 11-139, along with the instruction that the voter's ballot will be valid only if the affirmation statement is signed. The statement may appear on the return identification envelope or separately, depending on the means of transmission utilized or authorized by the clerk.

(c) A ballot package may be sent by electronic transmission. "Electronic transmission" refers to transmission by facsimile or electronic mail delivery, or the use of an online ballot and return system, which may include the ability to mark the ballot. An electronic ballot package additionally will include a waiver of secrecy under HRS § 11-137. This waiver may be combined with the affirmation statement. Additionally, instructions on how to return the ballot or ballot summary, depending on the type of electronic ballot system, used, by electronic transmission or alternatively by mail, may be included.

(d) Ballot, packages may generally be issued in the following contexts:

(1) To any registered voter who has not already voted and is legally eligible under state or federal law to receive a ballot;

(2) To any registered voter who has requested an absentee ballot;

(3) In response to a request for a replacement ballot by a voter; or

(4) Pursuant to a request by a voter covered under chapter 15D, HRS, or the Uniformed and Overseas Citizens Absentee Voting Act of 1986, as amended, or any other applicable federal or state law.