# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Vicente Topasna Borja, et al.,

Plaintiffs-Appellants,

v.

Scott T. Nago, et al.,

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Hawaii

## BRIEF FOR FEDERAL APPELLEES

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

CLARE E. CONNORS
  *United States Attorney*

MICHAEL S. RAAB
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff
  Civil Division, Room 7537
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 616-5446*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ............................................................... 1

STATEMENT OF THE ISSUES ................................................................ 1

STATEMENT OF THE CASE ................................................................... 2

    A.    Legal Background on U.S. Territories ................................ 2

    B.    The Federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) and Hawaii Election Law ......................... 7

    C.    Prior Proceedings ............................................................. 10

SUMMARY OF ARGUMENT ................................................................ 13

STANDARD OF REVIEW .................................................................... 16

ARGUMENT ....................................................................................... 16

I.    Plaintiffs Lack Standing to Challenge UOCAVA .................................... 16

II.    UOCAVA's Definition of "United States" Comports with Equal-Protection Principles ................................................................ 20

    A.    The District Court Properly Applied Rational-Basis Review ....................................................................... 20

        1.    UOCAVA Does Not Burden a Fundamental Right .......... 22

        2.    UOCAVA Does Not Discriminate Against a Suspect Class ............................................................... 29

    B.    UOCAVA's Definition of "United States" Advances Government Interests ..................................................... 33

III.    Plaintiffs' Proposed Remedy Would Be Improper in Any Event ......... 46

CONCLUSION..................................................................................................50

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                        **Page(s)**

*Allen v. Wright,*
   468 U.S. 737 (1984) ........................................................ 18

*Allied Concrete & Supply Co. v. Baker,*
   904 F.3d 1053 (9th Cir. 2018) ....................................... 16

*Anderson v. Celebrezze,*
   460 U.S. 780 (1983) ........................................................ 29

*Attorney Gen. of Territory of Guam v. United States,*
   738 F.2d 1017 (9th Cir. 1984), *cert. denied,*
   469 U.S. 1209 (1985) .............................. 2, 22, 23, 27, 42

*Ballentine v. United States,*
   486 F.3d 806 (3d Cir. 2007) .......................................... 23

*Barr v. American Ass'n of Political Consultants, Inc.,*
   140 S. Ct. 2335 (2020) ............................................. 47, 48

*Burdick v. Takushi,*
   504 U.S. 428 (1992) ........................................................ 29

*Bush v. Gore,*
   531 U.S. 98 (2000) (per curiam) ................................... 28

*Califano v. Torres,*
   435 U.S. 1 (1978) (per curiam) .............................. 30, 31

*Charfauros v. Board of Elections,*
   249 F.3d 941 (9th Cir. 2001) ........................................ 25

*City of New Orleans v. Dukes,*
   427 U.S. 297 (1976) (per curiam) ................................ 20

*Colon-Marrero v. Velez,*
   813 F.3d 1 (1st Cir. 2016) ............................................. 28

*Dunn v. Blumstein,*
   405 U.S. 330 (1972) .................................................. 24, 25

*Eche v. Holder*,
    694 F.3d 1026 (9th Cir. 2012) ........................................ 38

*Evans v. Cornman*,
    398 U.S. 419 (1970)........................................................25

*Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*,
    426 U.S. 572 (1976) ...................................................... 21

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) ................................................ 44, 45

*Green v. City of Tucson*,
    340 F.3d 891 (9th Cir. 2003) ............................... 24, 25, 29

*Harris v. Rosario*,
    446 U.S. 651 (1980) (per curiam) ................................. 31

*Holt Civic Club v. City of Tuscaloosa*,
    439 U.S. 60 (1978) .................................................. 24, 44

*Hussey v. City of Portland*,
    64 F.3d 1260 (9th Cir. 1995) ........................................ 28

*Igartua v. United States*,
    626 F.3d 592 (1st Cir. 2010) ............................... 3, 23, 28

*Igartua De La Rosa v. United States*,
    32 F.3d 8 (1st Cir. 1994) (per curiam), *cert. denied*,
    514 U.S. 1049 (1995) ............................................. passim

*Kahawaiolaa v. Norton*,
    386 F.3d 1271 (9th Cir. 2004) ................................. 16, 20

*Katzenbach v. Morgan*,
    384 U.S. 641 (1966) ................................................ 27, 45

*Kramer v. Union Free Sch. Dist. No. 15*,
    395 U.S. 621 (1969)........................................................25

*Lemons v. Bradbury*,
    538 F.3d 1098 (9th Cir. 2008)........................................24

iv

*McDonald v. Board of Election Comm'rs of Chi.*,
 394 U.S. 802 (1969) ........................................................ 27

*Mendia v. Garcia*,
 768 F.3d 1009 (9th Cir. 2014) ....................................... 19

*Mtoched v. Lynch*,
 786 F.3d 1210 (9th Cir. 2015) ................................ 5, 6, 37

*Northern Mariana Islands v. Atalig*,
 723 F.2d 682 (9th Cir. 1984) ......................................... 37

*Plyler v. Doe*,
 457 U.S. 202 (1982) ........................................................ 31

*Quiban v. Veterans Admin.*,
 928 F.2d 1154 (D.C. Cir. 1991), *cert. denied*,
 513 U.S. 918 (1994) ........................................................ 32

*Railway Express Agency v. New York*,
 336 U.S. 106 (1949) ........................................................ 45

*Romer v. Evans*,
 517 U.S. 620 (1996) ........................................................ 46

*Romero-Ochoa v. Holder*,
 712 F.3d 1328 (9th Cir. 2013) ....................................... 44

*Romeu v. Cohen*,
 265 F.3d 118 (2d Cir. 2001) .................................... passim

*Segovia v. United States*,
 880 F.3d 384 (7th Cir.), *cert. denied*,
 139 S. Ct. 320 (2018) ............................................... passim

*Sessions v. Morales-Santana*,
 582 U.S. 47 (2017) .................................................. 47, 48

*Simon v. Eastern Ky. Welfare Rights Org.*,
 426 U.S. 26 (1976) .................................................. 17, 19

*Tedards v. Ducey*,
 951 F.3d 1041 (9th Cir. 2020) ....................................... 29

v

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ........................................................ 46

*United States v. Karaouni,*
    379 F.3d 1139 (9th Cir. 2004) ........................................ 36

*United States v. Mayea-Pulido,*
    946 F.3d 1055 (9th Cir. 2020) ........................................ 30

*United States v. Vaello Madero,*
    142 S. Ct. 1539 (2022) ................................................ passim

*Wabol v. Villacrusis,*
    958 F.2d 1450 (9th Cir. 1990) ........................................ 37

*Williams-Yulee v. Florida Bar,*
    575 U.S. 433 (2015) ........................................................ 45

*Williamson v. Lee Optical of Okla., Inc.,*
    348 U.S. 483 (1955) ........................................................ 45

**U.S. Constitution:**

Art. I, § 2, cl. 1 ........................................................................ 3

Art. I, § 4, cl. 1 ........................................................................ 3

Art. II, § 1, cl. 2 ...................................................................... 2

Art. IV, § 3, cl. 2 ..................................................................... 4

Amend. XVII ........................................................................... 3

**Treaty:**

Tripartite Convention of 1899, art. II, 31 Stat. 1878, 1879 (1899) .................... 5

**Statutes:**

Act of Mar. 24, 1976,
Pub. L. No. 94-241, 90 Stat. 263, *reprinted as amended in*
48 U.S.C. § 1801 note:
art. I, § 105, 90 Stat. at 264 ....................................................38
art. V, 90 Stat. at 267-69 ....................................................38

Consolidated Natural Resources Act of 2008,
Pub. L. No. 110-229, § 711, 122 Stat. 754, 868
(codified at 48 U.S.C. § 1751) ..........................................7, 39

Guano Islands Act,
48 U.S.C. §§ 1411-1419 .......................................................... 5

Uniformed and Overseas Citizens Absentee Voting Act:
52 U.S.C. § 20301 *et seq.* ................................................... 7
52 U.S.C. § 20302 ............................................................ 39
52 U.S.C. § 20302(a)(1) ...................................................... 7
52 U.S.C. § 20310(3) .......................................................... 7
52 U.S.C. § 20310(5)-(6) ........................................ 33, 47, 48
52 U.S.C. § 20310(6) ....................................................... 8, 39
52 U.S.C. § 20310(8) ....................................... 8, 20, 33, 43, 47, 48
52 U.S.C. § 20310(5)(B)-(C) ................................................ 8

