SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111

TEL: (202) 371-7000

FAX: (202) 393-5760

www.skadden.com

DIRECT DIAL

202-371-7061

EMAIL ADDRESS

PARKER.RIDER-LONGMAID@SKADDEN.COM

FIRM/AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

August 7, 2024

Molly C. Dwyer
Clerk of Court
U.S. Court of Appeals for the Ninth Circuit
James R. Browning Courthouse
95 Seventh Street
San Francisco, CA 94103

RE:     *Vicente Topasna Borja, et al. v. Scott T. Nago, et al.*, No. 22-16742:
Federal Rule of Appellate Procedure 28(j) letter regarding *Texas Medical Association v. U.S. Department of Health & Human Services*, No. 23-40217, 2024 WL 3633795 (5th Cir. Aug. 2, 2024) (to be published in F.4th) (slip op. (Op.) attached)

Dear Ms. Dwyer:

*Texas Medical Association* underscores that Appellants have standing to bring their equal-protection claim against the federal defendants, contrary to the government's claim that Appellants' "injury is traceable to state, not federal law." U.S. Br. 19.

In *Texas Medical Association*, plaintiffs argued that federal departments lacked authority for their regulations setting procedures in statutorily mandated arbitrations over certain medical bills. Op. 8. Upholding the plaintiffs' standing, the Fifth Circuit rejected the departments' argument that the "arbitrators' asserted independence" "eliminate[d] the traceability component of standing." Op. 14. Even if arbitrators ultimately render independent decisions, the court explained, the regulations had a "'coercive effect' on arbitrators sufficient to prove traceability." *Id.* (quoting *Bennett v. Spear*, 520 U.S.

154, 169 (1997)). Indeed, the regulations' "very purpose" was to "instill uniformity and predictability of outcomes" in arbitration. *Id*. And "[t]hat goal," the court explained, "requires controlling arbitrators to some degree, whether or not it skews results." *Id.*

That reasoning shows that Appellants have standing to sue the federal defendants here. Congress enacted UOCAVA and its predecessor pursuant to Congress' power under § 5 of the Fourteenth Amendment to enforce the equal-protection guarantee. S. Rep. No. 93-1016, at 5 (1974). Congress sought to remedy discrimination favoring government personnel moving overseas (whom many states permitted to vote) over private citizens moving overseas (from whom many states withheld the vote). Appellants' Br. 6-7. Congress thus "preempted state residency voting requirements" and required equal extension of the vote "premised constitutionally on prior residence in a state." *Attorney General of Territory of Guam v. United States*, 738 F.2d 1017, 1020 (9th Cir. 1984).

Analogous to *Texas Medical Association*, the "very purpose" of the law was to "instill uniformity." Op. 14. Under the Supremacy Clause, UOCAVA requires states to enact Congress' discriminatory floor, excluding from the franchise those who move to the territories. It doesn't matter that states can go further and remedy the resulting equal-protection violation. The "very purpose" of UOCAVA is to "control[]" voting rights "to some degree, whether or not it skews the results." *Id*. Appellants have standing to challenge UOCAVA's "coercive effect," *id.*, on overseas voting.

Respectfully submitted,

*/s/ Parker Rider-Longmaid*

Parker Rider-Longmaid

*Counsel for Plaintiffs-Appellants*
  *Vicente Topasna Borja, et al.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that (1) this letter complies with the type-volume limitation of Federal Rule of Appellate Procedure 28(j) because, as calculated by Microsoft Word, its body contains 349 words, and (2) this letter complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: August 7, 2024                    */s/ Parker Rider-Longmaid*

                                                  Parker Rider-Longmaid

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2024, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: August 7, 2024                    */s/ Parker Rider-Longmaid*

                                                  Parker Rider-Longmaid

# ADDENDUM

*Texas Medical Association v. U.S. Department of Health & Human Services*, No. 23-40217, 2024 WL 3633795 (5th Cir. Aug. 2, 2024) (to be published in F.4th) (slip op.)

# United States Court of Appeals
# for the Fifth Circuit

_____

No. 23-40217

_____

United States Court of Appeals
Fifth Circuit

**FILED**

August 2, 2024

Lyle W. Cayce
Clerk

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL,
L.L.C.; DOCTOR ADAM CORLEY,

*Plaintiffs—Appellees,*

*versus*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES; DEPARTMENT OF LABOR; DEPARTMENT OF THE
TREASURY; XAVIER BECERRA, *Secretary, U.S. Department of Health
and Human Services*; JULIE A. SU, *Acting Secretary, U.S. Department of
Labor*; JANET YELLEN, *Secretary, U.S. Department of Treasury*,

*Defendants—Appellants,*

_____

LⅰꜰᴇNᴇᴛ, Iɴᴄᴏʀᴘᴏʀᴀᴛᴇᴅ; Eᴀꜱᴛ Tᴇxᴀꜱ Aɪʀ Oɴᴇ, L.L.C.,

*Plaintiffs—Appellees*,

*versus*

Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇꜱ Dᴇᴘᴀʀᴛᴍᴇɴᴛ ᴏꜰ Hᴇᴀʟᴛʜ ᴀɴᴅ Hᴜᴍᴀɴ Sᴇʀᴠɪᴄᴇꜱ; Xᴀᴠɪᴇʀ Bᴇᴄᴇʀʀᴀ, *Secretary, U.S. Department of Health and Human Services*; Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇꜱ Dᴇᴘᴀʀᴛᴍᴇɴᴛ ᴏꜰ ᴛʜᴇ Tʀᴇᴀꜱᴜʀʏ; Jᴀɴᴇᴛ Yᴇʟʟᴇɴ, *Secretary, U.S. Department of Treasury*; Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇꜱ Dᴇᴘᴀʀᴛᴍᴇɴᴛ ᴏꜰ Lᴀʙᴏʀ; Jᴜʟɪᴇ A. Sᴜ, *Acting Secretary, U.S. Department of Labor*; Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇꜱ Oꜰꜰɪᴄᴇ ᴏꜰ Pᴇʀꜱᴏɴɴᴇʟ Mᴀɴᴀɢᴇᴍᴇɴᴛ; Kɪʀᴀɴ Aʜᴜᴊᴀ,

*Defendants—Appellants*.

---

Appeal from the United States District Court
for the Eastern District of Texas
USDC Nos. 6:22-CV-372, 6:22-CV-373

---

Before Kɪɴɢ, Jᴏɴᴇꜱ, and Oʟᴅʜᴀᴍ, *Circuit Judges*.

Eᴅɪᴛʜ Jᴏɴᴇꜱ, *Circuit Judge*:

At the behest of Plaintiff healthcare providers[1] and providers of air ambulance services,[2] the district court vacated regulations promulgated by three federal departments[3] (collectively, the "Departments"). These regulations established priorities for independent arbitrators appointed to

---

[1] The healthcare provider Plaintiffs are Texas Medical Association, a trade association representing Texas physicians and medical students; Tyler Regional Hospital, a hospital in Tyler, Texas; and Adam Corley, a physician from Tyler, Texas.