7 U.S.C. § 2014 ................................................................. 36

8 U.S.C. § 1402 ................................................................. 36

8 U.S.C. § 1406 ................................................................. 36

8 U.S.C. § 1407 ................................................................. 36

8 U.S.C. § 1408 ................................................................. 36

28 U.S.C. § 1291 ................................................................ 1

28 U.S.C. § 1331 ................................................................ 1

42 U.S.C. § 602 ................................................................ 36

42 U.S.C. § 619(5) ................................................................... 36

48 U.S.C. § 731d .......................................................................... 6

48 U.S.C. § 734 ......................................................................... 36

48 U.S.C. § 891 ..................................................................... 6, 23

48 U.S.C. § 1421a ......................................................................... 6

48 U.S.C. § 1541 .......................................................................... 6

48 U.S.C. § 1662a ........................................................................ 6

48 U.S.C. § 1711 .................................................................... 6, 23

48 U.S.C. § 1731 .................................................................... 6, 23

48 U.S.C. § 1751 ....................................................................... 23

48 U.S.C. § 1801 .......................................................................... 6

48 U.S.C. § 1806(a)(2) ............................................................... 38

Haw. Admin. R. § 3-177-600(d) ................................................... 9

Haw. Rev. Stat. § 15-3 .............................................................. 10

Haw. Rev. Stat. § 15D-1 to -18 .................................................... 9

Haw. Rev. Stat. § 15D-2 ............................................................... 9

**Legislative Material:**

H.R. Rep. No. 99-765 (1986), *reprinted in*
  1986 U.S.C.C.A.N. 2009, 2009 ............................................. 7, 16

**Other Authorities:**

*Placing Into Full Force and Effect the Covenant With the Commonwealth of the Northern Mariana Islands, and the Compacts of Free Association With the Federated States of Micronesia and the Republic of the Marshall Islands*,
51 Fed. Reg. 40,399 (Nov. 3, 1986) ............................................................. 5, 6

Office of Insular Affairs, U.S. Dep't of the Interior,
*Definitions of Insular Area Political Organizations*,
https://perma.cc/38HQ-9L4S ............................................................................4

U.S. Gen. Accounting Office, GAO/OGC-98-5,
*U.S. Insular Areas: Application of the U.S. Constitution*
(Nov. 1997), https://perma.cc/4MBV-EV6J ................................................4, 5

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. § 1331. ER-153, ¶ 30. The district court granted summary judgment and entered final judgment on September 6, 2022. ER-5. Plaintiffs filed a timely notice of appeal on November 4, 2022. ER-174. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Plaintiffs are individuals and an organization with members who reside in the U.S. Territories of Puerto Rico, Guam, the U.S. Virgin Islands, or America Samoa. They seek to vote absentee in federal elections in Hawaii, where they lived before moving to the Territories. Plaintiffs challenge as unconstitutional both the Hawaii laws governing absentee voting and the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), which defines the Territories where plaintiffs now reside as part of the United States and thus does not require States to accept absentee ballots from former residents who move there. The questions presented with respect to the federal appellees are:

1. Whether plaintiffs have standing to challenge UOCAVA on the ground that the statute fails to force Hawaii to permit them to vote absentee.

2. Whether the district court correctly held that UOCAVA's definition of the United States as including Puerto Rico, Guam, the Virgin Islands, and America Samoa, but not the Northern Mariana Islands, is consistent with the equal-protection component of the Fifth Amendment.

## STATEMENT OF THE CASE

### A.    Legal Background on U.S. Territories

**1.** In general, U.S. citizens who reside in the Territories do not have a constitutional right to participate in federal elections. With respect to the President and Vice President, the Constitution provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art. II, § 1, cl. 2. The right to elect the President and Vice President of the United States "inheres not in citizens but in states: citizens vote indirectly for the President by voting for state electors." *Attorney Gen. of Territory of Guam v. United States*, 738 F.2d 1017, 1019 (9th Cir. 1984), *cert. denied*, 469 U.S. 1209 (1985). Because the Territories are not States, "[a] constitutional amendment would be required to permit [their residents] to vote in a presidential election." *Id.*; *see also Romeu v. Cohen*, 265 F.3d 118,

123 (2d Cir. 2001) (recognizing that "those Courts of Appeals that have decided the issue have all held that the absence of presidential and vice-presidential voting rights for U.S. citizens living in U.S. territories does not violate the Constitution").

With respect to Congress, the Constitution provides that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States." U.S. Const. art. I, § 2, cl. 1. The Seventeenth Amendment specifies that the Senate "shall be composed of two Senators from each State, elected by the people thereof." U.S. Const. amend. XVII. Each State's legislature prescribes "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," but "Congress may at any time by Law make or alter such Regulations, except as to the Places of ch[oo]sing Senators." U.S. Const., art. I, § 4, cl. 1. As with the election of the President and Vice President, residents of the Territories do not possess the right to elect voting members of the House or the Senate. *See Igartua v. United States*, 626 F.3d 592, 596 (1st Cir. 2010).

**2.** Congress has "broad authority to legislate with respect to the U.S. Territories," *United States v. Vaello Madero*, 142 S. Ct. 1539, 1541 (2022), pursuant to the Constitution's Territory Clause, which permits "all needful

Rules and Regulations respecting the Territory or other Property belonging to the United States," U.S. Const. art. IV, § 3, cl. 2. As a matter of "longstanding congressional practice," Congress "sometimes legislates differently with respect to the Territories," balancing "the needs of the United States as a whole" along with "the unique histories, economic conditions, social circumstances, independent policy views, and relative autonomy of the individual Territories." *Vaello Madero*, 142 S. Ct. at 1541.

There are at least 14 Territories that Congress governs, directly or indirectly, pursuant to the Territory Clause; only five (Puerto Rico, Guam, the Virgin Islands, America Samoa, and the Northern Mariana Islands) have permanent residents. *See* Office of Insular Affairs, U.S. Dep't of the Interior, *Definitions of Insular Area Political Organizations*, https://perma.cc/38HQ-9L4S (describing various insular areas). The United States initially acquired most of the Territories through international agreements, purchase, or annexation. For example, Puerto Rico and Guam were ceded to the United States by Spain as part of the Treaty of Paris after the Spanish-American War, and the United States purchased the Virgin Islands in 1917. *See* U.S. Gen. Accounting Office, GAO/OGC-98-5, *U.S. Insular Areas: Application of the U.S. Constitution* 7-8 (Nov. 1997),

https://perma.cc/4MBV-EV6J.  American Samoa became a Territory in 1900, after the withdrawal of competing claims by Great Britain and Germany.  *See* Tripartite Convention of 1899, art. II, 31 Stat. 1878, 1879 (1899).  A number of smaller unoccupied islands were annexed under the Guano Islands Act, 48 U.S.C. §§ 1411-1419.

By contrast, the newest Territory, the Commonwealth of the Northern Mariana Islands, voluntarily entered into a political union with the United States on negotiated terms.  The Northern Mariana Islands (along with Micronesia, Palau, and the Marshall Islands) were initially part of the United Nations "Trust Territory of the Pacific Islands" that the United States administered in the aftermath of World War II.  *See Mtoched v. Lynch*, 786 F.3d 1210, 1213 (9th Cir. 2015).  The other three islands became independent states and entered into compacts of free association with the United States. *See Placing Into Full Force and Effect the Covenant With the Commonwealth of the Northern Mariana Islands, and the Compacts of Free Association With the Federated States of Micronesia and the Republic of the Marshall Islands*, 51 Fed. Reg. 40,399 (Nov. 3, 1986).

The people of the Northern Mariana Islands, however, chose to become a self-governing commonwealth in political union with and under the

sovereignty of the United States.  After extensive negotiations, the Northern Mariana Islands and the United States in 1975 executed a covenant, which set forth the parameters for the new relationship with the United States.  *See Mtoched*, 786 F.3d at 1213.  Congress approved the covenant in 1976, *see* 48 U.S.C. § 1801, and it became fully effective on November 4, 1986, pursuant to a presidential proclamation, *see* 51 Fed. Reg. 40,399.  The Northern Mariana Islands thereby became a Territory of the United States.