[2] The Plaintiff providers of air ambulance services are LifeNet, Inc., and East Texas Air One.

[3] The Defendants are the Departments of Health and Human Services, Labor and the Treasury, and their Secretaries (or Acting Secretary of Labor).

resolve insurance reimbursement disputes pursuant to the No Surprises Act (the "Act"), part of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 2758-890 (2020). The Departments appealed. Tracking in large part the district court's able opinion, we AFFIRM.

# BACKGROUND

## I. Statutory Background: The No Surprises Act

The No Surprises Act is intended to protect patients from "surprise" medical bills by "limit[ing] the amount an insured patient will pay for emergency services furnished by an out-of-network provider." *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 654 F. Supp. 3d 575, 580 (E.D. Tex. 2023) (*Tex. Med. II*).[4] The Act also limits the amount an insured patient will pay for "certain non-emergency services furnished by an out-of-network provider at an in-network facility." *Id.*[5] Out-of-network providers are those who have not entered contracts for payment with the insureds' health plans. In-network providers agree to receive lower fees because the plans guarantee them dependable amounts of work. The Act was spawned by complaints that patients, and their insurers, were susceptible to receiving "surprise" bills from providers in circumstances, like emergency room visits or anesthesia administration, where they had no realistic choice of lower-cost in-network providers. Under the No Surprises Act scheme, out-of-network doctors are required to turn to the patient's insurer for payment of unreimbursed amounts, and insurers are obliged to pay them based on the prescribed "out-

_____

[4] As explained below, this is the second of several lawsuits brought by the Texas Medical Association against these defendants.

[5] The Act also limits the amount an insured patient will pay for emergency services furnished by an out-of-network provider and for certain non-emergency services furnished by an out-of-network provider at an in-network facility. *See Tex. Med. II*, 654 F. Supp. 3d at 580.

of-network rate." 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II).[6] But importantly, the covered out-of-network rates are not based on free-market principles under the Act.

The statute calls for the out-of-network rate to be determined by the following process.[7] The insurer first pays or denies payment to the provider. *Id*. § 300gg-111(a)(1)(C)(iv). If the provider is dissatisfied, the parties then engage in a 30-day negotiation; if that fails, either party may initiate arbitration (referred to in the statute as the "independent dispute resolution process" or "IDR process"). *Id*. § 300gg-111(c)(1)(A)-(B). Each side submits an offer for a payment amount. *Id*. § 300gg-111(c)(5)(B). The arbitration is a "baseball-style" process, in which the arbitrator ("IDR entity") must choose one of the two offers as the out-of-network rate. *See id*. § 300gg-111(c)(5)(A).[8]

---

[6] The relevant provisions occur in triplicate in the United States Code, because the Act amended three statutes: the Public Health Service Act (administered by the Department of Health and Human Services), the Employee Retirement Income Security Act ("ERISA") (administered by the Department of Labor), and the Internal Revenue Code (administered by the Department of the Treasury). We cite to the provisions in the Public Health Service Act, codified at Title 42 of the U.S. Code. The parallel provisions are codified at 29 U.S.C. § 1185e (ERISA) and 26 U.S.C. § 9816(c) (Internal Revenue Code).

[7] In some circumstances, the No Surprises Act looks to state law or to a State All-Payer Model Agreement under 42 U.S.C. § 1315a to supply the relevant payment rates. *See* 42 U.S.C. § 300gg-111(a)(3)(K)(i), (iii). This appeal concerns circumstances where those provisions are inapplicable; accordingly, the discussion that follows does not address circumstances where those provisions are applicable.

[8] This process, called "baseball-style" because of its association with baseball salary disputes, "leads to a convergence of offers," thus encouraging settlement. *See* Jeff Monhait, *Baseball Arbitration: An ADR Success*, 4 Harv. J. Sports & Ent. L. 105, 133 (2013). Unlike more open-ended arbitration, where the arbitrator might be expected to split the difference, in "baseball-style" arbitration, the parties have incentives not to offer an "aspirational" number. *Id*. at 132.

No. 23-40217

The No Surprises Act lists several factors that the arbitrator "shall consider" in determining the out-of-network rate. *Id.* § 300gg-111(c)(5)(C)(i). These factors include:

i. The "qualifying payment amount" ("QPA"). *See id.* § 300gg-111(c)(5)(C)(i)(I). The QPA is typically the median rate the insurer would have paid for comparable services in the same geographic area if provided by an in-network provider or facility. *See id.* § 300gg-111(a)(3)(E)(i).

ii. Five "additional circumstances": (I) The doctor's "level of training"; (II) the "market share" of the doctor or insurer in the geographic region; (III) the "acuity" of the patient or the "complexity" of the case; (IV) the "scope of services" of the facility; and (V) "[d]emonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or . . . the plan . . . to enter into network agreements and, if applicable, contracted rates between [those entities] during the previous 4 plan years." *Id.* § 300gg-111(c)(5)(C)(ii)(I)-(V).[9]

The regulations at issue govern how arbitrators should weigh these factors. The Parties dispute whether the regulations are valid under the statute.

---

[9] The provisions cited here apply to the arbitration process for all providers except air ambulances. The provisions governing air ambulance arbitrations are materially similar. *Compare, e.g.*, 42 U.S.C. § 300gg-111(c)(5)(C)(ii)(I) ("The level of training, experience, and quality and outcomes measurements of the provider or facility that furnished such item or service[.]"), *with id.* § 300gg-112(b)(5)(C)(ii)(III) ("The training, experience, and quality of the medical personnel that furnished such services."). There are also a few differences not relevant here. *Compare, e.g., id.* § 300gg-111(c)(5)(C)(ii)(II) ("The market share held by the nonparticipating provider . . . in the geographic region[.]"), *with id.* § 300gg-112(b)(5)(C)(ii)(IV) ("Ambulance vehicle type[.]").

## II. Interim Final Rule and Prior Proceedings

The Act required the Departments to "establish by regulation one independent dispute resolution process . . . under which . . . [an arbitrator] determines . . . the amount of payment" for covered services "in accordance with the succeeding provisions" addressing the dispute resolution process. 42 U.S.C. § 300gg-111(c)(2)(A). In July 2021, the Departments' Interim Final Rule established a methodology for how insurers must calculate QPAs. *See* Requirements Related to Surprise Billing: Part I, 86 Fed. Reg. 36,872 (July 13, 2021) ("Interim Final Rule I").[10] Shortly thereafter, in October 2021, the Departments issued a second Interim Final Rule establishing the arbitration process for resolving payments between health plans and providers. *See* Requirements Related to Surprise Billing: Part II, 86 Fed. Reg. 55,980 (Oct. 7, 2021) ("Interim Final Rule II"). This rule included what the Departments described as a "rebuttable presumption that the QPA is the appropriate payment amount." *Id.* at 56,060.