Congress allows the other permanently inhabited Territories to operate with varying forms of self-government.  While Puerto Rico and American Samoa have local constitutions that have been approved by Congress and the Executive Branch respectively, *see* 48 U.S.C. §§ 731d, 1662a, Guam and the Virgin Islands operate under organic acts alone, *see id.* §§ 1421a, 1541.  None of the Territories participates in federal elections for President, Vice President, Representatives, or Senators, but Congress has afforded these four Territories with non-voting representation in the House since at least the 1970s.  *See id.* § 891 (Puerto Rico); *id.* § 1711 (Guam and Virgin Islands); *id.* § 1731 (American Samoa).  The Northern Mariana Islands did not have a non-voting delegate with analogous official status until

2008.  *See* Consolidated Natural Resources Act of 2008, Pub. L. No. 110-229, § 711, 122 Stat. 754, 868 (codified at 48 U.S.C. § 1751).

## B.  The Federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) and Hawaii Election Law

**1.**  Congress enacted the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. § 20301 *et seq.*, approximately two to three months before the covenant with the Northern Mariana Islands went into full effect.  The statute was passed, among other reasons, to "facilitate absentee voting by United States citizens, both military and civilian, who are overseas."  H.R. Rep. No. 99-765, at 5 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2009, 2009; *see also Segovia v. United States*, 880 F.3d 384, 387 (7th Cir.) (describing UOCAVA's purpose "to protect the voting rights of United States citizens who move overseas but retain their American citizenship"), *cert. denied*, 139 S. Ct. 320 (2018).

UOCAVA directs that each State shall "permit absent uniformed services voters and overseas voters to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for" President, Vice President, and congressional members. 52 U.S.C. §§ 20302(a)(1), 20310(3).  Most relevant here, an "overseas voter" includes someone "who resides outside the United States" and is, or would

be, "qualified to vote in the last place in which the person was domiciled before leaving the United States." *Id.* § 20310(5)(B)-(C). The statute further defines "State" to mean "a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa," *id.* § 20310(6), and "'United States', where used in the territorial sense," to mean "the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa," *id.* § 20310(8).

Under UOCAVA, States (including Puerto Rico, Guam, the Virgin Islands, and American Samoa) must allow former residents to vote absentee if they reside outside the United States (which is also defined to include those four Territories). UOCAVA does not require States to extend absentee voting privileges to civilians who have moved within the United States (including those who move from one State to another or from a State to one of the listed Territories). The statute does not mention the Northern Mariana Islands or the other Territories that lack permanent residents, thereby treating those Territories as outside the United States. Accordingly, States (again including Puerto Rico, Guam, the Virgin Islands, and American Samoa) must allow active-service members and other former residents who

8

are stationed or live in a foreign country, the Northern Mariana Islands, or other non-listed Territories to vote absentee.

2. Consistent with UOCAVA, Hawaii has enacted a comprehensive scheme allowing certain "overseas voters" and "uniformed-service voters" to vote in federal elections by absentee ballot. Haw. Rev. Stat. § 15D-1 to -18. A Hawaii statute defines an "overseas voter" as "a United States citizen who is living outside the United States," which comprises "the several states, the District of Columbia, Puerto Rico, the United States Virgin Islands, and any territory or insular possession subject to the jurisdiction of the United States." *Id.* § 15D-2. Hawaii's administrative rules clarify that Hawaii accepts absentee ballots from former Hawaii residents living in U.S. Territories except those Territories listed in UOCAVA and defined to be part of the "United States"—that is, Puerto Rico, Guam, the Virgin Islands, and American Samoa. *See* Haw. Admin. R. § 3-177-600(d).

As plaintiffs' operative complaint states, "[i]n certain respects, Hawaii law also grants broader rights than UOCAVA." ER-163, ¶ 54. For example, "Hawaii's laws permit U.S. citizens who have *never* resided in Hawaii to vote absentee . . . if a parent or guardian was last domiciled in the state of Hawaii." ER-134, ¶ 10 (citing Haw. Rev. Stat. § 15D-2). Additionally, "[i]f

ineligible to qualify as a voter in the state to which the voter has moved, any former registered voter of Hawaii may vote an absentee ballot in any presidential election occurring within twenty-four months after leaving Hawaii." Haw. Rev. Stat. § 15-3.

## C.    Prior Proceedings

Plaintiffs are individuals who currently reside in Guam or the Virgin Islands and formerly resided in Hawaii, along with an organization whose members include former Hawaii residents living in those same Territories as well as Puerto Rico and America Samoa. ER-93, ¶¶ 9-13; ER-150, ¶ 20a. They filed suit against various federal, state, and local entities and officials, alleging that UOCAVA and Hawaii law violate equal protection. ER-131, ¶ 3. Plaintiffs based their equal-protection argument on the ground that Hawaii authorizes absentee voting by citizens who move from Hawaii to a foreign country or to the Northern Mariana Islands, but not by citizens who move to Puerto Rico, Guam, the Virgin Islands, or American Samoa. ER-131, ¶ 2.

The district court initially determined that plaintiffs lacked Article III standing but reversed course after plaintiffs filed an amended complaint. ER-13-15. The court acknowledged that "UOCAVA does not prevent Hawaii from allowing Plaintiffs to vote absentee." ER-112 (quotation marks

omitted).  The court nevertheless viewed this as a case of "indirect harm," where Hawaii law constitutes "the final link" but UOCAVA is "also part of the chain."  ER-113-14.  The court recognized that the Seventh Circuit reached the opposite conclusion on traceability and standing in *Segovia*, 880 F.3d 384.  *See* ER-110-12.

On the merits, the court rejected plaintiffs' equal-protection claim. Because "[t]erritorial residents have no right to vote in federal elections and U.S. citizens who move to certain territories likewise have no right to vote absentee in their former states of residence," ER-20, plaintiffs failed to identify a fundamental right of which they have been deprived, ER-29.  The court also explained that people "who move from a state to a territory are not a suspect or quasi-suspect class."  ER-31.  The court thus declined to apply strict scrutiny, concluding that rational-basis review is appropriate.  *See* ER-32 ("Because there is no infringement of a fundamental right or involvement of a suspect or quasi-suspect class, rational basis review applies.").

Applying that standard, the district court invoked decisions of the First, Second, and Seventh Circuits in concluding that UOCAVA and Hawaii law "easily survive[]" scrutiny because the distinctions they draw are rationally related to legitimate government interests.  ER-34.  The court

described the "unique historical and political relationship" between the Northern Mariana Islands and the United States that differentiates that Territory from the other permanently inhabited Territories. ER-39. The court explained that Congress could conceivably view the Northern Mariana Islands "as more analogous to a sovereign country" than the Territories where plaintiffs reside. ER-38. The court also upheld as reasonable the extension of absentee-voting rights to citizens who move abroad because, unlike plaintiffs who "can obtain voting rights in" their home Territories, "former state residents who move to foreign countries—many of whom serve in the military—would ordinarily lose the right to vote in *any* election in the United States." ER-42 (citing *Igartua De La Rosa v. United States*, 32 F.3d 8, 10-11 (1st Cir. 1994) (per curiam), *cert. denied*, 514 U.S. 1049 (1995)).

The district court highlighted additional anomalies that would result under plaintiffs' theory. Notably, plaintiffs seek privileges that "would be *superior* to those conferred upon their fellow territorial residents." ER-29. Plaintiffs' requested relief thus would itself create "a distinction of questionable fairness" by allowing some territorial residents "to vote for President and others not, depending on whether they had previously resided in a State." ER-35-36 (alteration and emphasis omitted) (quoting *Romeu*,

265 F.3d at 125). The district court explained that it is rational for the law to "avoid conferring greater voting rights to [plaintiffs] than their fellow territorial residents," ER-36, and instead to "treat [p]laintiffs the same as former state residents who move to another state or the District of Columbia," ER-41-42.

## SUMMARY OF ARGUMENT

UOCAVA requires States to accept absentee ballots from former residents who have moved outside of the territorial United States, which is defined to include four of the permanently inhabited Territories. It thereby sets a floor but places no restrictions on a State's ability to take a more expansive approach to absentee voting.