Interim Final Rule II was successfully challenged in previous litigation filed in the Eastern District of Texas by several medical providers (who overlap with the Plaintiffs here). *See Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 587 F. Supp. 3d 528 (E.D. Tex. 2022), *appeal voluntarily dismissed*, 2022 WL 15174345 (5th Cir. Oct. 24, 2022) (*Tex. Med. I*); *LifeNet, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 617 F. Supp. 3d 547, 563 (E.D. Tex. 2022). The district court held that the Rule's rebuttable presumption in favor of the QPA conflicted with the Act's provision requiring arbitrators to consider both the QPA and any information regarding the "additional circumstances" listed in the statute. *See Tex. Med. I*, 587 F. Supp. 3d at 542-

---

[10] As with the Act, the rules appear in triplicate in the Code of Federal Regulations. We cite to Title 45—Public Health. The parallel provisions appear at 29 C.F.R. § 2590.716-1 (Labor) and 26 C.F.R. § 54.9816-1T (Internal Revenue).

43; *LifeNet*, 617 F. Supp. 3d at 561. The court also held that the Departments violated the Administrative Procedure Act ("APA") by failing to provide the required notice and comment. *Tex. Med. I*, 597 F. Supp. 3d at 548; *LifeNet*, 617 F. Supp. 3d at 562. The court entered a universal vacatur of the provisions of the rule that effectuated this presumption in favor of the QPA. *See Tex. Med. I*, 597 F. Supp. 3d at 549; *LifeNet*, 617 F. Supp. 3d at 563.[11]

### III. Final Rule and This Litigation

In response to the unfavorable district court decisions and comments received on the interim final rules, the Departments promulgated the August 2022 Final Rule at issue in this case. *See* Requirements Related to Surprise Billing, 87 Fed. Reg. 52,618 (Aug. 26, 2022) ("Final Rule").[12] This Final

---

[11] In another lawsuit, some of the same plaintiffs have successfully challenged the calculation of the arbitrator's fee. *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, No. 6:23-cv-59, 2023 WL 4977746 (E.D. Tex. signed Aug. 3, 2023) (*Tex. Med. III*). The district court held that the agency actions violated the notice-and-comment requirement of the Administrative Procedure Act. *Id.* The Departments did not appeal.

In yet a fourth lawsuit, some of the same plaintiffs have successfully challenged aspects of the QPA calculation methodology. *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, No. 6:22-cv-450, 2023 WL 5489028 (E.D. Tex. signed Aug. 24, 2023), *appeal docketed*, No. 23-40605 (5th Cir. Oct. 25, 2023) (*Tex. Med. IV*). The U.S. District Court for the District of Columbia has upheld some aspects of the same methodology, stating: "Th[is] is the very type of well reasoned analysis the APA requires[.]" *Ass'n of Air Med. Servs. v. U.S. Dep't of Health & Hum. Servs.*, No. 21-3031, 2023 WL 5094881, at *7 (D.D.C. Aug. 9, 2023). In one instance, the two courts reached results that point in opposite directions. *Compare id.* at *3 (upholding the exclusion of single-case agreements from the calculation of the QPA as not arbitrary or capricious), *with Tex. Med. IV*, 2023 WL 5489028, at *15 (striking down the same as inconsistent with the No Surprises Act).

[12] The federal online portal went live in April 2022; between April 15, 2022, and March 31, 2023, almost 335,000 arbitration proceedings were initiated—"nearly fourteen times greater than the Departments initially estimated the caseload would be over the course of a full calendar year." Ctrs. for Medicare & Medicaid Servs., Federal Independent Dispute Resolution Process—Status Update 1 (2023), https://www.cms.gov/files/document/federal-idr-processstatus-update-april-2023.pdf.

Rule sets out three procedures arbitrators must follow in assessing which offer best reflects the value of the services at issue.

*First*, the arbitrator must consider the QPA and "then" consider information regarding the additional statutory factors, if the parties elect to submit any such additional information. 45 C.F.R. § 149.510(c)(4)(iii)(A)-(B).

*Second*, in considering additional evidence beyond the QPA, the arbitrator "should not give weight to information to the extent it is not credible, it does not relate to either party's offer for the payment amount . . . , or it is already accounted for by the [QPA]." *Id.* § 149.510(c)(4)(iii)(E); *see also id.* § 149.520(b)(3) (containing similar language in a parallel provision that is specific to air ambulance arbitrations). The rule includes five illustrative examples. *Id.* § 149.510(c)(4)(iv).

*Finally*, if the arbitrator relies on information beyond the QPA, the arbitrator's written decision "must include an explanation of why the [arbitrator] concluded that this information was not already reflected in the [QPA]." *Id.* § 149.510(c)(4)(vi).

The Plaintiffs filed suit ("*Texas Medical II*") in the Eastern District of Texas alleging that the Departments lacked statutory authority to promulgate these three aspects of the arbitration process.

On cross-motions for summary judgment, the district court granted summary judgment to the Plaintiffs and entered a universal vacatur of the challenged provisions. Initially, the court held that the Plaintiffs had Article III standing to sue based on procedural and financial injuries they would incur as a result of the provisions. Substantively, it concluded that the provisions impermissibly "place a thumb on the scale for the QPA." Whereas the Act "requires arbitrators to consider all the specified information in determining which offer to select" (that is, the quantitative

QPA as well as the generally qualitative additional circumstances listed in
the statute), the final rule privileges the QPA "by requiring arbitrators to
begin with the QPA and then imposing restrictions on the non-QPA factors
that appear nowhere in the statute." The court also rejected the
Departments' argument that the final rule merely establishes "reasonable
evidentiary and procedural rules"—for example, directing arbitrators not to
place weight on information that is not credible or not "related," or that
double-counts facts already reflected in the QPA.[13]

---

[13] The court vacated

(1) the word "then" in 45 C.F.R. § 149.510(c)(4)(iii)(B) ("The certified IDR entity must
then consider information submitted by a party that relates to the following
circumstances[.]");

(2) the entirety of § 149.510(c)(4)(iii)(E) ("In weighing the considerations described in
paragraphs (c)(4)(iii)(B) through (D) of this section, the certified IDR entity should
evaluate whether the information is credible and relates to the offer submitted by either
party for the payment amount for the qualified IDR item or service that is the subject of
the payment determination. The certified IDR entity should not give weight to
information to the extent it is not credible, it does not relate to either party's offer for the
payment amount for the qualified IDR item or service, or it is already accounted for by the
qualifying payment amount under paragraph (c)(4)(iii)(A) of this section or other credible
information under paragraphs (c)(4)(iii)(B) through (D) of this section.");

(3) the entirety of § 149.510(c)(4)(iv) (containing illustrative examples);

(4) the final sentence of § 149.510(c)(4)(vi)(B) ("If the certified IDR entity relies on
information described under paragraphs (c)(4)(iii)(B) through (D) of this section in
selecting an offer, the written decision must include an explanation of why the certified
IDR entity concluded that this information was not already reflected in the qualifying
payment amount."); and

(5) the entirety of § 149.520(b)(3) (containing credibility, relatedness, and double-
counting provisions for air ambulances).