Plaintiffs bring this suit to obtain the right to vote absentee in Hawaii, where they previously resided. Although Hawaii accepts absentee ballots from some citizens not covered by UOCAVA's requirement, it does not accept absentee ballots from Puerto Rico, Guam, the Virgin Islands, or American Samoa, where individual plaintiffs and members of the organizational plaintiff now reside. Plaintiffs' claimed harm is thus traceable to the actions of the Hawaii legislature, not UOCAVA, and their claims against the federal defendants should be dismissed for lack of standing.

13

In any event, the district court correctly concluded that UOCAVA satisfies the requirements of equal protection. UOCAVA defines the territorial United States to include the Territories in which plaintiffs reside but does not include the Northern Mariana Islands. As the district court correctly held, that definition does not impair any fundamental right that would trigger strict scrutiny. There is no dispute that the Constitution does not create a fundamental right for residents of a Territory to vote in elections in a State in which they do not live, a result that flows from the structure of the Constitution. Heightened scrutiny does not apply to a statute like UOCAVA that functions to expand access to the ballot without imposing any restrictions on anyone's right to vote.

Nor does UOCAVA draw classifications based on a suspect or quasi-suspect class. Former residents of Hawaii who move to Puerto Rico, Guam, the Virgin Islands, or American Samoa do not constitute a suspect class. And UOCAVA treats individuals who move anywhere within the United States—including the States, the District of Columbia, and the four listed Territories—identically.

Every court of appeals to have addressed the issue has thus upheld the distinctions in UOCAVA's definitional provision under deferential review.

*See Segovia v. United States*, 880 F.3d 384, 390 (7th Cir.), *cert. denied*, 139 S. Ct. 320 (2018); *Romeu v. Cohen*, 265 F.3d 118, 124 (2d Cir. 2001); *Igartua De La Rosa v. United States*, 32 F.3d 8, 10 (1st Cir. 1994) (per curiam), *cert. denied*, 514 U.S. 1049 (1995).  Those courts have concluded that the unique historical and political relationship between the United States and the Northern Mariana Islands provides ample justification for Congress's decision to treat that Territory as more akin to a foreign country for purposes of UOCAVA.  And those courts have explained the rational basis for treating former state residents who move to a foreign country (and would ordinarily lose the right to vote in any U.S. election) differently from former state residents who move to another State or a Territory (and may vote on the same terms as fellow residents in their new place of residence).

Plaintiffs' proposed approach would break from the consensus of the other circuits and, in the process, create a distinction among territorial residents by allowing only those who had previously lived in a State to participate in presidential and congressional elections.  That outcome highlights the problems with plaintiffs' equal-protection theory and their requested remedy.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo. *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1060 (9th Cir. 2018). In an equal-protection challenge where "no suspect class is involved and no fundamental right is burdened," this Court "appl[ies] a rational basis test to determine the legitimacy of the classifications." *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1277-78 (9th Cir. 2004).

## ARGUMENT

## I. Plaintiffs Lack Standing to Challenge UOCAVA

Plaintiffs' alleged injury is that they cannot vote absentee in Hawaii. But, as the district court recognized, nothing in UOCAVA prevents them from doing so or prevents Hawaii from accepting their ballots. *See* ER-112 (explaining that "UOCAVA does not prevent Hawaii from allowing Plaintiffs to vote absentee" (quotation marks omitted)). Instead, UOCAVA creates a statutory floor, requiring States to accept absentee ballots from former residents who move overseas. Each State remains free to elect to go beyond those minimum requirements. *See, e.g.*, ER-113 (acknowledging that "Hawaii *could* confer greater rights than UOCAVA"); H.R. Rep. No. 99-765, at 19 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2009, 2023 (noting that nothing

in UOCAVA "prevent[s] any State from adopting any voting practice which is less restrictive than the practices prescribed by this Act").

Consistent with UOCAVA, Hawaii could have chosen to accept absentee ballots from former Hawaii residents, like plaintiffs, who now reside in Puerto Rico, Guam, the Virgin Islands, or American Samoa. Hawaii has opted not to do so, but that was the State's choice. Plaintiffs themselves acknowledge that Hawaii law already "grants broader rights than UOCAVA" in some respects. ER-163, ¶ 54; *see also Segovia v. United States*, 880 F.3d 384, 387 (7th Cir.) (noting that Illinois allows former residents living in American Samoa to vote absentee, even though UOCAVA does not require that result), *cert. denied*, 139 S. Ct. 320 (2018). Thus, the differential treatment of which plaintiffs complain flows not from UOCAVA, but from a legislative judgment made by their former State of residence. *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976) (holding that federal courts may "act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party").

Indeed, the Seventh Circuit has addressed and rejected the precise standing theory that plaintiffs raise here. Facing a materially identical

equal-protection challenge by former Illinois residents, the court explained that "the reason the plaintiffs cannot vote in federal elections in Illinois is not the UOCAVA, but Illinois' own election law." *Segovia*, 880 F.3d at 388. The court underscored the State's broad discretion "to determine eligibility for overseas absentee ballots," pointing out that the federal government does not "run the elections in Illinois" or "encourage Illinois not to offer the plaintiffs ballots." *Id.* at 389. The claimed harm was not traceable to UOCAVA because, wholly irrespective of any federal requirement, "[s]tate law could provide the plaintiffs the ballots they seek; it simply doesn't." *Id.* at 388. That reasoning applies with full force here.

Plaintiffs' effort in district court to characterize their injury as an abstract harm from differential treatment not only fails to distinguish the Seventh Circuit's decision, but also fails on its own terms. Apart from plaintiffs' desire to vote absentee in Hawaii, it is difficult to see what "concrete interest" is allegedly affected or threatened simply because UOCAVA defines plaintiffs' places of residence as part of the United States. *Allen v. Wright*, 468 U.S. 737, 755, 757 n.22 (1984). Regardless, even as plaintiffs frame the harm, it is still not attributable to UOCAVA. Federal law does not require differential treatment; Hawaii law does. As the Seventh

Circuit explained, "[f]ederal law *requires* [a State] to provide absentee ballots for its former residents living in" one Territory, but "it does not *prohibit* [a State] from providing such ballots to former residents in" other Territories. *Segovia*, 880 F.3d at 388. Hawaii's decision not to do so is not a constitutional defect in UOCAVA.

The district court's related observation that UOCAVA could be amended to "facilitate[] voting by U.S. citizens who reside in the territories at issue in this litigation," ER-113, misses the point that plaintiffs' claimed injury is traceable to state, not federal, law. *See Simon*, 426 U.S. at 41-42 (holding that the plaintiffs lacked standing to sue for injuries traceable to independent action of third party). For much the same reason, this is not a case in which "there are multiple links in the chain." ER-113-14 (quoting *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014)). UOCAVA is not a necessary link in the causal chain at all: if Congress repealed UOCAVA tomorrow, plaintiffs' asserted harms would subsist. In short, "plaintiffs lack standing to challenge the federal UOCAVA because their injury derives not from the federal statute, but from the failure of [Hawaii] law to guarantee them absentee ballots." *Segovia*, 880 F.3d at 392.

## II. UOCAVA's Definition of "United States" Comports with Equal-Protection Principles

### A. The District Court Properly Applied Rational-Basis Review

The district court correctly concluded that UOCAVA's definition of "'United States', where used in the territorial sense" to include "the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa," 52 U.S.C. § 20310(8), is subject to rational-basis review, ER-32, and must be upheld so long as "a plausible policy reason" supports the classifications made, ER-40.

Absent interference with a fundamental right or discrimination against a suspect class, Congress's legislative judgments will not be set aside under the equal-protection component of the Fifth Amendment where they are rationally related to legitimate government interests. *See, e.g.*, *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam) (providing that a rational-basis test is used "[u]nless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions"); *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1277-78 (9th Cir. 2004) (same). And Congress's legislative discretion is especially broad when "legislat[ing] with respect to the U.S. Territories." *United States v. Vaello Madero*, 142 S. Ct.

1539, 1541 (2022); *see also Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 586 n.16 (1976) ("The powers vested in Congress . . . to govern Territories are broad.").  Every other circuit to consider the distinctions made in UOCAVA's definition of "United States" has thus applied deferential review.  *See Segovia v. United States*, 880 F.3d 384, 390 (7th Cir.), *cert. denied*, 139 S. Ct. 320 (2018); *Romeu v. Cohen*, 265 F.3d 118, 124 (2d Cir. 2001); *Igartua De La Rosa v. United States*, 32 F.3d 8, 10 (1st Cir. 1994) (per curiam), *cert. denied*, 514 U.S. 1049 (1995).