*Tex. Med. II*, 654 F. Supp. 3d at 595. The court also vacated the parallel provisions in Titles
26 and 29 of the Code of Federal Regulations. *Id*.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo. *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022). The district court's decision to vacate the challenged provisions of the rule is reviewed for abuse of discretion. *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022).

## DISCUSSION

The Departments defend this Rule on the grounds they articulated in the district court. They contend that the Plaintiffs lack Article III standing because their alleged injuries are speculative or not cognizable. The Departments support all of the challenged provisions as "modest procedural and evidentiary guardrails" that comfortably fit within the Act's delegation to "establish by regulation one independent dispute resolution process . . . under which . . . [an arbitrator] . . . determines . . . the amount of payment" for services covered by the Act. 42 U.S.C. § 300gg-111(c)(2)(A). Consequently, the Departments deny any violation of the Administrative Procedure Act. They argue that universal vacatur, in any event, was an impermissible remedy even if this court affirms the district court's determination.

## I. Standing

We exercise jurisdiction only if a plaintiff establishes Article III standing. At the summary judgment stage, this requires proof of (1) "an injury in fact" that is (2) "fairly traceable to the challenged conduct" and (3) "likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. ___, 143 S. Ct. 2355, 2365 (2023); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992) (elaborating on the three elements of standing). The Plaintiffs here allege that they suffer a procedural injury if they are subjected to arbitrations unfairly skewed, in their view, by

regulations illegally placed upon arbitrators who have independent status under the Act. They also allege financial injuries from the likelihood that the regulations will arbitrarily weigh in favor of lower QPA-based reimbursements pursuant to the baseball-style arbitrations governed by these regulatory benchmarks.

The district court found that the Plaintiffs' claim that they were "deprive[d] . . . of the arbitration process established by the Act" constituted an injury in fact sufficient for standing. It is established that "subjection to unwanted procedures" in various contexts may confer standing. 13A Charles Alan Wright & Alan R. Miller, Federal Practice and Procedure § 3531.4 & n.140 (3d ed. Apr. 2023 update) (collecting cases); *see, e.g., Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 447 (5th Cir. 2019) ("A plaintiff can show a cognizable injury if it has been deprived of 'a procedural right to protect [its] concrete interests.'" (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496, 129 S. Ct. 1142, 1151 (2009)); *Texas v. United States*, 497 F.3d 491, 497 (5th Cir. 2007) (holding that a plaintiff subjected to an "allegedly invalid process" has standing).

The Departments argue that the "procedural injury" doctrine applies only to situations where a plaintiff alleges that an agency failed to follow the correct procedures in promulgating a rule. Its interpretation of *Texas v. Equal Employment Opportunity Commission*, however, is unduly narrow. This court held that the state "suffered a procedural injury" because the Commission issued an employment "guidance" without affording prior notice and comment under the APA. *Texas*, 933 F.3d at 447. But nothing in the opinion limits procedural standing to cases where the agency fails to follow notice-and-comment procedures.

Further, this court and others have found standing in precisely the circumstances present here. *See Texas v. United States*, 497 F.3d at 497; *New Mexico v. Dep't of the Interior*, 854 F.3d 1207, 1216-17 (10th Cir. 2017). In *Texas v. United States*, this court held that Texas had standing to challenge regulations promulgated by the Secretary of the Interior concerning Indian gaming licenses. 497 F.3d at 494-95. Texas was "subjected to an administrative process involving mediation" in violation of an express statutory procedural prerequisite to mediation. *Id*. at 497. It is true that the court "did not explicitly characterize the injury that Texas had suffered as a procedural one." *New Mexico*, 854 F.3d at 1217. Nevertheless, the "key" to this court's conclusion in that case "was that Texas had been deprived of an alleged statutory procedural protection." *Id.* (quoting *Del. Dep't of Nat. Res. & Env't Control v. Fed. Energy Regul. Comm'n*, 558 F.3d 575, 579 (D.C. Cir. 2009)).

Here, the Act provides for independent arbitrators to review certain reimbursement claims, and the Plaintiffs assert injury from the Department's regulations that unlawfully skew the arbitrators' decisionmaking. As in *Texas v. United States*, this case turn on the substance of the regulations, not the APA procedures. *See* 497 F.3d at 497. The Departments also assert that "it was Congress, not the Departments, that directed plaintiffs and other medical providers to participate in negotiation and arbitration processes." That is true, but again, it is the Departments' regulations, not the statute, that "compelled [the Plaintiffs] to participate in an invalid administrative process." *See Texas v. United States*, 497 F.3d at 496-97. This injury is enough to show standing.

In the alternative, the fact that the Plaintiffs are now subject to regulations that are contrary to law is itself a concrete injury sufficient to give them standing. When "a plaintiff is an object of a regulation 'there is ordinarily little question that the action or inaction has caused him injury, and

that a judgment preventing or requiring the action will redress it.'" *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015) (quoting *Lujan*, 504 U.S. at 561-62, 112 S. Ct. at 2137 (1992)). In *Contender Farms*, this court held that participants in Tennessee "walking horse events" had standing to challenge regulations promulgated under the Horse Protection Act. *Id*. at 265. Those regulations empowered "Horse Industry Organizations" to impose suspensions on the participants in certain cases. *Id*. at 262. This court stated that "the suspensions target participants in Tennessee walking horse events . . . , and they are as much objects of the Regulation as the [Horse Industry Organizations] themselves." *Id*. at 265.

Similarly, the arbitrators under this Act are legally required to apply the regulatory provisions at issue, like the Horse Industry Organizations in *Contender Farms*. *See id*. at 262. The arbitrators have power to bind the Plaintiffs by determining the monetary value of their services, just as the Horse Industry Organizations had power to sanction the participants in the Tennessee "walking horse events." *See id*. "[C]ommon sense" dictates that the Plaintiffs have standing to challenge the rule. *See id*. at 265.