The Supreme Court's recent decision in *Vaello Madero* reinforces that no higher level of scrutiny is warranted.  In that case, the Court rejected an equal-protection challenge by an individual who became ineligible for certain federal benefits when he moved from New York to Puerto Rico because Congress extended the program to residents of the "United States," defined to include the States and the Northern Mariana Islands, but not Puerto Rico.  *See Vaello Madero*, 142 S. Ct. at 1542.  Relying on "the text of the Constitution, longstanding historical practice, and th[e] Court's precedents," the Court concluded that Congress may "legislate[] differently with respect to the Territories[] . . . than it does with respect to the States" if it "has a rational basis for doing so."  *Id.* at 1541-43.

### 1.    UOCAVA Does Not Burden a Fundamental Right

This case does not involve a restriction on a fundamental right that would require heightened scrutiny.  In general, U.S. citizens who reside in the Territories do not have a constitutional right to participate in federal elections.  Similarly, citizens do not have a constitutionally protected right to vote in a State in which they do not reside.  Plaintiffs concede both points. *See* Pls. Br. 15 (noting that it is "undisputed" that "territorial citizens have no freestanding constitutional right to vote for president"); Pls. Br. 39 ("Nobody disputes here that there's no freestanding constitutional right for former residents of Hawaii to vote in Hawaii's federal elections.").  In the absence of a constitutional right to vote in the first place, UOCAVA cannot burden a "fundamental right" triggering heightened scrutiny.  ER-29.

**a.**  The right of citizens residing in a State to vote in their State's federal elections flows from the role of the States under the Constitution.  Under Article II, "citizens vote indirectly for the President by voting for state electors." *Attorney Gen. of Territory of Guam v. United States*, 738 F.2d 1017, 1019 (9th Cir. 1984), *cert. denied*, 469 U.S. 1209 (1985).  Because a Territory "is not a state," this Court (along with every court of appeals that has addressed the issue) has held that a Territory "can have no electors" and

thus its residents "cannot exercise individual votes in a presidential election." *Id.*; *see Ballentine v. United States*, 486 F.3d 806, 810-11 (3d Cir. 2007) (collecting cases); *Romeu*, 265 F.3d at 123 (citing unanimous circuit rulings that "the absence of presidential and vice-presidential voting rights for U.S. citizens living in U.S. territories does not violate the Constitution"). Similarly, because the Constitution provides that Members of Congress represent and are selected by the States, residents of Territories lack a constitutionally protected right to vote for them. *See Igartua v. United States*, 626 F.3d 592, 596 (1st Cir. 2010).

By statute, Congress has accorded residents of the Territories some level of representation through non-voting delegates, *see* 48 U.S.C. §§ 891, 1711, 1731, 1751, and it is undisputed that plaintiffs may vote in federal elections for their respective Territories' delegates to Congress in the same manner as every other eligible U.S. citizen residing in those Territories. What plaintiffs ask for here is something else entirely: the right to participate in federal elections in a State where they formerly lived, even though they now reside in a different part of the United States. At bottom, "residents of the territories have no fundamental right to vote in federal

elections," and "plaintiffs have no special right simply because they *used to* live in a State." *Segovia*, 880 F.3d at 390.

The Supreme Court and this Court have expressly recognized that the core of the right to vote is applicable only "to individuals who were physically resident within the geographic boundaries of the governmental entity concerned." *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68 (1978); *see id.* ("No decision of this Court has extended the 'one man, one vote' principle to individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivisions."). Even the cases on which plaintiffs rely make this limitation clear. In *Dunn v. Blumstein*, for instance, the Supreme Court explained that citizens have a "constitutionally protected right to participate in elections on an equal basis with other citizens *in the jurisdiction*." 405 U.S. 330, 336 (1972) (emphasis added). In *Lemons v. Bradbury*, this Court identified as suspect laws that "deprive some residents *in a geographically defined governmental unit* from voting in a unit wide election" or that "dilut[e] the voting power of some qualified voters *within the electoral unit*." 538 F.3d 1098, 1104 (9th Cir. 2008) (emphases added) (quoting *Green v. City of Tucson*, 340 F.3d 891, 899-900 (9th Cir. 2003)). Similarly, in *Green*, this Court applied rational-basis

24

review to a statute that comported with the line of cases mandating "the equal treatment of voters *within the governmental unit holding the election*, be it a school district, a city or a state." 340 F.3d at 900 (emphasis added).

In the same vein, plaintiffs cite other cases "involving disparate treatment in the voting context *within a single geographical jurisdiction.*" ER-25. For example, in *Evans v. Cornman*, the Supreme Court held that Maryland could not exclude Maryland residents who lived on federal land in Maryland from voting because the State treated them as state residents for most purposes. 398 U.S. 419, 424-26 (1970). In *Kramer v. Union Free School District No. 15*, the question was whether a subset of "bona fide residents of the school district" in question could be excluded from a local school board election. 395 U.S. 621, 625-27 (1969). And in *Charfauros v. Board of Elections*, this Court concluded that an election board violated multiple individuals' rights "to participate in elections on an equal basis with other citizens in the jurisdiction" by adopting two different procedures to assess Democratic versus Republican challenges to individuals' claims that they resided in the relevant jurisdiction and were eligible to vote. 249 F.3d 941, 951-52 (9th Cir. 2001) (quoting *Dunn*, 405 U.S. at 336).

The geographical limitations on the fundamental right to vote stem from the basic conception of a political community. The facts of this case demonstrate the point. Hawaii residents are uniquely positioned to elect government officials who will represent the interests of the local communities and the entire State. Plaintiffs nonetheless assert a fundamental right to participate in those elections in Hawaii "even though they left [the State], in most cases, decades ago." ER-23; *see also* ER-142, ¶ 16c (noting that one plaintiff moved to Guam in 1984 and has lived and worked there "for over 35 years"). In other words, plaintiffs insist that they "retain *former* voting rights" in Hawaii, ER-23, notwithstanding that they have not shown any specific plan to return to Hawaii, that they lack a "stake in electoral decisions affecting Hawaii residents," ER-25, and that they are already permitted to vote for local leaders and congressional delegates as part of their current political community in the Territories.

In short, the fundamental right to vote does not include a right for residents of a Territory to vote absentee in a State in which they do not reside simply because they at some earlier point resided in that State. This conclusion flows from the structure of the Constitution itself, which provides that the right to elect the President, Vice President, and Members of

26

Congress inheres in States and derivatively their residents, not in Territories. *See Guam*, 738 F.2d at 1019. And the right to vote absentee in Hawaii is no more a fundamental right for someone who moves from Hawaii to Puerto Rico than for someone who moves from Hawaii to California—both lose their right to vote in Hawaii because they no longer live in Hawaii but gain the right to vote in their new places of residence.

To require States to extend absentee voting rights to overseas civilians, Congress had no choice but to define what counts as "overseas." This form of line-drawing does not impose the type of direct burden on the franchise that triggers heightened scrutiny, especially in the context of a statute that serves to expand voting rights and imposes no burden on anyone's access to the franchise. *See McDonald v. Board of Election Comm'rs of Chi.*, 394 U.S. 802, 807-08 (1969) (upholding as rational absentee voting statutes "designed to make voting more available to some groups who cannot easily get to the polls" on the ground that legislatures may take incremental steps at reform); *Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966) (upholding as rational voting rights statute "aimed at eliminating an existing barrier to the exercise of the franchise" against challenge that the statute should "have gone farther than it did" (quotation marks omitted)).

**b.** As the district court explained, plaintiffs do not advance their case by invoking (Pls. Br. 13, 18, 20-21 60) general statements in Supreme Court cases about the importance of the right to vote. *See* ER-24. "[I]n each of these cases the Court [was] address[ing] the voting rights of citizens 'of the several States.'" *Igartua*, 626 F.3d at 602 n.9. Again, plaintiffs disregard that "the Court's recognition of the right to vote has been consistently cabined by the geographical limits set out in the Constitution." *Id.*

Plaintiffs' other efforts to obscure that UOCAVA burdens no fundamental right are equally unavailing. They note (Pls. Br. 23-26) that statutory, rather than constitutional, provisions may sometimes grant voting rights. *See, e.g.*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam); *Hussey v. City of Portland*, 64 F.3d 1260, 1263 (9th Cir. 1995). But that notion does not change the fact that the relevant government unit in this case is Hawaii, ER-26, and there is no fundamental right for plaintiffs to vote absentee in this jurisdiction where they do not reside.