The Plaintiffs have a third basis for standing based on affidavits that attest to likely financial injury if arbitrators are constrained by the biased provisions of the Final Rule. Because the Plaintiffs' requests for reimbursement will often exceed QPA amounts, the Final Rule provisions pose a threat of reducing their claims. Financial injury "is a quintessential injury upon which to base standing." *El Paso County v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020) (quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006)). The Departments characterize the Plaintiffs' concern as "speculative," but for standing purposes, the court must accept as valid their claim that the Final Rule favors the QPA. *See Fed. Election Comm'n v. Ted Cruz for Senate*, 596 U.S. 289, 298, 142 S. Ct. 1638, 1647-48 (2022). In fact, as one of the Departments' amici points out, the Congressional Budget

Office's analysis of the Act shows that reliance on the QPA would result in lower payments to providers. Cong. Budget Off., Estimate for Divisions O Through FF, H.R. 133, Consolidated Appropriations Act, 2021, Public Law 116-260, Enacted on December 27, 2020, at 3 (2021). And the more closely the "independent" arbitrators track QPA reimbursement levels as a result of the challenged provisions of the Final Rule, the more likely the Plaintiffs are to suffer financial injuries.[14]

Finally, the Departments do protest too much in relying on arbitrators' asserted independence to eliminate the traceability component of standing. *See Lujan*, 504 U.S. at 560-61, 112 S. Ct. at 2136 ("[T]he injury . . . [must not be] 'th[e] result [of] the independent action of some third party not before the court.'" (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42, 96 S. Ct. 1917, 1926 (1976))). By design, the Final Rule has a "determinative or coercive effect" on arbitrators sufficient to prove traceability. *See Bennett v. Spear*, 520 U.S. 154, 169, 117 S. Ct. 1154, 1164 (1997). The very purpose of the "modest procedural and evidentiary guardrails," in the Departments' explanation, is to instill uniformity and predictability of outcomes. That goal requires controlling arbitrators to some degree, whether or not it skews results. The Departments cannot have it both ways on traceability.

---

[14] The Departments purport to rely on "disclaimers" in the Federal Register, which provide that the Final Rule "do[es] not require [arbitrators] to default to the offer closest to the QPA or to apply a presumption in favor of that offer," and that "these final rules specify that [arbitrators] should select the offer that best represents the value of the item or service under dispute after considering the QPA and all permissible information submitted by the parties." 87 Fed. Reg. at 52,628. Official commentary, however, lacks the status of the rules themselves and is merely hortatory.

No. 23-40217

## II. The Rule Conflicts with the Act

The Administrative Procedure Act requires a reviewing court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Where a statute delegates authority to an agency, "the role of the reviewing court under the APA is" to "'fix[] the boundaries of [the] delegated authority' and ensur[e] the agency has engaged in '"reasoned decisionmaking"'" within those boundaries." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024) (citation omitted) (quoting Henry P. Monaghan, Marbury *and the Administrative State*, 83 COLUM. L. REV. 1, 27 (1983), and then quoting *Michigan v. EPA*, 576 U.S. 743, 750, 135 S. Ct. 2699, 2706 (2015)).[15]

The No Surprises Act states that the Departments "shall establish by regulation one independent dispute resolution process . . . under which . . . [an arbitrator] determines, . . . in accordance with the succeeding provisions of this subsection, the amount of payment" for services covered by the Act. 42 U.S.C. § 300gg-111(c)(2)(A). The Departments exploit the term "one independent dispute resolution process" as the basis for the challenged portions of the Final Rule. As they correctly note, activities clearly contemplated by that provision include identifying the type of notice required to commence arbitrations, 45 C.F.R. § 149.510(b)(2)(iii), setting up an online portal for arbitration proceedings, *see id*. § 149.510(b)(2)(iii)(C), promulgating the selection process and standards for independent arbitrators, *id*. § 149.510(c)(1)(i)-(ii), and prescribing recordkeeping requirements for arbitration entities, *id*. § 149.510(c)(4)(viii). But nothing in

---

[15] *Loper Bright* was decided after oral argument was held in this case but before this opinion was issued.

the Act instructs arbitrators to weigh any one factor or circumstance more heavily than the others, nor does the Act authorize the Departments to superimpose regulatory rules on the clear statutory mandate. The Final Rule therefore exceeds the Departments' authority.

## A. Congress delegated to the Departments only narrow rulemaking authority

As noted above, the No Surprises Act states that the Departments "shall establish by regulation one independent dispute resolution process." 42 U.S.C. § 300gg-111(c)(2)(A). The Departments leapfrog from the purely administrative authority conferred by this provision to a broader claimed delegation that allows them to fill the gaps in the arbitration process itself with "procedural and evidentiary guidelines" that the "independent" arbitrators must follow. This is a lily pad too far.

Of course, Congress may so draft statutes as to "confer discretionary authority on agencies." *Loper Bright*, 144 S. Ct. at 2268. But courts have "obligations under the APA" to "police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Id.*

The No Surprises Act did not delegate to the Departments the authority to set substantive standards for the independent arbitrators to observe. Those standards are fully determined by the text of the Act itself. The Act provides that the arbitrator must determine the amount of payment "in accordance with the succeeding provisions of this subsection," that is, according to a list of statutory criteria described above. 42 U.S.C. § 300gg-111(c)(2)(A). As the district court noted, "[t]he Act specifies in meticulous detail . . . the information for [the arbitrators] to consider." *Tex. Med. II*, 654 F. Supp. 3d at 592. The specific and comprehensive statutory list necessarily controls over the Departments' general authorization for creating

the mechanics of the arbitration process. The challenged portions of the Rule thus unlawfully "supplement[]" a "comprehensive" statutory scheme. *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 753 (5th Cir. 2011); *see also Texas v. United States*, 809 F.3d 134, 179, 186 (5th Cir. 2015) ("DAPA is foreclosed by Congress's careful plan" because, "[i]n specific and detailed provisions," Congress has already "expressly and carefully provide[d] legal designations allowing defined classes of aliens to be lawfully present[.]"), *aff'd by an equally divided court*, 579 U.S. 547, 136 S. Ct. 2271 (2016).[16]

Moreover, when Congress charges a decisionmaker with considering several factors without assigning them a procedural order or "specific weight," the weighing of those factors is left to the decisionmaker's sound discretion. *New York v. Reilly*, 969 F.2d 1147, 1150 (D.C. Cir. 1992). Here, the No Surprises Act unambiguously provides that arbitrators deciding which offer to select "shall consider . . . the qualifying payment amounts . . . and . . . information on any circumstance described in clause (ii)." 42 U.S.C. § 300gg-111(c)(5)(C)(i). In *Reilly*, the decisionmaker, which happened to be the EPA, was specifically empowered to balance statutory factors underlying the "best demonstrated technology" for limiting harmful emissions. *Id*. at 1149 (quoting Standards of Performance for New Stationary Sources; Municipal Waste Combustors, 54 Fed. Reg. 52,251, 52,253 (proposed Dec. 20, 1989)). *Reilly*'s analysis applies here, too, where the statutorily empowered decisionmaker is an independent arbitrator.