To the extent that plaintiffs read (Pls. Br. 52-53) precedent to mandate heightened scrutiny for any regulation that pertains to voting, that view would be plainly mistaken. *See Colon-Marrero v. Velez*, 813 F.3d 1, 8 (1st Cir. 2016) ("The mere fact that a statute concerns voting does not establish

that the statute infringes on a fundamental right.").  The framework that the Supreme Court established in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), for evaluating voting restrictions presupposes that the regulation at issue impairs the fundamental right to vote.  Accordingly, while this Court has observed that "the *burdening* of the right to vote always triggers a higher level of scrutiny than rational basis review" under that framework, *Tedards v. Ducey*, 951 F.3d 1041, 1066 (9th Cir. 2020) (emphasis added), this Court has employed rational-basis review where, as here, the challenged statute does not burden the right to vote, *see Green*, 340 F.3d at 903.  The other circuits that have upheld the distinctions in UOCAVA have declined to apply strict scrutiny on precisely this basis.  *See Segovia*, 880 F.3d at 390; *Romeu*, 265 F.3d at 124; *Igartua De La Rosa*, 32 F.3d at 10 & n.2.

### 2. UOCAVA Does Not Discriminate Against a Suspect Class

Plaintiffs' fallback argument (Pls. Br. 50-52) that UOCAVA draws distinctions based on a protected class lacks merit.  UOCAVA simply defines the territorial United States to include the States, the District of Columbia, and four Territories.  The statute thereby treats citizens who move from a State to Puerto Rico, Guam, the Virgin Islands, or American Samoa no

differently from citizens who move from one State to another State or to the District of Columbia. Plaintiffs' claim is not based on their status as territorial residents, but rather on their status as former Hawaii residents who moved to particular Territories. Plaintiffs seek an advantage—the right to vote absentee in federal elections—that their neighbors who have never resided in a State would not have. *Cf. Califano v. Torres*, 435 U.S. 1, 4 (1978) (per curiam) (applying rational basis to reject the argument that "the Constitution requires that a person who travels to Puerto Rico must be given benefits superior to those enjoyed by other residents of Puerto Rico if the newcomer enjoyed those benefits in the State from which he came").

The relevant group—composed of former Hawaii residents who have moved to Puerto Rico, Guam, the Virgin Islands, and American Samoa—does not constitute a protected class. Plaintiffs offer no reason to think that arguments about whether territorial inhabitants have been historically subjected to "purposeful discrimination or legal disadvantage" have any application to a group composed of persons who resided in a State and then chose to move to one of four Territories. *United States v. Mayea-Pulido*, 946 F.3d 1055, 1063 & n.6 (9th Cir. 2020). In addition, "plaintiffs' current condition is not immutable, as nothing is preventing them from moving back

to [Hawaii]." *Segovia*, 880 F.3d at 390. Properly understood, the classification at issue here cannot plausibly be described as so "irrelevant to any proper legislative goal" to raise the specter of "deep-seated prejudice." *Plyler v. Doe*, 457 U.S. 202, 216 n.14 (1982).

More generally, plaintiffs' suggestion that territorial residents constitute a protected class cannot be squared with the Supreme Court's repeated application of rational-basis review to legislation bearing only on Territories. *See, e.g.*, *Harris v. Rosario*, 446 U.S. 651, 651-52 (1980) (per curiam); *Califano*, 435 U.S. at 4. The Court has recognized and approved the "longstanding congressional practice" of enacting legislation that reflects "the unique histories, economic conditions, social circumstances, independent policy views, and relative autonomy of the individual Territories." *Vaello Madero*, 142 S. Ct. at 1541. The district court cited several examples of federal law treating Territories "differently from" one another to address each Territory's distinctive needs. *See* ER-37 (noting that Congress has extended birthright citizenship and certain benefits programs to only some of the Territories). That plaintiffs have fewer rights to participate in federal elections is similarly a product of the constitutional status of the Territories, not membership in a suspect class. *See* ER-30.

Just last year, in an equal-protection challenge to a law distinguishing Puerto Rico from the States and the Northern Mariana Islands, the respondent before the Supreme Court made the same basic argument that plaintiffs do here that "strict scrutiny should apply to the classification of Puerto Rico residents because they are an easily identifiable, politically powerless minority that has experienced a history of racial and ethnic discrimination," Response Brief at 19, *Vaello Madero*, 142 S. Ct. 1539 (No. 20-303) (Aug. 30, 2021), https://perma.cc/BJS8-HFZ3, but the Court applied "[t]he deferential rational-basis test," *Vaello Madero*, 142 S. Ct. at 1543. A conclusion that heightened scrutiny applies when Congress enacts Territory-specific legislation would be sharply at odds with Congress's plenary powers under the Territory Clause and with Congress's long history of independently managing its varied relationships with each Territory. *See Quiban v. Veterans Admin.*, 928 F.2d 1154, 1160 (D.C. Cir. 1991) (Ginsburg, J.) (explaining that "[b]y definition, . . . residents of territories lack equal access to channels of political power" and declining to "require the government, on that account, to meet the most exacting standard of review" when regulating the Territories), *cert. denied*, 513 U.S. 918 (1994).

## B. UOCAVA's Definition of "United States" Advances Government Interests

In defining the boundaries of the United States for purposes of UOCAVA, Congress included the four major Territories then existing as part of the United States and treated the remaining outlying territories and the Pacific Trust territories (including the Northern Mariana Islands) as "overseas." *See* 52 U.S.C. § 20310(5)-(6), (8). That legislative judgment readily withstands rational-basis review.

1. In UOCAVA, Congress specified its intended treatment for the four then-existing Territories by defining "'United States', where used in the territorial sense," to mean "the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa." 52 U.S.C. § 20310(8). The statute thus treats individuals who move from Hawaii to one of those Territories just like individuals who move from Hawaii to another State or the District of Columbia. *See Romeu*, 265 F.3d at 125 ("[I]t is significant to note that in excluding citizens who move from a State to Puerto Rico from the statute's benefits, the UOCAVA treats them in the same manner as it treats citizens of a State who leave that State to establish residence in another State.").

Congress's decision to include these four Territories within its definition of "United States" serves the purpose of generally placing individuals who move from a State to a Territory on equal footing with the residents of that Territory for purposes of participation in federal elections. Conversely, if the Territories were not included in the definition of the United States, only those territorial residents who had previously lived in a State could vote for President—a regime that would be "arguabl[y] unfair[]" and "potential[ly] divisive[]," particularly because it might in practice make voting rights "effectively turn on wealth." *Romeu*, 265 F.3d at 125. Those "voters who could establish a residence for a time in a State would retain the right to vote for the President after their return," while voters who could not "would be permanently excluded." *Id.* Congress's decision not to create this sort of distinction in its four largest Territories directly serves an important governmental interest in preventing that outcome. *See* ER-35-36.

Plaintiffs appear not to contest that avoiding this type of distinction is a legitimate congressional purpose. Instead, they assert (Pls. Br. 53) that Congress could not have been seeking to serve that legitimate interest in Puerto Rico, Guam, the Virgin Islands, or American Samoa—which are expressly addressed in the statute—because UOCAVA does not provide

identical treatment for the Northern Mariana Islands. But the fact that Congress did not mention the Northern Mariana Islands, which was not yet a Territory when UOCAVA was enacted, does not suggest that Congress had no rational purpose when it specified its intended treatment of the four largest, most heavily populated Territories.

**2.** In any event, plaintiffs' equal-protection claim is meritless without regard to the timing of UOCAVA's enactment. A core part of their equal-protection argument is that Congress was required to exclude all of the Territories from UOCAVA's definition of "United States" because it failed to include the Northern Mariana Islands in that definition. That argument ignores the unique nature of the relationship between the United States and each Territory, as well as Congress's long history of managing its relationship with each Territory independently. *See Vaello Madero*, 142 S. Ct. at 1541 (discussing the "longstanding congressional practice" that legislation enacted under the Territory Clause reflects "the unique histories, economic conditions, social circumstances, independent policy views, and relative autonomy of the individual Territories").