---

[16] One of the Plaintiffs' amici argues that setting a benchmark rate forces smaller, independent providers to consolidate with larger systems, increasing healthcare costs, as apparently happened in California after the state passed its own surprise medical billing law, Cal. Health & Safety Code § 1371.31. *See* Erin L. Duffy, *Influence of Out-of-Network Payment Standards on Insurer-Provider Bargaining: California's Experience*, 25 Am. J. Managed Care e243, e245 (2019).

A helpful contrast may be drawn with *Cuozzo Speed Technologies*, to which the Departments turn in vain for support. In that case, a statute granted the Patent Office the authority to issue regulations "establishing and governing inter partes review." *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 266, 136 S. Ct. 2131, 2136 (2016) (quoting 35 U.S.C. § 316(a)(4)).[17] The Patent Office issued a regulation stating that the agency in inter partes review "shall [construe a patent claim according to] its broadest reasonable construction in light of the specification of the patent in which it appears." *Id.* (quoting 37 C.F.R. § 42.100(b) (2015)). The Supreme Court upheld the regulation as a permissible gap-filler. *Id.* at 276-77, 136 S. Ct. at 2142. But the Court's reasoning relied on a circumstance critically different from anything in this case: in *Cuozzo*, "neither the statutory language, its purpose, [n]or its history suggest that Congress considered what standard the agency should apply when reviewing a patent claim in inter partes review." *Id.* at 280, 136 S. Ct. at 2144. Here, by contrast, Congress has provided a comprehensive list of factors for the arbitrators to consider under the No Surprises Act.

With these regulations, the Departments exceeded their authority by infringing on arbitrators' discretion to balance the statutory factors. Congress has provided that it is not the Departments, but the arbitrator, who "shall consider" how to balance the factors under the statute. *See* 42 U.S.C. § 300gg-111(c)(5)(C)(i). By taking this discretion away from the Departments and giving it to the arbitrator, Congress created an "outer

---

[17] It is unclear how much of *Cuozzo* survives *Loper Bright*. Regardless, *Cuozzo* does not help the Departments here. The No Surprises Act, like the statute at issue in *Cuozzo*, delegates some authority to the Departments to promulgate regulations. But we hold that, unlike in *Cuozzo*, the regulations promulgated by the Departments exceeded that delegated authority.

statutory boundary" beyond which the Departments were not authorized to stray. *See Loper Bright*, 144 S. Ct. at 2268.

## B. The Rule exceeds the Departments' authority

The Rule exceeds the Departments' authority because it imposes three extrastatutory requirements on arbitrators: (1) the arbitrators must consider the QPA first and "then" the other factors; (2) the arbitrators must not consider information that is not "credible" or "related to" the issue, or that is already accounted for in the QPA; and (3) the arbitrators must explain their reasons if they depart from the QPA.

### 1. Starting with the Qualifying Payment Amount (QPA)

The Final Rule instructs arbitrators to consider the QPA and "then" to consider the "additional circumstances" listed in the statute. 45 C.F.R. § 149.51.510(c)(4)(iii)(B). The Rule thus prescribes a temporal sequence that the arbitrator must follow in analyzing the statutory factors.

The Departments defend the word "then" on the grounds that "[t]he structure of the statute, like the rule, directs arbitrators to the QPA first, and to other circumstances second." The statute states that arbitrators "shall consider" (I) the QPAs and (II) "information on any circumstance described in" the following clause. 42 U.S.C. § 300gg-111(c)(5)(C)(i). This order makes sense because the additional circumstances are not always relevant, whereas the QPA always is. It "represents the typical payment amount" that would reimburse in-network providers. Final Rule, 87 Fed. Reg. at 52,627. The Departments insist that "beginning the analysis with the QPA . . . does not give arbitrators leeway to fail to account for . . . 'additional circumstances' in instances where such information is submitted."

But in other statutes, when Congress has so chosen, it has prescribed looking first to one statutory factor and *then* to another. *See, e.g.*, *Ramirez v. Immigr. & Customs Enf't*, 471 F. Supp. 3d 88, 176 (D.D.C. 2020) (discussing

8 U.S.C. § 1232(c)(2)(B), which instructs the agency to "consider placement . . . after taking into account" other factors). Here, Congress gave no such instruction. It does not follow from the fact that a factor is *listed* first, that it must also be *considered* first. The Departments contend that the QPA must be considered first because it will be relevant "in all cases." Final Rule, 87 Fed. Reg. at 52,627. But the Act contains no language specifying the order in which arbitrators must consider information that is relevant.[18] Likewise, the Departments point to the subchapter heading's reference to "additional factors," implying that the QPA may be somehow primary. But the word "additional" has no temporal connotation and, in any event, subchapter headings are not dispositive. *United States v. Lawrence*, 727 F.3d 386, 393 (5th Cir. 2013).

By telling the arbitrators that they *must* consider the QPA before all other factors, the Departments place a thumb on the scale in favor of the insurer-determined QPA in derogation of the other congressionally mandated factors. It would distort the statutory scheme for the Departments to impose such an extrastatutory requirement here.

_____

[18] The Plaintiffs use legislative history to show that the arbitration process "is the result of years of congressional deliberation and compromise." Multiple failed bills "would simply have pegged out-of-network reimbursement to the in-network rate." *See* H.R. 3630, 116th Cong. (2019); S. 1895, 116th Cong. (2019). And Congress members recognized that "giving too much weight" to in-network rates could empower insurers to "push rates down" by threatening to "drop providers from networks." Press Release, Rep. Richard Neal, Neal Opening Statement at Markup of Surprise Medical Billing, Hospice, and Health Care Investment Transparency Legislation (Feb. 12, 2020). Under the Act, arbitrators "must equally consider many factors." Joint Statement of House Committees on Ways and Means, Energy and Commerce, and Education and Labor, Protecting Patients from Surprise Medical Bills (Dec. 21, 2020). In the absence of ambiguity, however, we need not consider this legislative history.

No. 23-40217

### 2. Disregarding "not credible" or "unrelated" information and prohibiting "double-counting"

The Final Rule instructs arbitrators, in weighing the "[a]dditional circumstances," "not [to] give weight to information" that is "not credible," that "does not relate to either party's offer," or that "is already accounted for by the [QPA]" or other information. 45 C.F.R. § 149.510(c)(4)(iii)(E). These provisions include five examples demonstrating the application of the rule. *Id.* § 149.510(c)(4)(iv).

The Departments argue that these provisions and the illustrative examples "mirror the sort of evidentiary rules that commonly apply" in adjudications. *See, e.g.*, FED. R. EVID. 402, 403, 611(b). They characterize the Plaintiffs' "true grievance" as with the calculation of the QPA itself, which is not at issue in this case, but which the Plaintiffs have challenged in *Texas Medical IV*. *See* 2023 WL 5489028, at *1.[19] We do not read the Plaintiffs' contention that way.