Just as Congress has "distinguish[ed] the Territories from the States" across various forms of legislation, *Vaello Madero*, 142 S. Ct. at 1542-43,

federal law has long distinguished between and among Territories in matters large and small, *see* ER-37.  For example, Congress has enacted legislation ensuring that Puerto Rico is treated like a State for most statutory purposes, *see* 48 U.S.C. § 734, but has not passed analogous legislation for other Territories.  Benefits programs routinely distinguish among Territories.  *See, e.g.*, 7 U.S.C. § 2014 (treating Guam and the Virgin Islands, but no other Territory, as akin to States for purposes of the federal food stamp program); 42 U.S.C. §§ 602, 619(5) (extending benefits program to "States," defined to include Puerto Rico, Guam, the Virgin Islands, and American Samoa, but not the Northern Mariana Islands).  And Congress has extended birthright citizenship to individuals born in most Territories, *see* 8 U.S.C. § 1402 (Puerto Rico); *id.* § 1406 (Virgin Islands); *id.* § 1407 (Guam), but not to those born in "outlying possessions" like American Samoa, *see id.* § 1408 (providing that persons born in outlying possessions are "nationals[] . . . of the United States"); *see United States v. Karaouni*, 379 F.3d 1139, 1142-43 (9th Cir. 2004) (identifying persons born in American Samoa as noncitizen nationals).

The cultural, political, and legal history of the Northern Mariana Islands provides ample basis for Congress to have treated it "as more analogous to a sovereign country" than the other Territories for purposes of

36

UOCAVA.  ER-38; *see also Segovia*, 880 F.3d at 391 (explaining that "[o]ne could rationally conclude that" the Northern Mariana Islands was "more similar to" a foreign country than the "territories where the plaintiffs reside").  As the district court correctly explained, the Northern Mariana Islands is by far the most recent addition to the Territories and "has a unique historical and political relationship with the United States."  ER-39.

When Congress passed UOCAVA in 1985, the Northern Mariana Islands was still a U.N. Trust Territory.  The territorial relationship began with the United States serving as trustee, not exercising sovereign control.  *See Northern Mariana Islands v. Atalig*, 723 F.2d 682, 684-85 (9th Cir. 1984).  Whereas the other "former trust territories decided to become independent nations," the Northern Mariana Islands "elected to enter into a closer and more lasting relationship with the United States."  *Mtoched v. Lynch*, 786 F.3d 1210, 1213 (9th Cir. 2015).

Unlike every other Territory, the Northern Mariana Islands entered the United States on terms negotiated and set forth in the covenant.  *See generally Wabol v. Villacrusis*, 958 F.2d 1450 (9th Cir. 1990).  To the extent that the covenant did not address whether a certain provision of federal law would apply to the Northern Mariana Islands, the covenant contemplated

that recommendations would be made by a commission, which was still active when Congress enacted UOCAVA.  *See* Act of Mar. 24, 1976, Pub. L. No. 94-241, art. V, 90 Stat. 263, 267-69, *reprinted as amended in* 48 U.S.C. § 1801 note.  Given the consensual nature of the relationship, the United States also agreed to "limit the exercise of [its] authority" to "enact legislation . . . applicable to the Northern Mariana Islands" in order to "respect the right of self-government."  *Id.* art. I, § 105, 90 Stat. at 264.

Consistent with these unique attributes, Congress has historically treated the Northern Mariana Islands as akin to a sovereign country.  The Territory "retained nearly exclusive control over immigration" until 2008, when Congress extended federal immigration laws to the Territory in part because population changes had undermined Congress's intent to ensure that indigenous populations maintained local control.  *Eche v. Holder*, 694 F.3d 1026, 1027 (9th Cir. 2012).  However, full implementation of federal immigration law in the Northern Mariana Islands will not be complete until December 31, 2029.  *See* 48 U.S.C. § 1806(a)(2).  And while the other four permanently inhabited Territories have all had non-voting delegates to Congress since at least the 1970s, the Northern Mariana Islands was not afforded a delegate with analogous rights to participate in certain legislative

activities until 2008. *See* Consolidated Natural Resources Act of 2008, Pub. L. No. 110-229, § 711, 122 Stat. 754, 868 (codified at 48 U.S.C. § 1751).

Against this background, it was rational for Congress to determine that moving from a State to the Northern Mariana Islands qualifies as moving "overseas" for purposes of UOCAVA and that requiring States to accept absentee ballots from former residents who move to the Northern Mariana Islands furthers UOCAVA's goal of expanding overseas access to federal elections. By declining to include the Northern Mariana Islands in UOCAVA's definition of a State, moreover, Congress did not impose the concomitant requirements on that Territory's electoral process that UOCAVA imposes on the other Territories, including the obligation to accept absentee ballots from former residents who move overseas. *See* 52 U.S.C. §§ 20302, 20310(6) (imposing requirements on each "State," which is defined to include the four listed Territories). Congress's decision to take a more hands-off approach with regard to the Northern Mariana Islands respected its unique relationship to the United States.

That conclusion is reinforced by the decision in *Vaello Madero*, in which the Supreme Court upheld a statutory provision making residents of the Northern Mariana Islands, but not the other Territories, eligible for

certain federal benefits. 142 S. Ct. at 1539. The respondent argued that this differential treatment was problematic because, for purposes of the benefits program, "residents of both Puerto Rico and the [Northern Mariana Islands] are the same in all relevant respects." Response Brief at 43, *Vaello Madero*, 142 S. Ct. 1539 (No. 20-303). But the Court concluded that Puerto Rico's exclusion from the program was rational and reaffirmed that "the unique histories, economic conditions, social circumstances, independent policy views, and relative autonomy of the individual Territories" are relevant when Congress legislates pursuant to its "broad authority" under the Territory Clause. *Vaello Madero*, 142 S. Ct. at 1541. In this case, those considerations provide a sound basis for drawing distinctions between the Northern Mariana Islands and the other Territories for purposes of UOCAVA.

**3.** Congress's decision to extend absentee-voting rights to former state residents who move to foreign countries, but not those who move to other States or to U.S. Territories, is also eminently reasonable. This treatment serves "the goal of preserving a right to vote that would otherwise be lost entirely." ER-41. Absent UOCAVA, "former state residents who move to foreign countries—many of whom serve in the military—would ordinarily lose the right to vote in *any* election in the United States." ER-42. Those

who live in Territories, by contrast, may vote in the elections in those Territories—including for various forms of non-voting representatives in Congress.  "For example, a citizen who moves to Puerto Rico would be eligible to vote in the federal election for the Resident Commissioner." *Igartua de la Rosa*, 32 F.3d at 11 n.3.

Congress could rationally have concluded that it was important to ensure that Americans living in foreign countries retained some opportunity to remain connected to the government of the United States.  And Congress could rationally have concluded that those who moved to the Territories had a lesser need, given the new voting rights that they gained upon arriving in the Territories.  *See Romeu*, 265 F.3d at 124-25 (explaining that "citizens who move outside the United States[] . . . might be completely excluded from participating in the election of governmental officials in the United States but for the UOCAVA" whereas "citizens of a State who move to Puerto Rico may vote in local elections for officials of Puerto Rico's government (as well as for the federal post of Resident Commissioner)").

That state and territorial residents have different rights to participate in federal elections does not change the analysis.  As an initial matter, it is a well-settled feature of our basic constitutional structure that, absent a

constitutional amendment, those who live in the Territories lack the right to vote in presidential or congressional elections. *See Guam*, 738 F.2d at 1019; *see also Igartua de la Rosa*, 32 F.3d at 11 ("While [UOCAVA] does not guarantee that a citizen moving to Puerto Rico will be eligible to vote in a presidential election, this limitation is not a consequence of [UOCAVA] but of the constitutional requirements discussed above."). By way of example, residents of the District of Columbia could not participate in presidential elections until the Twenty Third Amendment was ratified in 1961. *See Guam*, 738 F.2d at 1019. Plaintiffs may desire another arrangement, but "the judiciary is not the institution of our government that can provide the relief they seek." *Id.* at 1020.