Instead, as the district court explained, "the Rule precludes arbitrators from 'giv[ing] weight' to some information that the Act requires them to consider—*e.g.*, information relating to the non-QPA factors that happens to be 'already accounted for' in the QPA." *Tex. Med. II*, 654 F. Supp. 3d at 592 (citing 45 C.F.R. § 149.510(c)(4)(iii)(E)). The statute states that the arbitrators "shall consider" the "additional" factors, and Congress did not soften this "mandatory duty" with any qualifying language. 42 U.S.C. § 300gg-111(c)(5)(C)(i)(II). "[T]he mandatory 'shall' . . . normally creates an obligation impervious to . . . discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35, 118 S. Ct. 956, 962

---

[19] This case had not been decided by the time the Parties filed their briefs. The plaintiffs later prevailed. *See Tex. Med. IV*, 2023 WL 5489028, at *1.

(1998); *see also Anderson v. Yungkau*, 329 U.S. 482, 485, 67 S. Ct. 428, 430 (1947) ("The word 'shall' is ordinarily 'The [sic] language of command.'" (quoting *Escoe v. Zerbst*, 295 U.S. 490, 493, 55 S. Ct. 818, 820 (1935))). When Congress orders a decisionmaker to "consider" a list of factors, Congress is instructing that "[e]ach factor must be given genuine consideration and some weight" in the final determination. *Pub. Serv. Co. of Ind. v. Interstate Com. Comm'n*, 749 F.2d 753, 763 (D.C. Cir. 1984). The decisionmaker "is not free to ignore any individual factor entirely." *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998). These provisions treat the QPA in "a dramatically different fashion" from the other factors and so "distort[] the judgment Congress directed the [arbitrators] to make." *See Am. Corn Growers Ass'n v. EPA*, 291 F.3d 1, 6 (D.C. Cir. 2002).

Congress imposed on the arbitrators a mandatory duty to consider all the factors listed in the statute, giving preference to none. The Departments' not-so-subtle attempt to prevent the arbitrators from considering some of them in some cases thus violates the express, unambiguous terms of the Act.

### 3. The regulations violate the Act by imposing an explanation requirement

The Final Rule states: "If the [arbitrator] relies on information [about the non-QPA factors] in selecting an offer, the written decision must include an explanation of why the [arbitrator] concluded that this information was not already reflected in the [QPA]." 45 C.F.R. § 149.510(c)(4)(vi)(B).

The Departments contend that this provision enables the Departments to "fulfill their statutory functions to monitor and to report on how often, and why, an offer that is selected exceeds the QPA." Final Rule, 87 Fed. Reg. at 52,632. Future rulemaking will benefit from a robust case-by-case explanation why arbitrators may find in a given case that the QPA does not "best represent[] the value" of the item or service at issue. 45 C.F.R.

§ 149.510(c)(4)(ii)(A).  Further, the provision follows from the requirement that arbitrators not rely on additional information that is duplicative.

But as the Plaintiffs persuasively argue, the effect of this provision is to make the arbitrator work harder only if he gives weight to any information other than the QPA.  Because the arbitrator is under no obligation to explain why he chooses the QPA for reimbursement, this unequal burden tends to bias outcomes in favor of the offer closest to the QPA.  To analogize to a different context, the Supreme Court has noted that under the criminal Sentencing Guidelines, using the guidelines as a starting point in every case "make[s] the imposition of a non-Guidelines sentence less likely."  *Peugh v. United States*, 569 U.S. 530, 542, 133 S. Ct. 2072, 2083-84 (2013) (citing *Miller v. Florida*, 482 U.S. 423, 435, 107 S. Ct. 2446, 2453 (1987)).  The Final Rule would produce a similar result, but such a result would be in violation of the statute's command that all factors be considered.  *Cf. Am. Corn Growers Ass'n*, 291 F.3d at 6 ("To treat one of the [mandatory] statutory factors in such a dramatically different fashion distorts the judgment Congress directed the [arbitrators] to make.").  Although it is true that Congress has required the Departments to report *how often* reimbursements exceed the QPAs, 42 U.S.C. § 300gg-111(c)(7)(A)(v), (B)(iv), the reports need not explain *why* this is so.  Nor is there any requirement for the Departments' reports to reference explanations only when a non-QPA reimbursement is chosen.  The Departments' skewed interpretation is inconsistent with the evenhandedness embodied in the Act.

### III. Vacatur

The Departments argue that the rule should not have been vacated, or at least not vacated as to third parties.

First, it is asserted that the Administrative Procedure Act may not authorize vacatur at all.  *United States v. Texas*, 599 U.S. 670, 693-702,

143 S. Ct. 1964, 1980-85 (2023) (Gorsuch, J., concurring in the judgment). But in this court, the APA "empowers and commands courts to 'set aside' unlawful agency actions," allowing a district court's vacatur to render a challenged agency action "void." *Texas v. Biden*, 20 F.4th 928, 957 (5th Cir. 2021), *rev'd on other grounds*, 597 U.S. 785, 142 S. Ct. 2528 (2022) (quoting 5 U.S.C. § 706). Binding Fifth Circuit precedent recognizes this remedy. *Data Mktg. P'ship*, 45 F.4th at 856 n.2 (holding that *Texas v. Biden* "remains binding" "except for the portions of it on statutory interpretation and final agency action"); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation.").

Next, the Departments contend that even if vacatur is the norm, equitable interests counsel in favor of remand without vacatur because vacatur leaves arbitrators to conduct costlier and less predictable proceedings. But remand without vacatur is available only rarely, when there is "at least a serious possibility" that the deficiency can be corrected on remand and that vacatur would have "disruptive consequences." *Texas v. Biden*, 20 F.4th at 1000 (quoting *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389-90 (5th Cir. 2021), and then quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)). Here, the Departments do not explain how they could correct the Final Rule's conflicts with the Act on remand. Further, as the district court correctly noted, vacatur would not be disruptive; on the contrary, it "preserve[s] the status quo because arbitrators have been—and are presently—deciding payment disputes pursuant to the statute." *Tex. Med. II*, 654 F. Supp. 3d at 594.

In a last-ditch effort, the Departments argue that if any equitable relief is appropriate, it should be granted only with respect to the plaintiffs to this suit. *See United States v. Texas*, 599 U.S. at 703, 143 S. Ct. at 1986

(Gorsuch, J., concurring in the judgment) (instructing courts to "ask[] whether party-specific relief can adequately protect the plaintiff's interests" before entering broader relief). The Plaintiffs, however, aptly point out the inconsistency between this argument and one of the Departments' primary justifications for the Final Rule, which is to promote "uniformity and predictability across arbitrations." This goal, according to the Departments, is critical to Congress's specification that there should be "one" independent dispute resolution process. *Cf. Feds for Med. Freedom v. Biden*, 63 F.4th 366, 388 (5th Cir.) (en banc) (upholding a nationwide preliminary injunction against the federal employee vaccine mandate where more limited relief would "prove unwieldy and would only cause more confusion"), *vacated as moot*, 144 S. Ct. 480 (2023).