In any event, "the voting rights of citizens living in the territories in general" is not directly at issue. Pls. Br. 42. The pertinent question is whether Congress had a reason to distinguish between former state residents who move to foreign countries, on the one hand, and former state residents who move to other States or to U.S. Territories, on the other. Viewed through this lens, it was sensible for Congress to extend "voting rights in the prior place of residence to those U.S. citizens who by reason of their move outside the United States would otherwise have lacked any U.S.

voting rights," but not to extend "such rights to U.S. citizens who, having moved to another political subdivision of the United States, possess voting rights in their new place of residence." *Romeu*, 265 F.3d at 125.

For the same reason, the district court also properly rejected plaintiffs' suggestion—repeated on appeal (Pls. Br. 1, 10, 44)—that the relevant comparison is between citizens who move to the four listed Territories and who move to foreign countries. ER-41-42. UOCAVA "does not distinguish between those who reside overseas and those who take up residence in [the listed Territories], but between those who reside overseas and those who move anywhere within the United States." *Igartua De La Rosa*, 32 F.3d at 10. At base, plaintiffs' arguments amount to an objection that former state residents who move to plaintiffs' home Territories are treated identically to those who move to the 50 States or the District of Columbia—that is, they lose the ability to vote in the State that they left behind. That result is neither surprising nor constitutionally problematic. There is nothing irrational about Congress's decision to define the Territories as part of the "United States" for purposes of UOCAVA, 52 U.S.C. § 20310(8), on equal footing with the 50 States and the District of Columbia.

**4.** To overcome the "strong presumption of validity" that UOCAVA enjoys under rational-basis review, plaintiffs would have to "negative every conceivable basis which might support" the statutory classifications without regard to "whether the conceived reason for the challenged distinction[s] actually motivated the legislature." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993) (quotation marks omitted). Plaintiffs have not come close to making that showing. On the contrary, they consistently misapprehend that the rational-basis inquiry does not "judge the wisdom, fairness, or logic of legislative choices" but instead "ask[s] only whether there are plausible reasons for Congress' action." *Romero-Ochoa v. Holder*, 712 F.3d 1328, 1331 (9th Cir. 2013) (quotation marks omitted).

Each of the "multitude of reasons" articulated above provides a rational basis for Congress's classifications in UOCAVA. ER-43. Rather than engage with the relevant question whether these statutory distinctions are rationally related to legitimate government interests, plaintiffs assert (Pls. Br. 53-54) that they have a greater claim to vote absentee in Hawaii than their counterparts living abroad. But plaintiffs do not get to substitute their own normative judgments for the legislature's reasonable choices. *Cf. Holt*, 439 U.S. at 61-62, 70-71 (upholding as rational state statutes that

subjected an unincorporated area to the powers of the neighboring municipality without granting the residents of the unincorporated area the right to vote in the municipality's elections). Indeed, the sort of line-drawing at issue here may "inevitably require[] that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line." *Beach Commc'ns*, 508 U.S. at 315-16 (quotation marks omitted).

Nor can plaintiffs sustain their claim that UOCAVA lacks a rational basis because its protections "are not as expansive as" plaintiffs would prefer. ER-43. Congress "need not address all aspects of a problem in one fell swoop." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015). Congress may "take one step at a time" or even "select one phase of one field and apply a remedy there, neglecting the others." *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955); *Railway Express Agency v. New York*, 336 U.S. 106, 110 (1949) ("It is no requirement of equal protection that all evils of the same genus be eradicated or none at all."). Equal-protection principles do not demand that UOCAVA's definitional provision be recalibrated so as to require that States accept absentee ballots from more former residents. *See* ER-36; *see also Katzenbach*, 384 U.S. at 657 (holding

that "a statute is not invalid under the Constitution because it might have gone farther than it did" (quotation marks omitted)).

Finally, plaintiffs err in attempting (Pls. Br. 53-54) to liken UOCAVA's definition of "United States" to a state constitutional amendment "that denied gays and lesbians access to the protection of antidiscrimination laws." *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018). That amendment failed rational-basis review because it seemed "inexplicable by anything but animus toward the [affected] class" and the Supreme Court could discern no "relationship to legitimate state interests." *Romer v. Evans*, 517 U.S. 620, 632, 635 (1996). This case, by contrast, does not involve a statute devoid of "any purpose other than a bare desire to harm a politically unpopular group." *Trump*, 138 S. Ct. at 2420 (alteration and quotation marks omitted). Rather, as explained above, "[t]he distinction drawn by the UOCAVA . . . is supported by strong considerations, and the statute is well tailored to serve these considerations." *Romeu*, 265 F.3d at 124.

## III. Plaintiffs' Proposed Remedy Would Be Improper in Any Event

Assuming arguendo that there is a basis to issue any relief, the proper remedy would be to include the Northern Mariana Islands in UOCAVA's definition of "United States." In defining which citizens qualify as "overseas

voters," UOCAVA prescribes that residents of four of the five permanently inhabited Territories are in the "United States." 52 U.S.C. § 20310(5)-(6), (8). The outcome most consistent with "the legislature's intent, as revealed by the statute at hand," would not be to remove the four listed Territories, but to treat the fifth permanently inhabited Territory in the same manner as the other Territories. *See Sessions v. Morales-Santana*, 582 U.S. 47, 73 (2017).

The Supreme Court's decision in *Morales-Santana* is instructive. There, the Court held that a provision extending citizenship to certain children with one U.S. citizen parent violated equal-protection principles because it provided more lenient rules for unwed citizen mothers than for unwed citizen fathers. *Morales-Santana*, 582 U.S. at 72. Guided by the question of what "remedial course Congress likely would have chosen had it been apprised of the constitutional infirmity," the Court held that Congress would have eliminated the favorable treatment of mothers, rather than expand the rights of fathers. *Id.* at 77 (quotation marks omitted). The general preference for extending favorable treatment had to yield in the face of contrary congressional intent. *See id.* (declining to adopt remedy that "would render the special treatment Congress prescribed . . . the general rule, no longer an exception"); *accord Barr v. American Ass'n of Political*

47

*Consultants, Inc.*, 140 S. Ct. 2335, 2355 (2020) (plurality op.) ("[T]he correct result in this case is to sever the 2015 government-debt exception and leave in place the longstanding robocall restriction.").

The text, structure, and history of UOCAVA all point to a similar conclusion here. For purposes of drawing a line between voters who are and are not "overseas," UOCAVA expressly defines Puerto Rico, Guam, the Virgin Islands, and American Samoa as part of the "United States." 52 U.S.C. § 20310(5)-(6), (8). That definition does not include the Northern Mariana Islands, which had not yet become a Territory at the time of enactment. If plaintiffs were correct that this differential treatment constitutes an equal-protection problem, Congress likely would have resolved the issue by treating the Northern Mariana Islands like all of the other permanently inhabited Territories already addressed in the statute. As in *Morales-Santana*, removing the four listed Territories would improperly transform "the special treatment" reserved for one Territory into "the general rule" for all Territories. 582 U.S. at 77. It is most natural to "presume that Congress would have wanted the general rule—that U.S. territories are part of the United States—to control over the exception for the Northern Marianas." *Segovia*, 880 F.3d at 389 n.1.

As plaintiffs appear to acknowledge (Pls. Br. 63-66), their proposed remedy would create distinctions of its own. Under the regime that they envision, some territorial residents would get "to vote for President and others not, depending [on] whether they had previously resided in a State." *Romeu*, 265 F.3d at 125. Plaintiffs offer no cogent rationale for why Congress would prefer that scheme to one where someone who moves out of a State but stays within the country is placed on equal footing with fellow residents in her new State or Territory. In the end, if plaintiffs were to prevail, the net result would be a contraction of voting rights for certain residents of the Northern Mariana Islands because "instead of extending voting rights to all the territories, the proper remedy would be to extend them to none of the territories." *Segovia*, 880 F.3d at 389 n.1.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*

CLARE E. CONNORS
  *United States Attorney*

MICHAEL S. RAAB

  *s/ Brian J. Springer*
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*
  *brian.j.springer@usdoj.gov*

July 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,231 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*s/ Brian J. Springer*
Brian J. Springer

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2023, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals for the Ninth Circuit via the appellate CM/ECF system. Service

will be accomplished by the appellate CM/ECF system.


*s/ Brian J. Springer*
Brian J. Springer