In addition to being statutorily permissible, and required in this circuit, universal vacatur is appropriate here, because a party-specific injunction would thwart the uniformity and predictability of the arbitration process.

## CONCLUSION

The district court judgment vacating specific challenged provisions of the Final Rule is AFFIRMED.

KING, *Circuit Judge*, concurring in part and concurring in the judgment:

I concur in Parts I and III of the discussion section of the majority's opinion, which address standing and vacatur. I also concur in Part II.B.2 of the discussion section, as the regulations instructing arbitrators not to consider certain factors appear to conflict with the text of the No Surprises Act ("NSA"). With respect to the remainder of Part II, I agree with the majority's conclusion that the challenged regulations conflict with the NSA, though my reasoning in reaching this conclusion differs slightly from that of the majority.

While I agree that the challenged regulations effectively "place a thumb on the scale" for the qualifying payment amount ("QPA"), I am not quite convinced that the invalidity of these regulations is plainly evident from the text of the NSA alone. It is true, as the majority notes, that generally when Congress requires a decision-maker to consider statutory factors, Congress's failure to assign weight to those factors indicates that the decision-maker is "free to exercise his discretion in this area." *See New York v. Reilly*, 969 F.2d 1147, 1150 (D.C. Cir. 1992). But I find this rule more relevant when considering a plaintiff's challenge to a specific decision reached by a decision-maker vested with such discretion. Here, in contrast, Plaintiffs-Appellees challenge the Departments' authority to supplement a statutory scheme by regulating the process that decision-makers must undertake when reaching a decision.

In addressing this issue, I would avoid implying that when Congress charges a decision-maker with considering several factors and does not assign weight to those factors, regulators are categorically prohibited from implementing supplementary procedural and evidentiary rules. In my view, a better approach is to address each statute on a case-by-case basis, taking into account the statute's context and the grant of rulemaking authority in

each instance. One could imagine a scenario in which Congress mandates that a decision-maker consider several factors, but deliberately grants regulators the authority to implement additional procedural and evidentiary rules that might impact how those factors are to be weighed. Therefore, I am concerned about reaching a broad holding that forecloses potentially permissible regulations that are not before the court.

Turning to the facts of the case at hand, I disagree with the majority's conclusion that the NSA's text unambiguously bars the Departments from issuing regulations that may affect how arbitrators balance the QPA and the additional statutory factors. The NSA explicitly directs the Departments to establish, via regulation, an independent dispute resolution ("IDR") process. 42 U.S.C. § 300gg-111(c)(2)(A). The NSA also mandates that the Departments must enact this regulation "in accordance with the succeeding provisions of this subsection." *Id.* The relevant provision in this case is that which requires the arbitrators to consider the QPA and the additional statutory factors. *Id.* § 300gg-111(c)(5)(C)(i). But the NSA is arguably silent as to any additional procedural or evidentiary rules that the arbitrators must follow during the IDR process. Because the NSA expressly provides that the IDR process will be established via regulation, there appears to be some ambiguity as to whether the ability to regulate the process by which the arbitrators balance the QPA and the other statutory factors falls within the "boundaries of [that] delegated authority." *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024) (internal quotation omitted). As long as the regulations do not prevent the arbitrators from following their statutory duty to consider the QPA and the additional circumstances, such regulations may not necessarily run afoul of the NSA's text.[20]

_____

[20] To be clear, as referenced above, I concur with the majority's discussion in Part II.B.2 and agree that the regulations instructing arbitrators not to consider certain factors

Faced with this statutory ambiguity, to determine whether the Departments validly exercise their regulatory authority by imposing such rules, I would turn to legislative history for guidance. *See United States v. Orellana*, 405 F.3d 360, 365 (5th Cir. 2005). Here, as Plaintiffs-Appellees point out, and as the majority references in a footnote, the legislative history behind the NSA indicates that Congress very deliberately did not intend for the QPA to serve as a "benchmark" in the IDR process. Members of Congress across the political spectrum have insisted that ensuring the NSA would *not* contain a benchmark was a key point of emphasis in the bipartisan bill's passing.[21] While the challenged regulations may not explicitly establish

---

appear to directly conflict with the text of the NSA. However, the regulation requiring arbitrators to consider the QPA first, and the regulation requiring arbitrators to explain any deviation from the QPA, do not appear to unambiguously contravene the NSA's text.

[21] *See, e.g.*, Press Release, Rep. Richard Neal, Neal Opening Statement at Markup of Surprise Medical Billing, Hospice, and Health Care Investment Transparency Legislation (Feb. 12, 2020) (describing Representative Neal's concern with "giving too much weight to such a benchmark rate"); Joint Statement of House Committees on Ways and Means, Energy and Commerce, and Education and Labor, Protecting Patients from Surprise Medical Bills (Dec. 21, 2020) (noting that the NSA will contain "NO benchmarking or rate-setting"); Press Release, Rep. Richard Neal, Neal Opening Statement at Hearing on Implementation of the No Surprises Act (Sept. 19, 2023), https://democrats-waysandmeans.house.gov/media-center/press-releases/neal-opening-statement-hearing-implementation-no-surprises-act ("The IDR process was developed through robust, extensive Congressional consideration in this Committee for nearly two years before the [NSA's] enactment. As written, this law carefully avoids any factor unduly influencing the dispute resolution process."); Letter from Rep. Thomas R. Suozzi et al. to Secretary Xavier Becerra et al. (Nov. 5, 2021), https://wenstrup.house.gov/uploadedfiles /2021.11.05_no_surprises_act_letter.pdf ("During these deliberations, multiple proposals were considered including a benchmark rate, an independent dispute resolution (IDR) process, and a hybrid. Following a comprehensive process that included hearings, markups, and extensive negotiations, Congress rejected a benchmark rate and determined the best path forward for patients was to authorize an open negotiation period coupled with a balanced IDR process.").

the QPA as a benchmark, they do appear to move the needle in that direction, in contravention of Congress's intent behind the NSA.

This court is tasked with "fix[ing] the boundaries of . . . delegated authority" in a manner that "effectuate[s] the will of Congress." *See Loper Bright*, 144 S. Ct. at 2263 (internal quotation omitted). When considering the aforementioned legislative history and context, I ultimately agree with the majority's conclusion that the Departments undermined Congress's intended statutory scheme by issuing regulations that effectively "place a thumb on the scale for the QPA." But because I would reach a narrower holding that considers the NSA's legislative history and context in light of statutory ambiguity, I respectfully concur only in the judgment as to Part II of the discussion section of the majority's opinion—with the exception of Part II.B.2, which I join in full.